UNITED STATES of America,
Plaintiff,

v.

STATE OF MISSISSIPPI et al.,
Defendants.

Civ. A. No. 3312.

United States District Court
S. D. Mississippi,
Jackson Division.

March 6, 1964.

Dissenting Opinion March 23, 1964.

Concurring Opinion April 9, 1964.

Probable Jurisdiction Noted
June 22, 1964.
See 84 S.Ct. 1920.

Robert F. Kennedy, Atty. Gen. of the U. S., Robert E. Hauberg, U. S. Atty., Jackson, Miss., John Doar, Washington, D. C., for the United States.

T. F. Badon, Joe D. Gordon, Liberty, Miss., Joseph Drake, Port Gibson, Miss., Semmes Luckett, Leon Porter, Jr., Chester Curtis, Clarksdale, Miss., Aubrey Bell, Hardy Lott, Greenwood, Miss., J. O. Sams, Jr., William Burgin, Jr., W. H. Jolly, Columbus, Miss., B. D. Statham, Magnolia, Miss., Joe T. Patterson, Atty. Gen. of Mississippi, Dugas Shands, Asst. Atty. Gen. of Mississippi, Charles Clark, Jackson, Miss., for defendants.

Before CAMERON and BROWN, Circuit Judges, and COX, District Judge.

CAMERON, Circuit Judge:

In this action, the "Indestructible Union" member of the partnership which constitutes the government of this country makes a frontal attack upon the other member, the "Indestructible State" of Mississippi, seeking to enjoin the enforcement of certain laws of the State defining the qualifications of the "electors" who shall vote in elections for president and vice president of the United States and members of the Congress. The State of Mississippi and its people have, in the Constitution of 1890 and thereafter, *enacted constitutional and statutory provisions covering the whole field* of choosing of such "electors". The United States seeks to strike down some of these enactments upon the claim that they violate the Fourteenth and Fifteenth Amendments of the Constitution, in that they deny certain rights to Negroes because of their race, color or previous condition of servitude. We hold that, from the face of the pleadings, the effort to strike them down may not succeed.[1]

1. This Court has met on two occasions with counsel for the various parties. On the first meeting we had an extensive pretrial and exploratory hearing during which the large number of lawyers and the Court discussed generally the questions presented and the procedural means by which they could best be approached. There was general discussion about the issues involved, the use of discovery procedures and other matters and tentative orders were entered which, by the action taken here, are rendered inoperable.

After a change in the personnel of the Court, another hearing with counsel was held and full argument was invited in which each litigant urged the procedures he thought desirable. The defendants had filed, prior to their answers, a number of motions attacking the constitutionality of some of the statutes relied upon by the plaintiffs when given the constructions placed on them by the plaintiff; and each defendant had filed a motion to dismiss the claim against it or him, on the ground that the complaint failed to state a claim, that the Court did not have jurisdiction of the subject matter or of some of the parties and had moved that they be heard in advance of any trial on the merits.

Following that argument and after correspondence between the Judges, two additional conferences were had. The plaintiff had answered in large volume the interrogatories propounded to them by certain of the defendants and had taken a number of depositions, but had not completed its discovery procedures. The defendants were claiming the right, if their motions to dismiss were denied, to begin their discoveries and to take the depositions of each of the registrars in the State of Mississippi or of prior registrars. It further appeared that no matters outside the pleadings had been presented to the Court, that no motion for summary judgment under Rule 12(c) had been made or the propriety of it suggested, and that no affidavit or counter affidavits had been filed which complied with the requirements of Rule 12(c) and 52 F.R.Civ.P. It was further found that the interrogatories had been answered and sworn to by various attorneys for the plaintiff and set forth the results of their investigations and were made up of legal or factual conclusions from hearsay evidence or were otherwise inadmissible in evidence.

We concluded that the case could be heard and decided much more expeditiously by considering the complaint and all well-pleaded averments, stripped of legal opinions and conclusions, as factually true and could reach a decision in keeping with accepted legal principles and could do justice to the parties as completely as if the contents of the answers to interrogatories and the depositions should be considered.

The defendants have pressed their motions to dismiss, claiming the right to be

### I.

The United States of America filed a complaint invoking the jurisdiction of this Court under the provisions of 42 U.S.C. § 1971(d),[2] 28 U.S.C. § 1345,[3] and 28 U.S.C. § 2281.[4] The State of Mississippi was joined as a party defendant pursuant to § 601(b) of the Civil Rights Act of 1960.[5] The other defendants are the three members of the Miss. State Board of Election Commissioners, and six county registrars of voters (the regularly elected Circuit Clerks of their respective counties).

The complaint is filed under the authority of 42 U.S.C. § 1971(a)–(c).[6]

heard before trial on the merits on such grounds as failure of the complaint to state a claim, nonjurisdiction of the subject matter or the parties, and like questions. We concluded that this position was sound and in the interest of justice and have therefore disposed of the case on the face of the pleadings, having rejected all of the depositions and interrogatories and the answers thereto (although none of them were ever offered in evidence or presented to the Court).

We think this is not in conflict with such cases as Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80. Compare KVOS, Inc. v. Associated Press, 299 U.S. 269, 278, 57 S.Ct. 197, 81 L.Ed. 183; Battaglia v. General Motors Corp., 2 Cir., 169 F.2d 254, certiorari denied 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425; Flanders v. Coleman, 250 U.S. 223, 39 S.Ct. 472, 63 L.Ed. 948; Rhode Island v. Massachusetts, 12 Pet. 657, 659, 37 U.S. 657, 659, 9 L.Ed. 1233.

2. "1971. Voting rights—Race, color, or previous condition not to affect right to vote * * *

"(d) The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law. [71 Stat. 637, Sept. 9, 1957.]"

3. "§ 1345. United States as plaintiff

"Except as otherwise provided by the Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress. June 25, 1948, c. 646, 62 Stat. 933."

4. "§ 2281. Injunction against enforcement of State statute; three-judge court required

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title. June 25, 1948, c. 646, 62 Stat. 968."

5. "Whenever, in a proceeding instituted under this subsection any official of a State or subdivision thereof is alleged to have committed any act or practice constituting a deprivation of any right or privilege secured by subsection (a) of this section, the act or practice shall also be deemed that of the State and the State may be joined as a party defendant and, if, prior to the institution of such proceeding, such official has resigned or has been relieved of his office and no successor has assumed such office, the proceeding may be instituted against the State." (Now a part of 42 U.S.C. § 1971 (c)).

6. "(a) All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding.

"Intimidation, threats, or coercion

"(b) No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate for the office of President, Vice President, presidential elector, Member of the Senate, or Member of the House of Representatives,

It attacks the validity of the Mississippi Constitution and statutes which govern registration for voting. It contains four claims. In the plaintiff's words, these claims are described as follows:

"The first claim of the Complaint attacks the validity of Section 244 of the Mississippi Constitution, adopted in 1955 and used since that time by registrars throughout Mississippi, which provides as a prerequisite for registrations that persons must read and write and give a reasonable interpretation of any section of the Mississippi Constitution and a statement of the duties and obligations of citizenship to the local county registrar on a form provided by the State Board of Election Commissioners. The Complaint attacks Section 244 and its implementing legislation on the following grounds:

"1. Section 244 vests unlimited discretion in the registrar and in light of its setting of white political supremacy and a racially segregated society it is an unconstitutional device to disfranchise Negroes;

"2. Section 244 imposes new and more stringent requirements for registration following a long period of racial discrimination in the registration process, and exempts from the new requirement most of the white citizens, the inevitable effect of which is to perpetuate past discrimination;

"3. In a State where public educational facilities are and have been racially segregated and those for Negroes are inferior, the interpretation test which bears a direct relation to the quality of public education violates the Fifteenth Amendment;

"4. Section 244 is vague and provides no objective standards for its administration;

"5. There is no reasonable or legitimate interest on the part of the State in requiring as a prerequisite for voting that citizens interpret certain of the legal and hyper-technical provisions of the Mississippi Constitution.

"The second claim of the Complaint attacks Section 241–A of the Mississippi Constitution enacted in 1960 which provides that applicants for registration shall be of good moral character. The Complaint alleges that this constitutional provision is invalid because, since registration is permanent, it exempts most of the white citizens in Mississippi from its requirements. It also provides no objective reference by which the county registrar may determine good moral character and thus is so vague and indefinite as to permit

Delegates or Commissioners from the Territories or possessions, at any general, special, or primary election held solely or in part for the purpose of selecting or electing any such candidate.

"Preventive relief; injunction; costs; State as party defendant

"(c) Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section, the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order. In any proceeding hereunder the United States shall be liable for costs the same as a private person. Whenever, in a proceeding instituted under this subsection any official of a State or subdivision thereof is alleged to have committed any act or practice constituting a deprivation of any right or privilege secured by subsection (a) of this section, the act or practice shall also be deemed that of the State and the State may be joined as a party defendant and, if, prior to the institution of such proceeding, such official has resigned or has been relieved of his office and no successor has assumed such office, the proceeding may be instituted against the State. [74 Stat. 90, May 6, 1960.]"

registrars to arbitrarily reject Negro applicants.

"The third claim attacks the validity of a Mississippi statute enacted in 1960 which permits registrars to destroy registration records. In 1960 Congress enacted Title III of the Civil Rights Act requiring county registrars to retain and preserve the very records which under Mississippi law are permitted to be destroyed.

"The fourth claim in the Complaint attacks a package of legislation adopted by the Mississippi legislature shortly after the Court of Appeals for the Fifth Circuit issued an injunction on April 10, 1962 forbidding the registrar in Forrest County, Mississippi, from engaging in discriminatory practices in registration for voting. This legislative package included House Bills 900, 903, 822, 904 [Laws 1962, cc. 570, 571, 572, 573]. H.B. 900 requires that applicants for registration complete a letter-perfect application form without assistance in order to qualify to register. H.B. 903 prevents registrars from advising applicants for registration as to the reason such applicant was rejected, because such would constitute assistance to the applicant. H.B. 822 and 904 provide for publication of the names of applicants for registration, require an applicant to wait an extended period even before he determines whether he is registered or denied registration, and permit any qualified elector to challenge the qualifications of any applicant whose name is published. This package of legislation is attacked as arbitrary and unreasonable. It exempts from its provisions most of the white citizens because they are presently registered to vote and its unquestioned effect is to impose more burdensome and stringent requirements for registration on persons not registered prior to 1962. The legisla-

tion as with the other laws under attack provides no objective standards for its administration.

"The relief requested by the United States is a declaration of the invalidity of Sections 244 and 241-A of the Mississippi Constitution and the implementing legislation of both provisions, the records destruction legislation, and four bills in the package of legislation enacted in 1962. An injunction vitiating the effects of the invalid Mississippi laws and practices thereunder is requested. [Actually the complaint prays for a mandatory injunction setting up court created state voter registration qualifications for Negroes only and requiring the defendants to use such qualifications in registering Negroes who may apply after the date of such an order.] Plaintiff also requests the court to find that the use of the invalid legislation has deprived Negro citizens of the right to vote on account of their race and that the deprivations have been pursuant to a pattern and practice of racial discrimination. This finding is sought to set in motion 42 U.S.C. 1971(e) of the Civil Rights Act of 1960."

## II.

Each defendant has moved to dismiss the complaint for failure to state a claim on which relief could be granted and the defendant Registrars of voters who are non-residents of this district have moved to dismiss for want of venue jurisdiction; the defendant Registrar of Claiborne County has moved for dismissal or for transfer to the division having venue jurisdiction of her county. Each defendant Registrar has also moved for a severance and separate trial. No supporting or counter affidavits were or have been filed. Answers have been filed by all defendants.

## III.

It is elementary that in ruling on the motions to dismiss, the Court

must treat them substantially as demurrers testing the legal sufficiency of the complaint. The Court must assume all of the complaint's well-pleaded facts, as distinguished from conclusions, deductions and averments of law, as established for the purpose of the motion.[7] Neither the answers of the defendants nor any part of the discovery procedures should be considered.[8]

## IV.

The Complaint further alleges the following as facts: All registrars of voters in the State of Mississippi since at least 1892 have been white citizens. In the counties of the defendant registrars, the statistics on voting age population of Negro and white persons and the approximate voter registration of each race are as follows:

| | WHITE | | NEGRO | |
| | Voting Age Population | Registration | Voting Age Population | Registration |
|---|---|---|---|---|
| Amite | 4449 | 3295 | 2560 | 1 |
| Coahoma | 8708 | 8376 | 14604 | 1371 |
| Claiborne | 1688 | 1440 | 3969 | 138 |
| Lowndes | 16460 | 5869 | 8362 | 63 |
| LeFlore | 10274 | 9803 | 13567 | 258 |
| Pike | 12163 | 9989 | 6936 | 124 |

At the time of the adoption of the Mississippi Constitution of 1890 there were substantially more Negroes than whites in Mississippi. By 1899, approximately 122,000 or 82% of the white males of voting age and 18,000 or 9% of the Negro males of voting age were registered to vote in Mississippi. Since 1899, a substantial majority of white persons reaching voting age in Mississippi have become registered voters. The percentage of Negroes registered to vote has declined.

During the period from 1899 to approximately 1952 Negroes were not allowed to register to vote; literate Negroes were required to interpret sections of the Mississippi Constitution; and Negroes were excluded from Democratic primary elections. During this time, victory in the Democratic primary in Mississippi was tantamount to election. By 1951, a much higher percentage of the Negroes of voting age in Mississippi were literate than in 1890.

In 1952, a proposed amendment to Section 244 of the Constitution, providing that in the future, it would be prerequisite to becoming an elector that a person be able to read and write any section of

7. Collins v. Hardyman, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253; Halliburton Co. v. Norton Drilling Co., 5 Cir., 302 F.2d 431. Modern practice treats such motions as performing every office of the former demurrer, but as unhampered by any of its technical rules. The Complaint must be viewed in a light most favorable to the plaintiff.

8. "Plaintiffs did not submit the case to be decided upon the merits upon the bill, answers and affidavits. Defendants' motion to dismiss, like the demurrer for which it is a substitute (Equity Rule 29, 28 U.S.C.A. following section 723) was addressed to the sufficiency of the allega-

tions of the bill. For the purpose of that motion, the facts set forth in the bill stood admitted. For the purpose of that motion, the court was confined to the bill and was not at liberty to consider the affidavits or the other evidence produced upon the application for an interlocutory injunction." Polk Co. v. Glover, 305 U.S. 5, 59 S.Ct. 15, 83 L.Ed. 6; as to the rejection of conclusionary allegations of fact and law, see Newport News Shipbuilding & Dry Dock Co. v. Schauffler, 303 U.S. 54, 58 S.Ct. 466, 82 L.Ed. 646, and Snowden v. Hughes, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497; Gibbs v. Buck, 307 U.S. 66, 59 S.Ct. 725, 83 L.Ed. 1111.

the Mississippi Constitution and demonstrate a reasonable understanding of such section and the duties and obligations of citizenship, was defeated by the voters.

In 1954, at least 450,000 or 63 per cent of the white persons of voting age in Mississippi were registered to vote. In 1954, approximately 22,000 or five per cent of the Negroes of voting age in Mississippi were registered to vote.

In 1954, after the Supreme Court had declared state operation of racially segregated schools unconstitutional, white citizens councils—not parties to this action—were formed in Mississippi. The purpose of these organizations was the maintenance of racial segregation and white supremacy in Mississippi. The first statewide project undertaken by these organizations was the attempt to induce the white voters of Mississippi to adopt the proposed amendment to Section 244 of the Mississippi Constitution of 1890.

Of the approximately 472,000 registered voters in Mississippi who were eligible to vote on this proposed amendment in 1954, about ninety-five per cent were white; fewer than five per cent were Negro. The amendment was adopted in a state where the public education facilities were and are racially segregated, and where such facilities provided for Negroes were and are inferior to those provided for white persons.

Since 1955, the defendant registrars, as well as many other registrars in Mississippi have enforced the requirements of Section 244, as amended, when Negroes have attempted to register to vote, by requiring Negroes to interpret sections of the Mississippi Constitution and to demonstrate their understanding of the duties and obligations of citizenship on the form prescribed by the State Board of Election Commissioners.

In 1960, approximately 500,000 or 67 per cent of the white persons of voting age in Mississippi, and approximately 20,000 to 25,000, or five per cent of the Negroes of voting age were registered to vote.

Of the approximately 525,000 registered voters in Mississippi who were eligible to vote on the proposed amendment adding Section 241–A to the Mississippi Constitution, about 95 per cent were white; fewer than 5 per cent were Negro. The amendment was adopted in a state where all state officials were white.

The suits filed by the United States against several county voter registrars and the action taken by the Court of Appeals in issuing an injunction against T. C. Lynd, the Circuit Clerk and Registrar of Forrest County, Mississippi, concerning voter registration discrimination, were matters of common knowledge throughout the State of Mississippi.

Some registration application forms, including some forms received by defendant H. K. Whittington in Amite County, Mississippi, have been destroyed.

In late 1961 and early 1962, Negro citizens and organizations conducted a voter registration drive in Mississippi for the purpose of increasing the number of Negroes eligible to vote in the 1962 Mississippi primary elections. For the first time in many years Negroes were candidates for the office of representative in the Congress of the United States. These facts were widely publicized and were matters of common knowledge throughout Mississippi.

### V.

■ In support of its motion to dismiss, the State of Mississippi contends that Section 601(b) of the Civil Rights Act[9] is unconstitutional as applied to it. Its position is that the Fifteenth Amendment forms the only basis for 42 U.S.C. § 1971,[10] and that this amendment is directed to persons through whom a state may act and not to the sovereign entity of the state itself. The State of Mississippi also contends that all legislation by

---

9. See Note 5.

10. See United States v. Raines, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524.

which Congress may choose to implement the Fourteenth Amendment is subject to the same objection. It supports these contentions by citation of numerous authorities.[11] These contentions appear to us to present a substantial constitutional claim. Cf. Gibbs v. Buck, Note 8, supra.

In Ex parte Virginia,[12] the Supreme Court of the United States used the following language:

"They [the proscriptions of the 14th Amendment] have reference to actions of the political body denominated a State, by whatever instruments or in whatever modes that action may be taken. A State acts by its legislative, its executive or its judicial authorities. It can act in no other way. * * * Whoever, by virtue of public position under a State government, deprives another of property, life, or liberty, without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State. * * *

"But the constitutional amendment was ordained for a purpose. It was to secure equal rights to all persons, and, to insure to all persons the enjoyment of such rights, power was given to Congress to enforce its provisions by appropriate legislation. *Such legislation must act upon persons, not upon the abstract thing denominated a State, but upon the persons who are the agents of the State in the denial of the rights which were intended to be secured.*" [Emphasis added.]

This reasoning from Ex parte Virginia has been recently approved in Cooper v. Aaron;[13] and in United States v. Raines,[14] as to the Fifteenth Amendment. In the case of Poindexter v. Greenhow,[15] the Supreme Court said:

"In the discussion of such questions, the distinction between the government of a state and the state itself is important, and should be observed. In common speech and common apprehension they are usually regarded as identical; and as ordinarily the acts of the government are the acts of the state, because within the limits of its delegation of power, the government of the state is generally confounded with the state itself, and often the former is meant when the latter is mentioned. *The state itself is an ideal person, intangible, invisible, and immutable. The government is an agent, and, within the sphere of the agency, a perfect representative; but outside of that, it is a lawless usurpation.* The constitution of the state is the limit of the authority of its government, and both government and state are subject to the supremacy of the constitution of the United States, and of the laws made in pursuance thereof. So that, while it is true in respect to the government of a state, as was said in Langford v. U. S., 101 U.S. 341 (Bk. 25 L.Ed. 1010), that the maxim, that "the king can do no wrong" has no place in our system of government; yet it is also true, in respect to the state itself, that whatever wrong is attempted in its name is imputable to its govern-

11. E.g., the United States Supreme Court cases of: M'Culloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579; Osborn v. Bank of United States, 9 Wheat. 738, 6 L.Ed. 204; Texas v. White, 7 Wall. 700, 19 L.Ed. 227; Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676; Poindexter v. Greenhow, 114 U.S. 270, 5 S.Ct. 903, 29 L.Ed. 185; and Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714; and a number of opinions from the United

States Court of Appeals for the Fifth Circuit, the most recent of which is St. Helena Parish School Board v. Hall, 287 F.2d 376.

12. Note 11, supra.

13. 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5.

14. Note 10, supra.

15. Note 11, supra.

ment, and not to the state, for, as it can speak and act only by law, whatever it does say and do must be lawful. *That which, therefore, is unlawful because made so by the supreme law, the constitution of the United States, is not the word or deed of the state, but is the mere wrong and trespass of those individual persons who falsely speak and act in its name.* It was upon the ground of this important distinction that this court proceeded in the case of Texas v. White, 7 Wall. 700 (74 U.S., bk. 19 L.Ed. 227), when it adjudged that the acts of secession, which constituted the civil war of 1861, were the unlawful acts of usurping state governments and not the acts of the states themselves, inasmuch as 'the constitution, in all its provisions, looks to an indestructible Union, composed of indestructible states;' and that, consequently, the war itself was not a war between the states, nor a war of the United States against states, but a war of the United States against unlawful and usurping governments, representing not the states, but a rebellion against the United States."

In Ex parte Young,[16] the court was explicit in holding that the proper defendant in an action seeking to prevent the enforcement of an unconstitutional statute was not the sovereign state itself, but rather the officer charged with the enforcement of the statute.[17]

Although the cases relied on principally relate to instances in which the Eleventh Amendment was invoked as a bar to the action brought, the State of Mississippi contends that it does not rely on the Eleventh Amendment here. It rather asserts that the legal reasoning which allows individuals to pursue alleged violations of Fourteenth and Fifteenth Amendment rights caused by "State Action," despite the provisions of the Eleventh Amendment, is equally applicable to demonstrate the non-liability of the State in the present suit.

In the latest and only comment on the subject, the Supreme Court of the United States expressly pretermitted any decision on the constitutionality of Section 601(b) in its per curiam opinion in United States v. Alabama.[18] The Court of Appeals for the Fifth Circuit has taken the same attitude in a direct comment on the same question in United States v. Atkins,[19] in which the Court stated:

"In that case [United States v. Alabama], the Supreme Court intimated no views upon 'any defenses, constitutional or otherwise, that may be asserted by the State.' We follow the same course in the present case."

Obviously these tribunals consider the question still an open and undecided one.

The plaintiff contends that Section 601(b) authorizes its suit against the State and cites in support thereof the Atkins case and the prior Fifth Circuit decisions of United States v. Lynd,[20] and United States v. Dogan.[21]

Since it is clear from United States v. Alabama, Note 18, supra, and United States v. Atkins, Note 19, supra, that neither the Supreme Court nor the Court of the Fifth Circuit considers that the constitutionality of § 601(b) has been passed upon and that both courts consider the question open, it is desirable to pause here to demonstrate that neither Lynd nor Dogan passed upon the constitutionality of the statute in any legal way.

The hasty and confused handling of the two Lynd cases by the Court of Ap-

---

16. Note 11, supra.

17. See also Peay v. Cox, 5 Cir., 190 F.2d 123, 125, certiorari denied, 342 U.S. 896, 72 S.Ct. 230, 96 L.Ed. 671, a voting case which came up from Mississippi.

18. 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed.2d 982.

19. 323 F.2d 733.

20. 301 F.2d 818.

21. 314 F.2d 767.

peals for the Fifth Circuit leaves "the whole voyage of their life bound in shallows and in miseries." Perhaps an effort at unscrambling them may be measurably fruitful.

The first case commenced against Lynd —but the second case decided—was brought under Title III, Civil Rights Act, 1960, 42 U.S.C. § 1974d, and involved an effort by Kennedy to examine and copy his records.[22]

This case, No. 1604, in some way found its way to the Court of Appeals and was decided by a panel composed of Judges Rives, Brown and Wisdom, the opinion by Judge Brown. See Kennedy v. Lynd, 306 F.2d 222. The opinion covered several other cases from the State of Louisiana and is specifically dealt with beginning at page 227 under the heading "No. 19636, Lynd, Registrar Forrest County, Mississippi." It was there that the dictum was first expressed that "Relief under § 1971(c) is not confined to named individual voter officials but extends as far as the sovereign State itself." The opinion purports to lay down a broad sweep of general rules governing the right of the United States to examine and copy records.

It is plain that the above quoted statement from page 228 of the Report is wholly without basis. Neither the United States nor the State of Mississippi was a party to that civil action. The appeal was from the action of the court below in passing the case to the files—certainly a non-appealable action which could be set aside by either party at any time upon a showing that the reason for putting the case on the inactive list was no longer in existence. The decision is bottomed by the author on United States v. Wood, 5 Cir., 1961, 295 F.2d 772, 777. An examination of that

report will reveal that it did not involve any of the questions presented by Kennedy v. Lynd, and the statement that the sovereign State was within the ambit of the relief accorded by the statutes is without legal basis.

The second case commenced against Lynd—but the first decided—was brought pursuant to 42 U.S.C. § 1971(c) and involved a discrimination suit by the United States against Lynd and the State of Mississippi.[23] In that case, no mention was made anywhere in the pleadings, the brief of either counsel, or the opinion of the Court of Appeals of the question of the constitutionality of § 601 (b) of the Civil Rights Act of 1960.

This case had never been decided by the District Court. The State of Mississippi was joined as a party defendant, as permitted by the explicit terms of the Act. The only time we find the State mentioned in the opinion by the Court of Appeals is at page 823 of 301 F.2d, where it rejected the contention that the Court of Appeals should not grant a temporary injunction "because the State has not filed its answer and has not put on its proof."

The trial court had ordered the United States to furnish the names of all persons whom it intended to use as witnesses to show discrimination. The Government responded by filing an amended complaint, to which it attached an appendix giving the names of its witnesses. A number of witnesses were called whose names did not appear on the list, and the defendants objected to the testimony as being outside the scope of the pleadings. The District Court permitted the United States to amend orally the amended complaint, with the condition, however, that defendants could defer cross-examination of the surprise witnesses for a period of

22. Civil Action No. 1604, Hattiesburg Division, Southern District of Mississippi, commenced January 19, 1961, decided by the District Court January 15, 1962, which court entered an order adjudicating that "Case No. 1604 [is] abandoned and effectually non-existent," and the case was passed to the files. The reason assigned was that the United States had brought a second suit involving the same subject matter.

23. Number 19576, United States v. Lynd, et al., begun July 6, 1961 and decided by the Court of Appeals April 10, 1962, 301 F.2d 818.

thirty days and could then answer the amended complaint.

The United States rested its case, but the defendants duly reserved their right at a later time to put on their testimony. At the conclusion of the three-day hearing, the District Court ruled, upon application of the defendants, that all questions before it, including motion for preliminary injunction, would be deferred until after the thirty-day period, so that the defendants could prepare to cross-examine the witnesses whose names had been omitted from the list.

The District Court did not enter any order at all, and did not make any findings of fact or conclusions of law, and no notice of appeal was given, as provided by the Federal Rules of Civil Procedure. The United States adopted the expedient of going direct to the Court of Appeals for the Fifth Circuit, there filing a motion for an injunction pending appeal. The case was heard at an emergency hearing in Houston, Texas.

Neither in the District Court nor in the Court of Appeals was the question of the suability of the State of Mississippi mentioned in the briefs and, as stated, the opinion of the Court of Appeals did not mention the existence of such a question. The sole specification of error relied upon by the United States alleged that the District Court erred in not granting the temporary injunction prayed for.[24]

It is clear, therefore, that the question of the constitutionality or meaning of § 601(b) never became an issue in either Lynd case and was never passed upon by the court in either case. Whatever language the Court of Appeals used in either Lynd case, therefore, was pure dictum and established no precedent to guide the action of any court.

Nevertheless, the language misled the author of the opinion in the Dogan case,[25] and led to the quoting in Dogan of the statement which had been incorrectly made in Kennedy v. Lynd quoted supra.

The District Court for the Northern District of Mississippi [26] had denied the motion of the United States for a preliminary injunction against Dogan, Sheriff and Tax Collector, in connection with his alleged refusal to permit Negroes to pay their poll taxes. The State of Mississippi was named as party defendant, but the lower court had denied any relief against either Dogan or the State. We find no mention in the opinion of Honorable Claude F. Clayton, District Judge,[27] of the question whether any relief should be granted against the State of Mississippi. In the original record, however, among the various discussions of evidence between the court and counsel on one or more occasions, that question was adverted to. It is natural that the discussion did not relate to the suability of the state, because nobody made any attack upon the statutory grant of jurisdiction to sue the states. Some objections to testimony were made and the Government contended that the evidence was admissible to show the state's connection with Dogan's actions. Ruling was reserved on the objections, and the Court was never called upon to make its ruling, and did not ever rule on the question.

When the case reached the Court of Appeals, the two specifications of error filed by the United States were these:

"(1) The District Court erred in refusing to find that distinctions on account of race or color have been made in the collection of poll taxes in Tallahatchie County;

---

24. "The District Court erred in refusing to grant the Attorney General's application for an order, pursuant to § 305 of Title III of the Civil Rights Act of 1960 (42 U.S.C. § 1974(d), 74 Stat. 88), requiring the registrar of elections of Forrest County, Mississippi to permit the

Attorney General to inspect the voting records of that county."

25. 314 F.2d at 771.

26. 206 F.Supp. 446.

27. 206 F.Supp. 446.

"(2) The District Court erred in excluding evidence of racially discriminatory acts occurring prior to the incumbency of Sheriff Everett R. Dogan on December 24, 1959."

No issue was raised before the Court of Appeals, therefore, as to whether relief "extends as far as the sovereign State itself." It is clear, therefore, that the language used by the Court of Appeals in the Dogan case (314 F.2d page 771) is dictum and is not authority in any case involving a question similar to the one before us. In fact, Judge Rives, who is the author of Atkins, supra,[28] sat as a member of the Court in the second Lynd case and in the Dogan case.[29] And see also the majority and dissenting opinion of that court in United States v. Ramsey, 5 Cir., 331 F.2d 824.

The State of Mississippi further makes the point that any violation of 42 U.S.C. § 1971, which would give rise to a cause of action, would constitute a crime under the provisions of 18 U.S.C. § 242. This would then amount to an interpretation of the statute which would authorize a suit between the sovereign federal government and the sovereign state in a criminal matter. As between sovereigns there is no law of crime. It additionally makes the point that the State cannot create an agency to commit a crime, and therefore no statute by fiat can create such a criminal agency relationship.

The State also contends that the special statutes under which this three-judge Court is convoked (28 U.S.C. § 2281–2284) specifically authorize an injunction only "restraining the action of any *officer* of such State in the enforcement or execution" of the statutes charged to be unconstitutional.

In Federal Trade Commission v. Claire Furnace Co.,[30] the Supreme Court ruled that no injunction should issue against a party whose only connection with the proceedings was that it could have requested others to take enforcement action, since all defenses available to the party aggrieved could have been presented in the proceeding wherein enforcement was attempted. In the three-judge district court case of Massachusetts Farmers Defense Committee v. United States,[31] the court relied upon the Claire Furnace Company case and other authorities to support the statement:

"It is well settled that where a statute or regulation is challenged as being unlawful or unconstitutional, an injunction will lie only against the person or agency who is charged with the enforcement of the statute or regulation."

In Kresge Co. v. Ottinger, D.C., 29 F.2d 762, a special three-judge court, speaking through an opinion by Circuit Judge A. N. Hand, took similar action, as evidenced by the following excerpt from their opinion:

"Inasmuch as the district attorney of New York county and the board of optometry are nowhere in the statute charged with the enforcement of the act, each bill is dismissed as to them for this reason, as well as for other reasons hereafter stated."

The Federal Court System has always adhered to the rule that constitutional issues are not to be decided except where such constitutional decision is clearly required by the interests of justice. Perhaps the landmark case in support of this proposition is Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688. Speaking through Chief Justice Hughes, the Court stated [p. 324 of 297 U.S., p. 472 of 56 S.Ct. 80 L.Ed. 688]:

---

28. 323 F.2d 733.

29. The recent three-judge district court, in the case of United States v. Louisiana, (District Louisiana, Baton Rouge Division, 225 F.Supp. 353) was apparently led into the same error in its holding that the State may be joined as a party defendant in a proceeding under 42 U.S.C.A. § 1971. It refers to Lynd and Dogan as authority.

30. 274 U.S. 160, 47 S.Ct. 553, 71 L.Ed. 978.

31. 26 F.Supp. 941.

"The pronouncements, policies, and program of the Tennessee Valley Authority and its directors, their motives and desires, did not give rise to a justiciable controversy save as they had fruition in action of a definite and concrete character constituting an actual or threatened interference with the rights of the persons complaining. The judicial power does not extend to the determination of abstract questions. * * * At the last term the court held, in dismissing the bill of the United States against the state of West Virginia, that general allegations that the state challenged the claim of the United States that the rivers in question were navigable, and asserted a right superior to that of the United States to license their use for power production, raised an issue 'too vague and ill-defined to admit of judicial determination.' * * * Claims based merely upon 'assumed potential invasions' of rights are not enough to warrant judicial intervention." [Citations in the original opinion are omitted for brevity.]

The concurring opinion of Mr. Justice Brandeis gives us an outline of the great judicial principles applicable to constitutional adjudications: [Pp. 345–348 of 297 U.S., p. 482 of 56 S.Ct., 80 L.Ed. 688]:

"The Court has frequently called attention to the 'great gravity and delicacy' of its function in passing upon the validity of an act of Congress; and has restricted exercise of this function by rigid insistence that the jurisdiction of federal courts is limited to actual cases and controversies; and that they have no power to give advisory opinions. On this ground it has in recent years ordered the dismissal of several suits challenging the constitutionality of important acts of Congress. * *

"The Court developed, for its own governance in the cases confessedly within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision. They are:

"1. The Court will not pass upon the constitutionality of legislation in a friendly, nonadversary, proceeding, declining because to decide such questions 'is legitimate only in the last resort, and as a necessity in the determination of real, earnest, and vital controversy between individuals. It never was the thought that, by means of a friendly suit, a party beaten in the legislature could transfer to the courts an inquiry as to the constitutionality of the legislative act.' * * *

"2. The Court will not 'anticipate a question of constitutional law in advance of the necessity of deciding it.' * * * 'It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.' * * *

"3. The Court will not 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' * * *

"4. The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of. This rule has found most varied application. Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter. * * *

"5. The Court will not pass upon the validity of a statute upon complaint of one who fails to show that he is injured by its operation. * * Among the many applications of this rule, none is more striking than the denial of the right of challenge to one who lacks a personal or property right. Thus, the challenge by a public official interested only in the per-

formance of his official duty will not be entertained. \* \* \*

"6. The Court will not pass upon the constitutionality of a statute at the instance of one who has availed himself of its benefits. \* \* \*

"7. 'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' " [32]

■ We are of the view that the motion to dismiss filed by the State of Mississippi presents a case where the Court can and should avoid a decision on a question of constitutionality where, as here, the matter may be decided on non-constitutional grounds. As the Fifth Circuit pointed out in United States v. Atkins, supra, it would not be appropriate for it to grant relief against the State where Registrars are in office and are subject to suit and injunctive relief. Nowhere does the Complaint, except by injecting rash conclusions, demonstrate that the State, as such, is enforcing or threatening to enforce the statutes or constitutional provisions under attack. Rather, it is the County Registrars who are defendants who enforce the regulations in question.[33]

Before leaving the question of the suability of the State, it is well to consider the circumstances under which the statute granting the right to sue the State came into being. The United States of America sued the State of Alabama, together with certain registrars who had resigned from the position before the suit was filed. The United States District Court for the Middle District of Alabama dismissed the action holding, among other things, that the sovereign State of Alabama was not sub-

ject to suit by the United States in the action involving alleged discrimination in the denial to Negroes of voting rights. United States of America v. State of Alabama et al., March 6, 1959, 171 F. Supp. 720, 730. It relied on the fact that the Civil Rights Act of 1957 did not specifically grant the right to proceed against the State. The court there followed the general law as stated in United States v. United Mine Workers of America, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884, in which it was held that sovereign governments were not included within the word "Persons."

The Court of Appeals for the Fifth Circuit affirmed the decision of the district court, United States of America v. State of Alabama, June 16, 1959, 267 F. 2d 808, stating:

"Without elaborating upon it, as under the settled law of the cases we could do in extenso, it is sufficient for us to simply say that, under the principle which has been, and still is, controlling upon the federal courts, whatever congress might or could do in providing in a civil rights action for conferring federal court jurisdiction over a state, it has never heretofore done so and it has not in terms done so in the statute invoked here.

"Absent such specific conferring of jurisdiction, a federal court would not, indeed could not assume jurisdiction over a sovereign state without a precedent determination that, though the jurisdiction had not been expressly conferred, the language of the invoked statute carried the necessary, the unavoidable implication that the congress upon the gravest considerations and after the utmost thought and deliberation had intended to and did confer it." (Citing a large number of cases.)

While this action was pending in the Supreme Court upon certiorari, the Con-

32. (Again, citations have been omitted for the sake of brevity.) See also Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281.

33. See Note 36 infra.

gress inserted the words making the state itself conditionally liable under the Civil Rights Act (Act of May 6, 1960, 74 Stat. 86, § 601(b), 42 U.S.C. § 1971 (c)). The Supreme Court, on May 16, 1960, vacated the judgments of the Court of Appeals and the District Court and remanded to the District Court for further hearing, United States v. Alabama, 362 U.S. 602, 604, 80 S.Ct. 924, 4 L.Ed.2d 982, using this language:

"Shortly before the case was heard in this Court on May 2, 1960 [being the same day the case was argued before the Supreme Court], Congress passed the Civil Rights Act of 1960. * * * Among other things § 601(b) of that Act amends 42 U.S.C. § 1971(c) by expressly authorizing actions such as this to be brought against a State. Under familiar principles, the case must be decided on the basis of law now controlling, and the provisions of § 601 (b) are applicable to this litigation. * * *

"We hold that by virtue of the provisions of that section the District Court has jurisdiction to entertain this action against the State. In so holding we do not reach, or intimate any view upon, any of the issues decided below, the merits of the controversy, or any defenses, constitutional or otherwise, that may be asserted by the State.

"Accordingly, the judgments of the Court of Appeals and the District Court will be vacated, and the case remanded to the District Court for the Middle District of Alabama with instructions to reinstate the action as to the State of Alabama, and for further proceedings consistent with this opinion."

From these facts it is clear that the statute was passed for a particular purpose, i. e., to fill a vacuum caused by the fact that there were no registrars having jurisdiction over Macon County, Alabama. Under settled principles of constitutional law, this departure from traditional constitutional principles would be held to apply only to the circumstances and conditions which lay behind the Court's holding. We do not have such a situation here. The registrars are all available and full relief can be had against them, and the dismissal of the State from the controversy will in no wise prejudice the granting of the relief sought.

For the reasons stated we think that the proper course here is to grant the motion of the State to dismiss on the ground that the complaint fails to state a claim against it upon which relief could be granted.

## VI.

■ The State Board of Election Commissioners is, by statute composed of the Governor, the Secretary of State, and the Attorney General of the State of Mississippi. § 3204, Mississippi Code of 1942, Annotated. The duties of these Commissioners are comprehensively prescribed and particularized by statute. § 3209.6 Mississippi Code of 1942, Annotated. We have examined the Complaint in detail without finding any fact allegation that these Commissioner Defendants did in any way enforce any of the statutes under attack, nor is any fact allegation made that their actions enforced a denial of registration to any otherwise qualified applicant because of the race or color of the applicant or for any other reason.

No choice is given to the State Election Commission in the selection of County Registrars, that duty arising only in the extreme situation where they have reached the determination that the duly elected Circuit Clerk is an "improper" person. They have no control over the tenure or actions of the Circuit Clerk as Registrar once they have appointed him as required. They are rigidly regulated as to the type of registration forms they must prepare. The statutes make it plain that they are mere conduits through whom a minor part of the registration process is required by statute to flow. The State Election Commissioners are

not charged in the Complaint with promulgating any form or with appointing any Registrar otherwise than in accordance with their duties under the statutes relied upon by plaintiff. These statutes are not under attack in this case. Considering the Complaint and any set of circumstances which could be proved under its allegations, we cannot visualize how an injunction could issue against the State Board of Election Commissioners or any of its members individually, for they are not charged with enforcing or threatening to enforce any of the statutes under attack.[34] The presence of the State Election Commissioners as parties-defendant in this litigation nevertheless presents the rights of three additional defendants which must be recognized by way of pleadings, discovery procedures, objections to evidence, cross-examination of witnesses, presentation of evidence, and the many other trial procedures which, while time-consuming, are the due of every litigant under our system of judicial procedure.

 Three-judge courts constitute a unique burden on the Federal Judiciary. To keep this burden to a minimum, the statutes vesting the right to call such courts to sit in judgment of constitutional challenges are to be strictly construed as a procedural technicality and not as a broad remedial social policy. See Phillips v. United States, 312 U.S. 246, 61 S. Ct. 480, 85 L.Ed. 800; Stainback v. Mo Hock Ke Lok Po, 336 U.S. 368, 69 S.Ct. 606, 93 L.Ed. 741; and Kesler v. Dept. of Public Safety, 369 U.S. 153, 82 S.Ct. 807, 7 L.Ed.2d 641.

 Where, as here, parties are brought before such a tribunal who are not at all within the contemplation of the statutes attacked and who are not indispensable, necessary or proper parties to the determination of the issues in controversy, they should be dismissed in the interests of sound judicial administration as well as to spare the litigants themselves the expense and inconvenience of a trial procedure. For these additional reasons, the motion of the State Election Commissioners to dismiss for failure to state any claim upon which relief could be granted should be sustained.[35]

## VII.

 We are further of the opinion that the statutes of Mississippi make it plain that the County Registrar alone is charged with the enforcement of the statutes under attack here.[36]

Complainant makes no charge of any conspiracy or any concert of action between any two or more of the individual county registrar defendants.[37] By plain-

---

34. See Federal Trade Commission v. Claire Furnace Co., supra; Massachusetts Farmers Defense Committee v. United States, supra; and Kresge Co. v. Ottinger, supra.

35. What is here stated with regard to the State Election Commissioners would apply with equal force to the defendant, State of Mississippi, so long as the actual enforcement officials, the County Registrars, remained in office and subject to suit.

36. Mississippi Code of 1942, Annotated, § 3212, entitled "Registrar to register voters," states:
"The registrar shall register on the registration books of the election district of the residence of such person any one appearing before him, and being, upon examination, found, in compliance with Section 244 of the Constitution, as amended, and in compliance with Section 241-A of the Constitution of Mississippi to be entitled to be registered as an elector, upon such person taking and subscribing the oath required by Section 242 of the Constitution of Mississippi; but persons who may be entitled to register under the provisions of Section 251 of the Constitution of Mississippi, who would be otherwise disqualified by reason of age, may take the oath as modified by that circumstance, and the subscription of the oath shall be by the elector writing his name in the proper column in the registration book."

37. Registration to vote is an individual process of showing qualification or lack of qualification on a case by case basis. It cannot be the subject of class action relief. Reddix v. Lucky, 5 Cir., 252 F. 2d 930.

tiff's own interpretation, the Complaint charges no series of transactions or occurrences but, rather, individual enforcement by the separate Registrar Defendants of the statutes alleged to be unconstitutional and void. We cannot agree with plaintiff's contention that, if several unrelated officials of a State independently applied the terms of a statute in the enforcement of their duties of office, all of such applications would constitute a single transaction or occurrence, or a series of transactions or occurrences within the meaning of Rule 20(a) of the Federal Rules of Civil Procedure.

In the absence of a charge of joint wrong-doing by the individual defendant registrars, we find no authority to continue the suit against them as a joint cause of action. Each act of registration or failure or refusal to register must, of necessity, take place separately and apart from every other act of registration or non-registration, even within the same county. The Complaint contains no allegation that any such act of registration or failure or refusal to register was a part of any transaction or occurrence concerned with similar acts in a separate county. The only nexus is the use of the same registration laws. This is insufficient to support a joint cause of action.

## VIII.

If the plaintiff intended by its Complaint to state also a cause of action based upon a pattern and practice of individual racial discrimination by these defendants in the enforcement of the duties of their offices, such causes of action would be justiciable solely before a single district judge.

■ This Court has venue jurisdiction of the claims asserted against H. K. Whittington, the Registrar of Amite County, and against Wendell R. Holmes, the Registrar of Pike County, both of

these defendants being residents of the Jackson Division of the Southern District. We do not agree with plaintiff's effort to consolidate the various counties with the idea that the acts of the several registrars may be pooled in determining whether there has been a pattern or practice under the terms of the statute. Those very terms recognize that each county in Mississippi is a separate unit for registration and must be so treated in every action against the registrar.

## IX.

The asserted right of plaintiff that the United States can maintain this action against any one or all of the defendants is not sustained by the authorities upon which the plaintiff relies.[38]

§ 2281 deals with three-judge courts, and we need spend no time in further discussion of that statute. The controversy is limited, therefore, to whether the Congress could vest in the plaintiff the right claimed by it to maintain this particular action and whether § 1971 does, in fact, justify maintenance by the plaintiff of the action it has brought. It should be borne in mind what is fairly stated in the complaint and the briefs of the plaintiffs and what its attorney categorically stated at the argument— that the sole object of this action is to have the Court declare the attacked sections of Mississippi's Constitution and statutes unconstitutional, and to substitute therefor the alternative suggestions set forth in the complaint; the plaintiff specifically disavowing any desire or purpose to seek any relief based upon discrimination. This is further verified by the four claims stated supra in plaintiff's own language.

■ It is elementary that all federal jurisdiction is statutory unless the Constitution itself confers it. And the existence of federal jurisdiction must be

---

38. The complaint states that the Court has jurisdiction "under 42 U.S.C. § 1971 (d), 28 U.S.C. § 1345, and 28 U.S.C. § 2281." Neither party makes any serious argument concerning § 1345, which vests district courts with jurisdiction of all

civil actions "commenced by the United States, or by any agency or officer thereof *expressly authorized to sue by Act of Congress.*" The controversy revolves around the words in the statute which we have italicized.

shown clearly, and it must be denied if there is doubt about the constitutionality of the grant of jurisdiction. In Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495, the court was able to save what would otherwise have been an unconstitutional grant by surrounding the jurisdiction by narrow limitations.

 The only claim asserted by plaintiffs which has any show of merit is that this action is maintainable under 42 U.S.C. § 1971(d), which has been quoted supra. That subsection must be considered in the light of the one immediately preceding it: "Whenever, in a proceeding instituted under this subsection any official of a State or subdivision thereof is alleged to have committed any act or practice constituting a deprivation of any right or privilege secured by subsection (a) of this section * * *." The provision of subsection (a) to which reference is made is in these words: "(a) All citizens of the United States *who are otherwise qualified by law to vote in any election by the people in any State,* Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color," notwithstanding the Constitution, laws, custom or usages of the state.

These words from subsection (a) plainly state that the United States may intervene in aid of any person of color, *provided that person is "otherwise qualified by law* to vote at any election by the people in any state * * *" (Emphasis added.) The meaning of these provisions seems perfectly clear. The United States may institute proceedings for preventive relief, provided a state officer is threatening or attempting to deny him the right of voting in a federal election; and provided also he had "the qualifications requisite for electors of the most numerous branch of the state legislature." *Then, and only then, could the United States come to the rescue* of one of its citizens whose right to vote was challenged. In that event, the Attorney General was empowered to bring an action for preventive relief.

The complaint here fails to show that those circumstances existed. This action seeks no relief for any citizen who is qualified under the laws of Mississippi to vote for electors of the most numerous branch of Mississippi's legislature. This action seeks solely to have the Court declare unconstitutional most of the qualifications Mississippi defines for electors of the most numerous branch of its Legislature. It constitutes a massive scatter-gun attack against the many important provisions of Mississippi's Constitution and statutes. There is no intimation that § 1971, as a whole or as to any part of it, vests such a right in the United States itself. § 244 was placed into the organic law of Mississippi by its people in convention assembled after the confusions and frustrations of twenty years of the Tragic Era had subsided enough for its citizenship to bring a semblance of order out of chaos. The people themselves, through their elected convention, placed that section in the Constitution.

The other constitutional provisions attacked by the plaintiff entered the Constitution of Mississippi by the direct vote of the people. The symmetrical statutory structure for carrying out the constitutional mandates was worked out and duly passed by the legally constituted legislatures of the state. § 1971 does not invest the United States or its Attorney General with any power to bring any action to destroy any state's constitution or laws.

 It is clear that § 1971 contemplated and envisioned the existence of state requirements for voting which did not on their face discriminate because of race or color. The operative language is "[a]ll citizens of the United States who are otherwise qualified by law to vote." This presupposes the existence of valid state requirements for voting. There is no provision of the Constitution or a statute of Mississippi which deprives any citizen of the right to vote because of race or color.

It is equally clear that this effort of the United States to invalidate the state voting requirements here involved is outside the scope of the Fifteenth Amendment to the Constitution, which has been repeatedly held to be the sole basis of § 1971(a). United States v. Reese, 92 U.S. 214, 23 L.Ed. 563 and Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L. Ed. 1340.

Guinn involved a constitutional provision of Oklahoma, which set up a registration requirement for voting, but provided that this requirement should not be applied to any person who was, on January 1, 1866, qualified to vote or to the lineal descendant of such person. The Supreme Court found this constitutional provision on its face to be in conflict with the Fifteenth Amendment, since it was well known that no Negroes were qualified to vote in Oklahoma on January 1, 1866. This brief quotation from the decision in Guinn (238 U.S. 347, at 362, 35 S.Ct. 926, at 930, 59 L.Ed. 1340) will suffice to demonstrate the attitude of the court then and now:

> "Beyond doubt the Amendment does not take away from the state governments in a general sense the power over suffrage which has belonged to those governments from the beginning, and without the possession of which power the whole fabric upon which the division of state and national authority under the Constitution and the organization of both governments rest would be without support, and both the authority of the nation and the state would fall to the ground. In fact, the very command of the Amendment recognizes the possession of the general power by the state, since the Amendment seeks to regulate its exercise as to a particular subject with which it deals. * * * Thus the authority over suffrage which the states possess and the limitation which the Amendment imposes are co-ordinate and one may not destroy the other without bringing about the destruction of both."

Language of identical import is found in Reese (92 U.S. 217–218, 23 L.Ed. 563).

The first sentence of subsection (c) of § 1971 is the one which grants the Attorney General the power to institute certain proceedings under certain circumstances: "Whenever any *person* has engaged or there are reasonable grounds to believe that any *person* is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this section." The plain meaning of that part of subsection (c) is that Congress vested the Attorney General with power to seek injunctive relief against state election officials acting under color of law when said officials should deny a person "otherwise qualified to vote" of the right to vote because of race or color.

Assuming, therefore, that § 1971 does empower the United States, through the Attorney General, to assist legally a person who meets all of the other qualifications of Mississippi law, who is being discriminated against because of his color, the statute does not tend to support the action here, which is not based upon discrimination, but upon the asserted fundamental unconstitutionality of the entire structure of Mississippi law providing voter qualifications. Under these circumstances the least this Court can do is to avoid a doubtful constitutional construction and to dismiss the action because it is not brought under any power given by the statute relied on, but is a direct attack by the Indestructible Nation as such, and is against the Indestructible State as such. And, moreover, it is an attack against a state aimed at destroying its action in a field committed exclusively to it by the Constitution; to-wit, the state's power to determine and define the qualifications of the electors who may vote not only in state elections, but in federal elections as well.

## X.

Article I, Section 2 of the Constitution provides that representatives shall be "chosen every second Year by the

People". It further provides that "the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature". These simple words contain the only requisite provided for the selection of those persons who shall vote in federal elections.[39]

As pointed out by Dr. Ritz, the very simplicity of this language of the Constitution might tend to suggest casualness of draftsmanship. He promptly points out, however, that such was not the case, suggesting that the records of the convention, as discussed in Farrand, show that it was deeply concerned with problems relating to the election of officials of the Federal Government, adopting a plan for the indirect election of the President and Vice President by use of an electoral college. The convention provided: "Each state shall appoint in such manner as the legislature thereof may direct, a number of electors * * *", thereby leaving the method of selection and qualifications to the states, although Congress was authorized to establish the time of their choosing.

On May 29, 1787, in presenting the resolutions known as The Virginia Plan, which provided the basic framework of the Constitution, Edmund Randolph proposed a national legislature to consist of two branches, the members of the first to be elected by the people of the several states, and the members of the second to be elected by the first branch from persons nominated by the state legislatures.

The national executive was to be elected by the national legislature.[40]

On May 31, sitting as a committee of the whole House, the convention approved the resolution calling for a national legislature to consist of two branches, and then considered and debated the resolution calling for election of the first branch by the people, adopting it by a vote of six states to two, with two states divided.[41] A few days later the convention reconsidered and again upheld popular election, this time by a vote of eight states to three.[42]

During consideration of The New Jersey Plan, still another attack on popular election was narrowly defeated, then another motion to reconsider was voted down by six states to four, with one divided.[43]

As Dr. Ritz points out, on page 950 of the A.B.A. Journal for October, 1963, various aspects of the provision were debated with care until, finally, the provision was passed without any state dissenting. The debate on the qualification of voters was thus ended. On August 9th, the convention granted to Congress the power to supersede state regulations *as to the time, place and manner of holding* elections. The debate shows that it was pointed out that the provision *had nothing to do with voter qualifications*.[44]

On September 8th, the convention named a committee of style, which made only one change which was adopted by the convention denying Congress any power over the place of election of senators. The provisions relating to elec-

39. Volume 49, No. 10, 1963, of the American Bar Association Journal contains an excellent article on "Free Elections and the Power of Congress Over Voter Qualifications." Therein is reproduced the paper by Dr. Wilfred J. Ritz, Professor of Law, Washington and Lee University, which won first place in the 1962 Samuel Pool Weaver Constitutional Law Essay Competition conducted annually by the American Bar Foundation.

We draw extensively from this paper in this portion of the opinion. Dr. Ritz cited many times from Farrand, "The

Records of the Federal Convention of 1787," 4 Vols. (Rev. ed. 1937).

While the article deals alone with the power of Congress, most of its contents apply equally to the Courts.

40. 1 Farrand 20–21, 27–28.

41. 1 Farrand, 46, 47–50, 54–55, 56, 60.

42. 1 Farrand 118, 124, 130, 132–138, 140–141, 142–144, 145, 147.

43. 1 Farrand, 353, 358–360, 364–365, 367, 368.

44. 2 Farrand 229, 239–242, 244.

tions were adopted and became a part of the completed Constitution.[45]

The article further points out that the Seventeenth Amendment ratified in 1913, providing for the popular election of senators, follows the pattern set forth in the original Constitution by providing that the electors in each state shall "have the qualifications requisite for electors of the most numerous branch of the state legislatures".[46]

It further states that, except for the Fifteenth and Nineteenth Amendments, which place restrictions on the qualifications the states may require of electors for state officials and so, indirectly, become limitations on the qualifications as defined in the original Constitution, "Otherwise, there are no constitutional restrictions on the qualifications the states may require of electors for state officials, and so also of electors of federal officials.[47]" The article refers also to the "Poll Tax Amendment," emphasizing that it departed from the pattern of previous amendments in that a state is permitted to establish a different qualification for electors to the most numerous branch of its own state legislature than the state can establish for the election of federal officials. But the elimination of that qualification could be done by constitutional amendment alone.

It is clear, therefore, that in the ratification of the Seventeenth Amendment and of the Poll Tax Amendment, the Congress of the nation and the people have affirmed in this century that the power to establish or change the qualifications of electors for federal officials can be accomplished by constitutional amendment alone.

Dr. Ritz's estimate of the constitutional scheme for establishing the qualifications of electors for federal officials is thus stated at the conclusion of his article: [48]

" * * * For this reason, the Constitution establishes the qalifications of electors for federal officials by a readily ascertainable and completely objective standard. This objective standard is beyond the power of the Federal Government to change, except by going to the states and the people to seek a change through the process of constitutional amendment. History demonstrates that when a change has been needed, the necessary constitutional amendments have been forthcoming. * * * "

The decisions of the Supreme Court teach a similar lesson. Slaughter-House Cases, 16 Wall. 36, 83 U.S. 36, 21 L.Ed. 394; Minor v. Happersett, 21 Wall. 162, 88 U.S. 162, 22 L.Ed. 627; United States v. Reese, supra; United States v. Cruikshank, 92 U.S. 542, 23 L.Ed. 588; Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274; Swafford v. Templeton, 185 U.S. 487, 22 S.Ct. 783, 46 L.Ed. 1005; Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340; Newberry v. United States, 256 U.S. 232, 41 S.Ct. 469, 65 L.Ed. 913; Breedlove v. Suttles, 302 U.S. 277, 58 S.Ct. 205, 82 L.Ed. 252; Lassiter v. Northampton Board of Elections, infra.

## XI.

At the risk of tedium, we feel that we ought to discuss briefly the provisions of Mississippi's Constitution and statutes which plaintiff would strike down. We find each of them to be within the power of the State and to be reasonable and valid. For convenience, we copy at this point in the margin the language of §§ 244 and 241-A of the Constitution.[49] Attack is made also upon sixteen

---

45. 2 Farrand 651, 653.

46. Vol. 49, No. 10, A.B.A.J. page 951.

47. Id.

48. 49 A.B.A.J., No. 10, page 954.

49. "Section 244. Every elector shall, in addition to the foregoing qualifications be able to read and write any section of the Constitution of this State and give a reasonable interpretation thereof to the county registrar. He shall demonstate to the county registrar a reasonable understanding of the duties and obligations of citizenship under a constitutional form of government.

948

statutory enactments published in the Mississippi Code of 1942. We will not copy or refer to those at this point beyond this mention of them, but will bring forward the gist of the statutes as they are discussed.

 It is appropriate at the outset of this portion of the opinion to set forth the basic principles which have guided the court in reviewing questions presented by the motion to dismiss:

"The cardinal principle of statutory construction is to save and not to destroy. * * * as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same.[50]"

Courts should consistently seek an interpretation of a statute which supports constitutionality and avoid, where posible, holding that the statute is vague or indefinite.[51]

> "The person applying to register shall make a sworn, written application for registration on a form to be prescribed by the state board of election commissioners, exhibiting therein the essential facts and qualifications necessary to show that he is entitled to register and vote, said application to be entirely written, dated and signed by the applicant in the presence of the county registrar, without assistance or suggestion from any person or memorandum whatever; provided, however, that if the applicant is unable to write his application by reason of physical disability, the same, upon his oath of such disability, shall be written at his unassisted dictation by the county registrar.
> "Any new or additional qualifications herein imposed shall not be required of any person who was a duly registered and qualified elector of this state prior to January 1, 1954.
> "The Legislature shall have the power to enforce the provisions of this section by appropriate legislation."
> "Section 241–A. In addition to all other qualifications required of a person to be entitled to register for the purpose of becoming a qualified elector, such

When the terms of a statute are unambiguous the court may not, in construing it, speculate on probabilities of the intention of Congress.[52] The legislative history of an unambiguous statute is immaterial.[53]

"The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction." [54]

With these principles in mind we have examined the provisions of the constitutional and statutory sections here challenged to determine if they are ambiguous or uncertain. We find them to be plain, simple and straightforward. Their meanings and intention are transparent and completely unambiguous. We have, therefore, determined that their constitutional status cannot be changed by delving into supposed legislative intent, history or purpose.

 It is likewise true that the method of application or administration of

> person shall be of good moral character.
> "The Legislature shall have the power to enforce the provisions of this section by appropriate legislation."

50. National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893.

51. United States v. National Dairy Products Corp., et al., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561.

52. Merchants' Insurance Co. v. Ritchie, 5 Wall. 541, 18 L.Ed. 540.

53. United States v. McKesson & Robbins, Inc., 351 U.S. 305, 76 S.Ct. 937, 100 L. Ed. 1209; United States v. Oregon, 366 U.S. 643, 81 S.Ct. 1278, 6 L.Ed.2d 575.

54. Gemsco, Inc. v. Walling, 324 U.S. 244, at 260, 65 S.Ct. 605, at 614, 89 L.Ed. 921. Cf. Davis v. Schnell, D.C., 81 F.Supp. 872, 878:
> "*When a word or phrase in a statute or constitution is ambiguous*, it is the duty of the court, in construing the meaning of that word or phrase, to attempt to determine whether an exact meaning was *intended and if so*, to ascertain that meaning." (Emphasis added.)

the statutes cannot affect the validity or invalidity of the statutes themselves. In Giles v. Harris, 189 U.S. 475 at 487, 23 S.Ct. 639, at 642, 47 L.Ed. 909, the Supreme Court stated:

"If the sections of the constitution concerning registration were illegal in their inception, it would be a new doctrine in constitutional law that the original invalidity could be cured by an administration which defeated their intent."

The reverse effect has also been negated:

"A statute may not be held void because of the action of an executive officer in applying its provisions. Even when there is an abuse of executive power against which the courts cannot relieve because of their inability to control administrative discretion, the act of Congress under which the action is taken is not rendered invalid any more than it is by action which is absolutely unauthorized." [55]

Indeed, any other method of statutory interpretation would permit members of the Executive Branch, at will, to make or unmake legislative enactments. We do not hold that arbitrary or discriminatory administration of a law which is valid on its face will not give rise to a right of action against the offending enforcement official; rather, we limit our holding to the determination that such administration cannot change the constitutional status of the law on its face.

## XII.

The analysis of the Complaint required by the motions before us should properly begin with a consideration of the validity of Section 244 of the Mississippi Constitution. This same section in its present form was before this Court in Darby v. Daniel, D.C.1958, 168 F.Supp. 170, from which no appeal was taken. We could very well fashion our opinion at this point by literally rescripting Sections I and II from this opinion, but such

a procedure would be needlessly prolix. Suffice it to say that we adopt those two sections as our opinion here upholding the constitutionality of Section 244 on its face.[56] The authorities there cited are still completely valid support for the points made. The fact that plaintiff there was required to follow the administrative remedies available to him does not detract from the logic or correctness of the court's constitutional holding, which we approve as controlling the identical questions here presented.

Since the date of the Darby decision, the Supreme Court of the United States has again placed its stamp of constitutional approval on the use of a literacy test as a permissible voter qualification requirement. Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072. The court there stated:

"The ability to read and write likewise has some relation to standards designed to promote intelligent use of the ballot. Literacy and illiteracy are neutral on race, creed, color, and sex, as reports around the world show. Literacy and intelligence are obviously not synonymous. Illiterate people may be intelligent voters. Yet in our society where newspapers, periodicals, books, and other printed matter canvass and debate campaign issues, a State might conclude that only those who are literate should exercise the franchise. Cf. Franklin v. Harper, 205 Ga. 779, 55 S.E.2d 221, appeal dismissed 339 U.S. 946, 70 S.Ct. 804, 94 L.Ed. 1361. It was said last century in Massachusetts that a literacy test was designed to insure an 'independent and intelligent' exercise of the right of suffrage. Stone v. Smith, 159 Mass. 413–414, 34 N.E. 521. North Carolina agrees. We do not sit in judgment on the wisdom of that policy. We cannot say, however, that it is not an allowable one

---

55. Duke Power Co. v. Greenwood County, 4 Cir., 91 F.2d 665, 672; Affirmed 302 U.S. 485, 58 S.Ct. 306, 82 L.Ed. 381.

56. Except for Subsection 4 of Section II, relating to newspaper exhibits, because that question is not before us here.

measured by constitutional standards." [57]

In Trudeau v. Barnes, 65 F.2d 563, certiorari denied 290 U.S. 659, 54 S.Ct. 74, 78 L.Ed. 571, the Court of Appeals for the Fifth Circuit approved Louisiana's constitutional requirement embracing reading and interpreting its Constitution and that of the United States. However, on November 27, 1963, in the case of United States v. State of Louisiana, supra, a two-judge majority of a three-judge District Court panel hearing that case held that the Trudeau case was no longer valid in the light of the decision in Davis v. Schnell, supra, and "the more recent cases." They also pointed out that the Trudeau court, perhaps because of the poor presentation of the case, did not have the "benefit" of evidence of discriminatory purpose and proof of "discriminatory affect" of the Louisiana interpretation test. We think this citation is invalid especially in view of the Supreme Court's holding in Lassiter.

We note, moreover, these differences between United States v. Louisiana and the case here presented, it being there contended:

1. The Louisiana Board of Registration has the power to remove *at will* any parish registrar of voters;

2. The parish registrar's whim alone determines who will be tested and who will be registered without testing;

3. No written records were made in most test cases, thus precluding the use of such records for check or review purposes;

4. The Louisiana Registrar is vested with "raw power;"

5. The test prescribed by Louisiana's law has no rational relation to a legitimate governmental objective; it vests unrestrained discretion in the Registrar; it is subjective, unreasonable and is *incapable* of equal enforcement.

Their opinion equates the Louisiana constitutional provision with Alabama's Boswell Amendment, which was condemned in Schnell v. Davis, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093. For the reasons set out in Darby and because of the legal and factual differences noted above, we cannot agree that Mississippi's Section 244 presents the same questions.

The Louisiana three-judge opinion also places much emphasis on its conception of the difference between "literacy" and "understand" and "interpretation." The latter two phrases are said to be words without definite meaning in the law and unlike the words "read" and "write." We cannot agree with the court's observations there. First of all, it seems clear to us that, when the Supreme Court stated "Literacy and intelligence are obviously not synonymous" in its opinion in Lassiter quoted above, it did not mean that tests which require a showing of comprehension, understanding or interpretation are not literacy tests. Rather, we believe the court there meant to demonstrate logically that an illiterate person could be intelligent, but that literacy was nevertheless a permissible standard for states to require of prospective electors. The dictionary defines the adjective "literate" as "instructed in letters; educated; specifically, able to read and write." It defines the noun "literate" as "one who can read and write." The transitive verb "read" is thus defined: "to go over, *especially, with apprehension of the meaning of,* as characters or words; to take in the sense of, as of language, by interpreting the characters with which it is expressed. To utter aloud or render something written, especially so as to give an interpretation of its significance. To interpret; to discover the meaning of." The transitive verb "read" is defined: "to peruse or to go over *with understanding.*" [Emphasis added.]

---

57. In Note 7 appearing at 360 U.S. 52, 79 S.Ct. 990, 3 L.Ed.2d 1072, the court pointed out that 19 states have some sort of literacy requirement as a prereq-

uisite to voter eligibility. Mississippi's requirements are among those fully described without adverse comment or observation.

Literacy must necessarily include understanding if it is to be the meaningful requirement of voter qualification which the Supreme Court discussed in Lassiter. If literacy encompassed only the ability orally to pronounce the syllables of a grouping of letters, without a corresponding understanding or comprehension of their meaning, it would signify nothing. A person might look at a book or letter written in Spanish or French and have the ability to write off the words found there and to pronounce them orally, but if he knows nothing of the meaning or thought conveyed by those words, he cannot be said to be literate in Spanish or French. This reasoning draws added support by reference to 42 U.S.C. § 1971. In subsection (e) thereof the Congress recognized literacy *and* understanding as valid voter qualification requirements in two separate places in their directions to court appointed voting referees.[58]

The lack of an effective review procedure is another significant difference between the Louisiana case and Mississippi's Section 244. In Section IV of the opinion in Darby, the court discussed in detail the machinery which Mississippi had at that time provided for reviewing decisions of the Registrar.[59] Since the Darby decision, the only change in the review procedure has been to require the County Election Commissioners to consider both oral and documentary evidence. The statute still provides that the hearing is de novo. As we pointed out in Darby, "The heart of Mississippi's [registration] machinery lies in the right of any person to appeal to the County Election Commission."

We would also call particular attention to the fact that the words of 42 U.S.C.

§ 1971(d) permitting recourse to this Court, without regard to whether the party aggrieved shall have *exhausted* administrative or other remedies, were also before the court in Darby. Nowhere does the Bill of Complaint before us allege or aver that anyone who claims to have been denied the right to register even *began* the "simple," "cheap," administrative remedy open under Mississippi law, let alone pursued it or exhausted it.

For all of these reasons, we distinguish the case of United States v. Louisiana, supra, from the situation presented by the Complaint now before this Court. To the extent that its holdings may conflict with those here, we do not follow it.

Section 244 should be appraised in yet another way, as suggested by the Supreme Court in Yick Wo v. Hopkins, Sheriff, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220. In that case, the court suggested a simple but effective test to determine if a statute or ordinance vests arbitrary power in the officer charged with its enforcement and administration. This test is as follows:

[In that case, persons who wished to operate laundries in wooden buildings were required to obtain the consent of the Board of Supervisors.]
"* * * * if an applicant for such consent, being in every way a competent and qualified person, and having complied with every reasonable condition demanded of any public interest, should, failing to obtain the requisite consent of the supervisors to the prosecution of his business, apply for redress by the judicial process of *mandamus* to require the supervisors to consider and act upon his case, it would be a sufficient an-

---

58. "Where proof of literacy or an understanding of other subjects is required by valid provisions of State law, the answer of the applicant, if written, shall be included in such report to the court; if oral, it shall be taken down stenographically and a transcription included in such report to the court."

"The applicant's literacy and understanding of other subjects shall be deter-

mined solely on the basis of answers included in the report of the voting referee."

59. A review procedure which the Court of Appeals of the Fifth Circuit, in Peay v. Cox, supra, characterized thus:

"[T]he remedy is wholly administrative, simple, and cheap and ought to be exhausted plainly."

swer for them to say that the law had conferred upon them authority to withhold their assent, without reason and without responsibility."

Because of the result of the test, the court held the statute there under consideration to be purely arbitrary.[60]

For sake of comparison, we call attention to the situation presented in Schnell v. Davis, supra, and the Boswell Amendment and its implementing statute requiring an applicant for voter registration to establish to the satisfaction of the Registrar that he or she was qualified. If we apply the mandamus test suggested by Yick Wo, we would have this situation: a fully qualified applicant would request the court to mandamus the Registrar to place his name on the rolls. The Registrar could persist in his denial and resist the mandamus action by simply stating that he was not satisfied with the applicant's attempt to establish to him that he or she was qualified. This would be a complete answer to the mandamus proceeding without reason given and without further responsibility on the Registrar's part.

Under the provisions of Mississippi's Section 244, the situation is just the reverse. Here, if a qualified applicant has made a reasonable interpretation and been refused registration by either the Registrar or the County Election Commission, a mandamus action would most surely result in a requirement that the applicant be registered, because the question before the court would be: did the applicant give a reasonable interpretation?

Seeing no reason to depart from our opinion in Darby v. Daniel, we hold that Section 244 of the Mississippi Constitution is valid on its face and does not violate the Constitution or Laws of the United States.

### XIII.

■ The Complaint next charges that Section 241-A of the Mississippi Constitution violates the Constitution of the United States. Good moral character is a prerequisite for admission to practice before the Supreme Court of the United States,[61] the Court of Claims of the United States,[62] and United States Custom Court,[63] and each of the ten circuit Courts of Appeals.[64] Good moral character is a prerequisite for naturalization.[65] Connecticut,[66] Alabama,[67] Georgia,[68] and Louisiana [69] all require a prospective elector to be of good moral character or good character. In Atkins,

---

60. This opinion has proven confusing to a number of courts, as evidenced by their varied descriptions of its holding. A careful reading of the opinion discloses that the Supreme Court *did not* hold the municipal ordinance unconstitutional. They did order Yick Wo released and the criminal charge against him dismissed, but the basis for their ruling was because the arbitrary statute was found to have been applied by the Board of Supervisors in an unconstitutional manner.

61. Rule 5.

62. Rule 77.

63. Rule 10.

64. This variously appears in Rules 6, 7 or 8 of each of the Circuits except for the Fifth. In this Circuit, admission to practice before a District Court is required, and since this Mississippi district requires admission to the State Courts of Mississippi, this requirement is imported

into the rules of the Fifth Circuit, at least for Mississippi practitioners in the Southern District.

65. 8 U.S.C. § 1101, § 1427. It should be noted that although § 1101 sets out several criteria for determination of good moral character, it concludes with the statement: "The fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character."

66. Chapter 143, Section 9–12, Gen.Statutes of Conn., Rev.1958.

67. Constitution, Section 180, Article 8, Constitution of 1901.

68. Constitution, Section 2–704 (6398) Paragraph IV, Const. art. 2, § 1. (This is one of the alternative provisions for those who cannot read and write.)

69. LSA–Constitution, Article VIII, Section 1(c). See also LSA–Revised Statutes, Vol. 14, Ch. 1, Title 18, Section 31.

supra, 323 F.2d 733, the Court of Appeals for the Fifth Circuit approved the Alabama requirement of good moral character upon condition that a proper written examination is provided. The Mississippi statutes outlined supra provide very stringent requirements for such a hearing as to moral character. § 3217–01 through § 3217–14.

Mississippi presently requires good moral character of:

| | |
|---|---|
| Taxicab Operators | § 3495 |
| Incorporators of Banks | § 5156 |
| Bank Examiners | § 5165 |
| Architects | § 8632–09 |
| Attorneys | § 8654 |
| Barbers | § 8725 |
| Dentists | § 8755 |
| Embalmers | § 8782 |
| Nurses | § 8816 |
| Optometrists | § 8840 |
| Pharmacists | § 8848 |
| Physicians | § 8879 |
| Podiatrists | § 8896 |
| Accountants | § 8905 |
| Veterinarians | § 8914–07.[70] |

Counsel have pointed out in argument that a majority of states require good moral character of applicants for licenses as architects, attorneys, barbers, engineers, medical doctors, undertakers and embalmers, pharmacists, real estate salesmen, veterinarians and public accountants. These are but a few examples of the wide use that the term has found in statutory situations where legislative bodies sought to extend privileges to those citizens whom it thought worthy of confidence and trust. We mention these instances to demonstrate that good moral character has found widespread acceptance as a concise and meaningful description of an attribute of a desirable citizen. It seems to us to be self-defining. Any attempt by the legislature to have written a definition applicable to all applicants for voter registration or for any of the licenses mentioned would undoubtedly have ended in a cumbersome, wordy enactment which could have added nothing to the inherent meaning of the words themselves and might well have detracted from their efficient and effective application.[71]

Requiring that applicants for registration as qualified electors be of good moral character is reasonable and is patently not discriminatory on the basis of race. We note that there is no allegation or charge that Negroes have bad moral character as a racial trait, even though such an allegation would not per se invalidate the enactment.[72] It does discriminate—but in a way that is in nowise unconstitutional. It bars those of bad moral character of every race from becoming voters. While it is beyond this Court's prerogative to commend the enactment of such a measure, we do have authority to say that such an enactment is entirely within the constitutional competence of the people of the State of Mississippi. It is a regulation calculated to improve the quality of the electorate though it might curtail its number. This may justifiably be thought to be a pathway to better government.

The Complaint objects to this requirement on the ground that, since more whites than Negroes are now registered, the greater numerical impact will fall on Negroes. This statistical argument is without legal merit.[73] It also lacks logical merit. The provision applies equally to every *unregistered person* of every race, now and for all time to come. It does not partake of the invalidity detected in Guinn v. United States, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340, and Lane v. Wilson, supra. These cases involved situations where the electorate

---

70. All references are to sections of the Mississippi Code of 1942, Annotated.

71. We agree with the court in Raabe v. State, 7 Ohio App. 119, when it stated that the phrase "good moral character" defines itself as accurately as the Legislature could define it by any other terms that it might employ along that line. Cf. Petition of Gani, D.C., 86 F.Supp. 683.

72. Williams v. Mississippi, 170 U.S. 213, 18 S.Ct. 583, 42 L.Ed. 1012.

73. Williams v. Mississippi, supra; and Snowden v. Hughes, supra

had by law been *exclusively* white. The new regulations applied practically exclusively to Negroes because the exemption was extended to all registered whites and their posterity in perpetuity. In Lane v. Wilson, the court frankly discusses the problems of the amendment offered to cure this situation solely in terms of the Negro race. The inevitable result of the provisions struck down was a racially discriminatory result. It is not so here. This enactment applies to new white and Negro registrants alike.

If statistics of present voter registration as compared to census figures can create a climate that would make an otherwise wholesome and valid enactment void because of race discrimination, then every other requirement governing voting—whether newly enacted or covered with antiquity—would be similarly void on the same statistical basis. Each such enactment making *any* requirement for registration would necessarily affect more of one race than the other and thus under plaintiff's theory, be invalid. If census figures are considered in the same sterile and unrealistic atmosphere, they demonstrate that race discrimination must be most flagrant in the states of the northern and midwestern portion of the nation because few, if any, Negroes can be found there.

Plaintiff contends that the good moral character requirement "facilitates" racial discrimination, but they do not say how, other than objecting to the lack of a statutory definition. It seems to us that a legislative definition, which could constitutionally bear more heavily on some of the undesirable racial traits peculiar to the Negro as a racial group, might constitute just such a "facility" instead of avoiding it. It is our view that the words are sufficiently direct and plain to be self-defining.

## XIV.

■ The Complaint next turns its attack to the statutory law of the State of Mississippi. It alleges that the provisions of the last paragraph of Section 3209.6 (and 3209.7), Mississippi Code of 1942, Annotated, are unconstitutional and void as being in conflict with and contrary to the requirements of Title III of the Civil Rights Act of 1960.[74] The provisions of this Act require election officers to retain certain voting records for a period of twenty-two months. The Mississippi statutes provide that, in cases where there is no appeal pending and where a particular application has been waived or abandoned, "the registrar is *not required* to retain or preserve any records made under the provisions hereof."

If this statute were to be construed as requiring registrars to destroy records under the circumstances named, it would at most be in conflict with the Federal Statute (42 U.S.C. § 1974). It does not do so. The words "not required to retain" should not be interpreted to mean "permitted to destroy." With this construction the State statutes do not in any way conflict with the Federal enactment. If a registrar does not comply with the provisions of Title III, he cannot justify his noncompliance on the basis of any compulsion derived from the Mississippi Act. It must be construed as permissive only, since it is readily susceptible of that construction. In fact, we cannot see that it is susceptible of any other reasonable construction. These concluding paragraphs of Sections 3209.6 and 3209.7 are constitutional.

■ Section 3213 of the Mississippi Code of 1942 [75] makes it mandatory that an applicant complete all blank spaces in the application form "properly and responsively" and sign the same, together with the required oath.

Section 3212.5 of the Mississippi Code of 1942 [76] requires a registrar to endorse the word "passed" on the application form of qualified applicants, makes it the responsibility of the applicant to make inquiry to determine whether he or she

---

74. 42 U.S.C. § 1971–1974e.

75. House Bill No. 900, 1962 Session.

76. House Bill No. 903, 1962 Session.

has passed, and provides for the endorsement of the words "failed" or "not of good moral character" to be endorsed on unsuccessful application forms.

It is charged that these two sections "facilitate" racial discrimination by establishing formal, technical or inconsequential errors or omissions as grounds for disqualification. We do not agree. The registrar is required by the statutes to make this endorsement on all forms of all applicants without regard to race. The statute also makes it the responsibility of all applicants to make inquiry to determine the status of their application. Again, these challenges are unaccompanied by any fact allegation that the statutes are directed against a racial trait. The proper and responsive completion by an applicant of a form is neutral on race, creed and color. The required endorsements cannot, in our opinion, constitute any facilitation of racial discrimination. If anything, they would hinder it by requiring a more complete record of the action taken by the registrar, which would be available in the event of a challenge to his action.

Another ground of invalidity involves the numerical effect of the statutes. We have previously discussed and rejected this ground as a vehicle by which unconstitutional deprivation may be established in connection with our discussion of the good moral character requirements of Section 241-A of the Constitution. We adhere to those same views here.

It is next contended that these statutes convert the application form into a hypotechnical and unreasonable examination which constitutes an arbitrary restriction on the exercise of the "right to vote." It may be thought unnecessary to reiterate here the status of the Federal and State sovereignties in relationship to the right of suffrage, but it appears to us to be a matter of sufficient moment to warrant indulgence.

In Minor v. Happersett, 21 Wall. 162, 88 U.S. 162, 22 L.Ed. 627, the Court pointed out:

"For nearly ninety years the people have acted upon the idea that the Constitution, when it conferred citizenship, did not necessarily confer the right of suffrage."

In the case of United States v. Reese, 92 U.S. 214, 23 L.Ed. 563, the court stated:

"The Fifteenth Amendment does not confer the right of suffrage upon anyone."

In McPherson v. Blacker, 146 U.S. 1, 13 S.Ct. 3, 36 L.Ed. 869, it was stated:

"The right to vote intended to be protected refers to the right to vote as established by the laws and constitution of the state."

In Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817, the court stated:

"The privilege to vote in any state is not given by the Federal Constitution, or by any of its amendments. It is not a privilege springing from citizenship of the United States. * * * In other words, the privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution."

As recently as Lassiter v. Northampton County Board of Elections, supra, the court stated:

"The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised."

We assume that the State of Mississippi must believe that the information required on its voter application forms is proper and necessary information to determine the qualified or unqualified status of the applicant under its requirements. If it did not so believe, then the information should not be requested; but, believing it to be required, it seems to us that it is completely within its prerogative to demand that the form be properly and responsively completed and that the registrar make a full written record of his actions thereon. If it is

an exacting examination,—which we do not determine it to be—it is one which the statute requires to be administered without regard to race, creed or color. It is beyond the jurisdiction of this Court to question.

We do not find that these statutes vest unlimited discretion or arbitrary power in the registrar. The words "properly" and "responsively" indicate to this Court a definite enough standard for intelligent and consistent application. The completion of the oath and signature also appear to be normal requirements on their face. No tricky application form is alleged or exhibited. If it does, in fact, operate to "trip" applicants into a disqualifying omission, it again operates indiscriminately of race or color. Even if we thought it were an unwise requirement, we cannot for that reason alone find it to be unconstitutional. After a careful review of the statutes themselves in the light of all objections made, we are of the opinion that Section 3213 and Section 3212.5 of the Mississippi Code of 1942 are constitutional.

 The next attack is made upon Section 3212.7 of the Mississippi Code of 1942 [77] and Section 3217–01 through 3217–13 of the Mississippi Code of 1942.[78] Section 3212.7 requires the registrar to publish the name and address of every applicant for registration to vote, for two consecutive weeks. The cost of such publication is to be paid out of the general fund of the county. Fourteen days after the date of the last publication must be allowed by the registrar for challenge by any qualified elector of the county. After this period the registrar is required to proceed to determine the applicant's qualifications.

Sections 3217–01 through 3217–13 prescribe the procedure for challenges and hearings concerning any challenges made.

These two statutes are alleged to be unconstitutional because they vest power and authority in white citizens to harass Negroes. Even so, it is likewise true that the statutes vest power and authority in Negro citizens to harass whites, in Negro citizens to harass Negroes, and in white citizens to harass whites. The choice as to whether to exercise the power conferred or not is one of purely private decision not subject to the mandates of the Fourteenth or Fifteenth Amendments. With regard to the contention that no objective standard is provided to limit the grounds of challenge, we disagree. The grounds are limited to the good moral character of the applicant and other requirements which the applicant must meet in order to be qualified to register to vote.

The challenge is made that the requirements are onerous, arbitrary and unreasonable. These challenges are directed to the legislature's wisdom in the enactment of the statute and not to any permissible grounds of constitutional objection. We do not see in the grant of authority to the registrar to take the matter of a challenge under advisement any unlimited power to forestall registration on a racial basis. Surely the statute contemplates and must be interpreted to require reasonable action on the part of the administrative officer in the discharge of the duties conferred upon him under the authorities previously mentioned.[79] We cannot presume that he will not correctly and impartially render each citizen his due.

Here again we have statutes whose wisdom we are not free to debate. The State of Mississippi could certainly feel that each community should be advised of the names and addresses of its members who seek through the exercise of the franchise to control its political fate. It is certainly within the state's power to determine that additional solemnity and formality should be added to the act of application for registration. We are unable to say that the requirements of these statutes bear no reasonable rela-

---

77. House Bill No. 822, 1962 Session.

78. House Bill No. 904, 1962 Session.

79. Cf. Snowden v. Hughes, supra.

tionship to a legitimate state interest. We, therefore, hold Section 3212.7 and Sections 3217–01 through 3217–13 to be valid and constitutional.

■■■ The Complaint might also be interpreted to challenge Section 3232 of the Mississippi Code of 1942 [80] and Section 3209.6 of the Mississippi Code of 1942. Section 3232 was amended so as to eliminate the requirement for designation of the race of voters in county poll books. Section 3209.6, in addition to permitting destruction of records, was amended so as to make provision for the application form to contain a demonstration of good moral character.

In view of our ruling on the constitutionality of Section 241–A requiring good moral character as a prerequisite to registration, we deem it unnecessary to discuss further the contentions of the Complaint as to the last Code section. As to the section requiring the elimination of the designation of race from the poll books, we could state categorically that the new statute is constitutional, but it would be further pertinent to observe that this appears to the Court to be a situation where the state could be thought to be on the "horns of a dilemma." If it left the designation of race a part of its requirements, it would be subject to criticism for making a record of race where the race of the elector was immaterial. Now, having acted to remove reference to race, it finds itself criticized for having done so.

The Supreme Court, this term, held that a state statute [81] requiring that, in all primary, general or special elections, the nomination papers and ballots shall designate the race of candidates for elective office, violates the equal protection and due process clause of the Fourteenth Amendment or the Fifteenth Amendment to the Constitution of the United States.[82]

We hold Section 3232 and Section 3209.6 to be valid and constitutional.

■■■ In all of these statutory areas, we believe the question of validity must turn on a determination of the power of the state, not its supposed secret intentions or presumed improper motives. In the light of our comments above, we believe that it would be no more fitting to inquire into the motive or object of the legislature than it would be to permit such an inquiry to be made as to the motives of the judges of a court for making a decision, or the executive branch for taking or withholding executive action in any given situation.[83] As Mr. Justice Black cautioned in the case of Everson v. Board of Education of Ewing Township, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711:

> "But we must not strike that state statute down if it is within the state's constitutional power even though it approaches the verge of that power. See Interstate Consolidated Street Ry. Co. v. Commonwealth of Massachusetts, Holmes, J., supra 207 U.S. [79] at 85, 88, [28 S.Ct. 26, 27, 28, 52 L.Ed. 111]."

And see the discussion of this question in Darby, supra, 168 F.Supp. at pp. 176, et seq., and in Palmer v. Ohio, 248 U.S. 32, 39 S.Ct. 16, 63 L.Ed. 108; Beers for Use of Platenius v. Arkansas, 20 How. 527, 15 L.Ed. 991; Memphis & C. Railroad Co. v. Tennessee, 101 U.S. 337, 25 L.Ed. 960; and Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842.

We would hardly feel that a proper sense of proportion was being observed if we did not draw out this already much too long opinion sufficiently to say that those who speak for the United States in this case do not propose to leave Mississippi's Constitution and statutes wholly unrecognized. After having importuned this Court to strike down sub-

---

80. House Bill No. 901, 1962 Session.

81. LSA–Revised Statutes (1960 Supp.) § 18:1174.1.

82. Anderson v. Martin, 375 U.S. 399, 84 S. Ct. 454, 11 L.Ed.2d 430.

83. Fernandez v. Wiener, 326 U.S. 340, 66 S.Ct. 178, 90 L.Ed. 116; Sonzinsky v. United States, 300 U.S. 506, 57 S.Ct. 554, 81 L.Ed. 772. See also the article and cases cited in Footnotes 21–23 of the opinion in Darby v. Daniel, supra.

stantially all which the people and the legislature have written during the tedious, sometimes tragic, years in which they have endeavored to maintain a government of laws, the representatives of this Indestructible Union here pray that this Court set up a substitute system of voting qualifications for Negroes, asking that we

"7. Order said defendants to register as a voter any Negro applicant for registration who possesses the following qualifications for registering to vote and none of the disqualifications as set forth in the Mississippi Constitution of 1890:

"(a) He is a citizen not less than twenty-one years of age;

"(b) He has been a resident of the state, county and election district for the period prescribed by Mississippi law;

"(c) He is able to read;

"(d) He has not been convicted of any disqualifying crimes enumerated in the Constitution and laws of Mississippi and is not insane."

The Complaint, as amended, thus fails to state a claim upon which any relief can be granted and should be dismissed with prejudice, and the relief prayed for should be denied. A judgment accordingly, with costs, will be entered.

WILLIAM HAROLD COX, District Judge (concurring):

The majority opinion of the Court in this case, prepared by Honorable Ben F. CAMERON, United States Circuit Judge, very forcefully and correctly decided this case, and I unconditionally joined in that opinion and in executing the consequent judgment of the Court, but wish to add my concurrence therein as herein expressed.

Initially, and as a fundamental proposition of universal application, the United States had no authority to institute or maintain this suit in the absence of express statutory authorization therefor. That position was readily admitted by counsel at the bar, but it is contended that 42 U.S.C.A. § 1971 expressly provided such necessary authorization for this suit. A careful analysis of that section of the statute will reveal the fallacy of that contention. Indeed, the United States was expressly granted authority to bring certain suits against certain *persons* for preventive relief against violation of certain Civil Rights of others. The State of Mississippi is simply not such a person as was envisioned by that statute. It was not designed, or intended to grant the national sovereign any carte blanche authority to arbitrarily and capriciously select any law, or package of laws of a state which it desired invalidated, and to have declaratory relief by a test in such manner of the constitutionality thereof.

The suability of the sovereign State of Mississippi by the United States in this case presents that serious question at the very threshold of this suit. Contrary to the dissent herein, no question is presented, or relied on by anybody in this case as to any immunity afforded a state by the 11th Amendment to the Federal Constitution. It is perfectly clear in this case that the United States must find express authority in 42 U.S.C.A. § 1971 (c) to bring this suit, or it is without authority in this case to sue the State of Mississippi. This Congressional Act very carefully limited the right of the United States to bring a suit under the act against a *person* offending another person by depriving him of a right under the act, and for *preventive* relief. Ordinarily, the term "person" does not include a state or a municipal corporation, unless the statute itself makes the intention to do so very clear. Significantly, the last paragraph of § 1971(e) contains its own lexicon. Congress made it clear that the word "vote" meant all things prerequisite to voting, including registration where necessary to vote, and casting the ballot and having it counted. Other well known words and phrases were specifically defined to comply with the legislative intent. The Congress

knew that a state is ordinarily not considered a person within the purview of legislation of this character, and it did not deem it proper to carry out the legislative intent to make this act specifically to extend to a sovereign state as a person. This act clearly provides that: "Whenever *any person* has engaged, or there are reasonable grounds to believe that *any person* is about to engage in any act or practice which would deprive *any other person* of any right or privilege secured by subsection (a) or (b) of this section," then the Attorney General may institute the civil action in the name of the United States for *preventive* relief under this act. Then Congress provided that in such a suit the United States shall be liable for costs *the same as a private person*. The act provides that if a state official has violated either paragraph (a) or paragraph (b) of that section that the state may be made a party to the suit (not for any relief against it) but as a mere conduit or procedural vehicle to preserve jurisdiction where offending officials have died, or resigned as happened in the Alabama situation which was met by this provision in the act. But the state of Mississippi is simply not a *person* within any concept of this act, and is not suable in this case. In Sims v. U. S., 359 U.S. 641, 79 S.Ct. 641, 3 L.Ed.2d 667, it is said that "[w]hether the term 'person' when used in a federal statute includes a State cannot be abstractly declared, but depends upon its legislative environment, State of Ohio v. Helvering, 292 U.S. 360, 370 [54 S.Ct. 725, 727, 78 L.Ed. 1307;] State of Georgia v. Evans, 316 U.S. 159, 161 [62 S.Ct. 972, 973, 86 L.Ed. 1346.]" In Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492, the Court held that a municipal corporation was not within the ambit of a statute which related to a person who might deprive a citizen of a civil right under 42 U.S.C.A. § 1983. That same rule was followed by the Court in Egan v. City of Aurora, 365 U.S. 514, 81 S.Ct. 684, 5 L.Ed.2d 741; where the Court held that a municipality is not a person within the meaning of said act.

Then in United States v. State of Alabama, D.C., 171 F.Supp. 720, the district court in speaking of the 1957 Civil Rights Act, said that a person did not include or mean a sovereign state. On appeal of that decision in United States v. State of Alabama, (5CA) 267 F.2d 808, the Court very strongly reiterated and amplified that same view. The Court in that case said that the state of Alabama was not a person within the purview of the 1957 Civil Rights Act appearing as 42 U.S.C.A. § 1971(c). Yet, almost a year later when the present act was amended in 1960, no attempt was made by Congress to make any change in the first two sentences of this act which appeared exactly in the same verbiage as in the 1957 Civil Rights Act.

A statutory intent to authorize the United States to sue a sovereign state is not to be lightly inferred. Such authority must be found in a statute in the very clearest terms before a Federal Court will assume jurisdiction of a sovereign state. In United States v. Alabama, supra, Judge Hutcheson as chief judge, speaking for the Court 267 F.2d at page 811, said: "Absent such specific conferring of jurisdiction, a federal court would not, indeed could not assume jurisdiction over a sovereign state without a precedent determination that, though the jurisdiction had not been expressly conferred, the language of the invoked statute carried the necessary, the unavoidable implication that the congress upon the gravest considerations and after the utmost thought and deliberation had intended to and did confer it."

The State Board of Election Commissioners (composed of the Governor, the State Attorney General and the Secretary of State) are assigned statutory duties in connection with the preparation of forms of applications which the registrars use in testing the qualifications of an applicant to register to vote. These commissioners are thus acting in a legislative capacity in the discharge of such function and are, therefore, not ordinarily amenable to suit. But their

duties have been discharged when they release these forms of applications for use by the registrars in the counties; and the Mississippi State Board of Election Commissioners thereafter have absolutely nothing to do with the registration of voters, or the conduct of any election. The complaint as to the State of Mississippi, and as to said State Board of Election Commissioners is, therefore, clearly without any possible merit on its face. The complaint does not aver that the State Board of Election Commissioners have done anything, or threatened to do anything other than prepare those official registration blank forms exactly as directed by the Mississippi Legislature.

The gravamen of this complaint in its entirety is that two sections of the Mississippi Constitution, and six state statutes implementing those constitutional sections are all unconstitutional and void in the opinion of the United States. The acts and laws under attack in this case are Mississippi Constitution 1890, § 241–A [1] and § 244 [2] and six state statutes (all referred to herein as statutes) designated as H.B. 900 (Chapter 570, Mississippi Laws 1962),[3] H.B. 901 (Chapter 574,

1. "*Section 241-A.* In addition to all other qualifications required of a person to be entitled to register for the purpose of becoming a qualified elector, such person shall be of good moral character. The Legislature shall have the power to enforce the provisions of this section by appropriate legislation."

2. "*Section 244.* Every elector shall, in addition to the foregoing qualifications be able to read and write any section of the Constitution of this State and give a reasonable interpretation thereof to the county registrar. He shall demonstrate to the county registrar a reasonable understanding of the duties and obligations of citizenship under a constitutional form of government. The person applying to register shall make a sworn, written application for registration on a form to be prescribed by the state board of election commissioners, exhibiting therein the essential facts and qualifications necessary to show that he is entitled to register and vote, said application to be entirely written, dated and signed by the applicant in the presence of the county registrar, without assistance or suggestion from any person or memorandum whatever; provided, however, that if the applicant is unable to write his application by reason of physical disability, the same, upon his oath of such disability, shall be written at his unassisted dictation by the county registrar. Any new or additional qualifications herein imposed shall not be required of any person who was a duly registered and qualified elector of this state prior to January 1, 1954. The Legislature shall have the power to enforce the provisions of this section by appropriate legislation."

3. "*Section 1.* Person not to register unless he can read and write. A person shall not be registered unless he be able to read and write any section of the constitution of this state and give a reasonable interpretation thereof to the county registrar. He shall demonstrate to the county registrar a reasonable understanding of the duties and obligations of citizenship under a constitutional form of government; he shall also demonstrate to the county registrar that he is a person of good moral character. The person applying to register shall make a sworn, written application for registration on a form prescribed by the state board of election commissioners, exhibiting therein the essential facts and qualifications necessary to show that he is entitled to register and vote, said application to be entirely written, dated and signed by the applicant in the presence of the county registrar, without assistance or suggestion from any person or memorandum whatever; provided, however, that if the applicant is unable to write his application by reason of physical disability, the same, upon his oath of such disability, shall be written at his unassisted dictation by the county registrar. As originally enacted each provision is and it is further declared to be mandatory and not directory; no application should have been and shall not be approved or the applicant declared qualified to register to vote unless all blank spaces in the application and the oath are properly and responsively filled out by the applicant; and the oath, as such, shall be signed by the applicant; and the application, as such, shall be signed separately by the applicant at the places thereon provided for applicant's signature. Provided, however, the provisions herein imposed shall not be required of any person who was a duly registered and qualified elector of this state prior to January 1, 1954; except

Mississippi Laws 1962),[4] H.B. 905 (Chapter 569, Mississippi Laws 1962),[5] H.B. 904 (Chapter 573, Mississippi Laws 1962),[6] H.B. 822 (Chapter 572, Missis-

that from and after the effective date of this act no person shall be permitted to register unless he demonstrates to the county registrar that he is of good moral character as required by the provisions of Section 241-A of the Constitution of Mississippi. *Section 2.* Should any provision of this act be held to be unconstitutional or otherwise invalid for any reason, such holding shall not be construed to affect the validity of any other part or portion of this act.

4. *"Section 1.* That Section 3232, Mississippi Code of 1942, Recompiled, be and the same is hereby amended to read as follows: 3232. Form of poll book. The poll book of each election district shall have printed or written at the top of each page words to designate the election district for which it is to be used, and shall be ruled in appropriate columns, with printed or written headings, as follows: Date of registration; name of electors; age; and a number of blank columns for the dates of elections. All who register within four months before any regular election shall be entered on the poll books immediately after such election, and not before, so that the poll books will show only the names of those qualified to vote at such election. When election commissioners determine that any elector is disqualified from voting, by reason of being delinquent for poll tax, removal from the precinct, or other cause, that fact shall be noted on the registration book and his name shall be erased from the poll book. After disqualification for delinquency has been removed in subsequent years, the name of such elector shall be reinstated on the poll book without re-registration, and that fact shall be noted in the registration book."

5. *"Section 1.* The state board of election commissioners shall, as soon as practicable and thereafter at such times as it may deem advisable, consistent with the Constitution, prepare a series of application blanks, including the oath of the person offering to register, in compliance with Section 242 of the Constitution of this state, and including blank forms for furnishing of information, showing date of application, which shall be the date of registration if such applicant be approved for registration; name of applicant; age; occupation; where business carried on; if employed, by whom; place of residence; date such residence began; previous place of res-

idence; what oath applicant takes; if more than one person of the same name in precinct, by what name applicant wishes to be called; whether applicant has been convicted, and if so, when and where, of any of the crimes referred to in Section 241 of the Constitution of Mississippi, which are bribery, theft, arson, obtaining money under false pretenses, perjury, forgery, embezzlement and bigamy, and the moral character of applicant; all designed to test the ability of applicants for registration to vote to read and write any section of the Constitution of this state and give a reasonable interpretation thereof, and demonstrate to the county registrar a reasonable understanding of the duties and obligations of citizenship under a constitutional form of government; and to demonstrate to the county registrar that applicant is a person of good moral character as required by Section 241-A of the Constitution of Mississippi. Such applications shall be designed to exhibit the essential facts and qualifications necessary to show that such person is entitled to register and vote. Copies of such application blank forms shall be delivered to the county registrar of each county, and such copies shall be supplied to each county registrar as needed. The oath required by Section 242 of the Constitution shall be administered by the registrar. The board of supervisors is authorized to make proper allowances for office supplies reasonably necessary by this act. If no appeal has been or is taken as provided by law from the ruling of the registrar upon any application for registration, or if any application for registration is abandoned or waived by the applicant therein by making another application for registration before any final judgment or decision has been rendered on any prior application, or otherwise waived or abandoned same, the registrar is not required to retain or preserve any record made under the provisions hereof. *Section 2.* \* \* \* Registrar to register voters. The registrar shall register on the registration books of the election district of the residence of such person anyone appearing before him, and being, upon examination found, in compliance with Section 244 of the Constitution, as amended, and in compliance with Section 241-A of the Constitution of Mississippi to be entitled to be registered as an elector, upon such person taking

6. See Note 6 on Page 962.

and subscribing the oath required by Section 242 of the Constitution of Mississippi; but persons who may be entitled to register under the provisions of Section 251 of the Constitution of Mississippi, who would be otherwise disqualified by reason of age, may take the oath as modified by that circumstance, and the subscription of the oath shall be by the elector writing his name in the proper column in the registration book. *Section 3.* * * * Form of registration books. The registration books are to be in the following form: They shall have printed at the top of the pages the oath prescribed by Section 242 of the Constitution of Mississippi, and beneath shall be ruled appropriate columns, the headings of which shall be printed respectively, as follows, viz: date of registration; names of electors; age; occupation; where business carried on; if employed, by whom; place of residence in the district; what oath does elector take? If more than one person of same name in district, by what appellation does elector wish to be called? Has the elector met all of the requirements of Section 244 of the Constitution of Mississippi, as amended? Has the elector met all of the requirements of Section 241-A of the Constitution of Mississippi? Signature of elector; remarks. In the column headed 'What oath does elector take?' the registrar shall write the word 'general,' if the elector take the general oath prescribed, the word 'minister's,' or 'minister's wife,' if he or she take the oath as modified by the parenthetical sentence thereon; and the words 'special as to age,' if the elector will, as provided in Section 251 of the Constitution of Mississippi, become of age before the election next after he proposed to register; and in the column headed, 'Has the elector met, etc?' if he has met all the requirements of Section 244 of the Constitution, as amended, and Section 241-A of the Constitution of Mississippi, the word 'yes' shall be entered. And provided further, that when a new registration is ordered in a county that new registration books shall be purchased to comply with the form prescribed herein. And provided further, that persons registering in any such new registration books who were duly registered and qualified electors of this state prior to January 1, 1954, shall be entitled to register in such new registration books in accordance with the requirements of law in existence on said date; except that all persons registering after the effective date of this act shall be of good moral character as required by Section 241-A of the Constitution of Mississippi. *Section 4.* Should any provision or section of this act be held to be unconstitutional or otherwise invalid for any reason, such holding shall not be construed to affect the validity of any other part or portion of this act.

6. *"Section 1.* The sufficiency and the truthfulness of the statements made in the application to register to vote, and the contents thereof, and the good moral character of an applicant to register to vote are material, and this act is adopted to further enforce the requirements to register to vote as set out in the Constitution and laws of the State of Mississippi. *Section 2.* Any qualified elector of the county may challenge the good moral character of any applicant and any other requirement of any applicant to vote within fourteen (14) days after the date of the last publication of the name and address of such applicant by filing with the registrar an affidavit in duplicate setting forth facts upon which the challenge is based. Upon the filing of any such challenge the registrar shall within seven (7) days thereafter, exclusive of the date of the filing of such challenge, send to applicant by certified mail, addressed to him at the address shown on the application, one copy of such affidavit, and notice of the date, time and place where the registrar will hold an administrative hearing to determine the sufficiency of the application or challenge. *Section 3.* The registrar, who is an administrative officer of the county in which he serves as registrar, is hereby vested with full power and authority to hold and conduct such administrative hearing and render his decision thereon; he may render his decision at the completion of the hearing or may take the matter under advisement just as a court may do. *Section 4.* Such hearing shall be held in the office of the registrar or at some other place designated by the registrar in the county courthouse, and shall be set within a reasonable time after the date of the mailing of said notice. If there be two (2) judicial districts in the county, then the hearing shall be had in the courthouse of the judicial district in which the application to register is made. On his own motion or for good cause shown, the registrar may change the date and time of such hearing. At such hearing by the registrar he may hear oral and documentary evidence in support of, in challenge of, or denial of, the sufficiency of the application, the good moral character of the applicant, and as to any other require-

sippi Laws 1962),[7] and H.B. 903 (Chapter 571, Mississippi Laws 1962) [8] set out

in the footnotes for ready access thereto and analysis thereof.

ment which applicant must meet in order to be qualified to register to vote. *Section 5.* The registrar may issue subpoenas to be served by the Sheriff of the county to secure their attendance as witnesses and the production of documents at such hearing. Obedience to any such subpoena may be secured by the registrar by filing with the Circuit Judge, in term time or in vacation, a petition seeking enforcement, and the person subpoenaed shall obey the order of the Circuit judge made therein. The Circuit Judge, in vacation or in term time, is hereby vested with jurisdiction to hear and determine such petition, make proper orders thereon and issue appropriate process, and said petition shall be heard at such time and place as he may specify on five (5) days' notice to all parties. *Section 6.* The registrar shall administer to the witnesses who testify in said administrative hearing the same oath as is used in the trial of cases in the Circuit Court. *Section 7.* The registrar shall require all testimony taken before him to be taken down by a competent stenographer or reporter, and a transcript thereof shall be filed with and retained by the registrar as a record of his office. All costs of such proceedings may be taxed by the registrar in accord with the manner and practice pertaining to costs in the Chancery Court under the laws of this State. *Section 8.* If the decision of the registrar be that the applicant is qualified to register under the Constitution and laws of the State of Mississippi, he shall be forthwith registered; but if the registrar finds that applicant is not qualified under said Constitution and laws to be registered, he shall not register the applicant but shall mark his application 'failed'; but if he finds that applicant is not of good moral character he shall so endorse the application and state the facts upon which the finding of lack of good moral character is based. *Section 9.* At such hearing held by the registrar, applicant and any person or persons challenging the truthfulness or sufficiency of the application may be represented by counsel, but applicant and any challenger may appear pro se in and on his own behalf if they choose. Witnesses may be examined or cross-examined as in trials in the Circuit Court. *Section 10.* An appeal may be taken to the Board of County Election Commissioners by any persons against whom the registrar may

decide within the same time and in the same manner as is now provided for an appeal from registration or denial of registration by the registrar. *Section 11.* If the applicant or any challenger does not appear at the time and place set by the registrar for the hearing of any challenge, the registrar may, in his discretion, reset the hearing or may proceed and determine whether applicant is or is not, as the case may be, qualified under the Constitution and laws of the State of Mississippi to register to vote. The person or persons against whom the registrar decides may appeal as above provided just as if a hearing had been held. *Section 12.* Strict rules of evidence shall not be enforced at the hearing herein provided for. Witnesses may be examined by the applicant or his attorneys, and by the challenger or challengers or their attorneys. *Section 13.* The provisions of this act are intended to provide an additional administrative method whereby third parties may challenge the sufficiency of any application to register and the good moral character of an applicant, and are not intended to affect the right, duty and authority of the registrar to determine such qualifications, as now provided by law, if no challenge is made by any third party.

7. *"Section 1.* Within ten (10) days after the receipt by the registrar of any application to register to vote and before consideration is given to the sufficiency of the application, the registrar shall deliver for publication in a newspaper hereinafter described the name and address of such applicant as stated in said application and shall cause same to be published once each week for two (2) consecutive weeks in a newspaper having general circulation in the county where such applicant has applied to register, but if no such newspaper is published in such county, then publication shall be made in some newspaper published in an adjoining or other county but of general circulation in the county of the residence of the applicant. *Section 2.* The said name and address shall be published in said newspaper under a heading entitled: 'Applicants for registration to vote.' When said publication shall have been completed, proper proof of publication shall be furnished to the registrar and same shall be preserved

8. See Note 8 on Page 964.

The complaint as to the registrar of Amite County, the registrar of Claiborne County, the registrar of Pike County (all within the Southern District of Mississippi, but in different divisions of this district; and against the registrar of Coahoma County, the registrar of LeFlore County and the registrar of Lowndes County, all in different divisions of the Northern District of Mississippi), presents a much more difficult question. Surely, § 1971(c) authorized the United States to bring a suit against a registrar for any violation, or any threat of violation of the Civil Rights of a citizen through discrimination against that citizen in any manner, or to any extent by any sort of device however clever or concealed it may be.

It must be remembered that this is not a voting case. It is a registration case, but registration is a condition precedent to voting in Mississippi and the United States, as plaintiff, may seek preventive relief against a registrar as a person (as an official, indeed, but not as a private individual) under § 1971(c) on the basis that such registrar is doing or is threatening to do something in violation of 42 U.S.C.A. § 1971(a). It is not stated in the complaint that either one of these registrars ever did, or threatened to do anything in violation of that statute, but it is stated that these registrars were

as a record of his office. The cost of the publication and proof thereof shall be paid by the county out of its general fund at the rate for legal notices. *Section 3.* If within fourteen (14) days, exclusive of the date of the last publication of the name or names aforesaid, after the date of the last publication, no qualified elector of the county, other than the registrar, shall have challenged, in the manner prescribed by law, the good moral character of applicant and any other requirement which applicant must meet in order to be qualified to register to vote, the registrar shall within a reasonable time, under the circumstances, determine whether applicant has complied with the Constitution and laws of the State of Mississippi to entitle him to register to vote.

8. "*Section 1.* When the registrar shall have determined that an applicant to register to vote has qualified to register under the Constitution and laws of the State of Mississippi, he shall endorse upon the application the word 'passed,' or a word or words of equivalent meaning, and the applicant shall be entitled to register upon his request for registration made in person to the registrar, or deputy registrar, if a deputy registrar has been appointed. As is now required by law, no person other than the registrar or a deputy registrar shall register any applicant. It shall be the responsibility of an applicant for registration to make inquiry of the registrar, or the deputy registrar, if a deputy registrar has been appointed, to determine whether such applicant has passed and is qualified to register. *Section 2.* If

applicant be of good moral character, but has not otherwise complied with the Constitution and laws of this state to entitle him to vote, then the registrar shall endorse upon the application the word 'failed,' without specifying the reason or reasons therefor, as so to do may constitute assistance to the applicant on another application. *Section 3.* If applicant is otherwise qualified to register, but fails to demonstrate to the registrar that applicant is of good moral character and the registrar so finds, the registrar shall endorse upon the application the words 'not of good moral character,' and shall state the facts or reasons why he finds applicant not to be of good moral character. *Section 4.* If applicant is not otherwise qualified under said Constitution and laws and fails to demonstrate that he is of good moral character, then the registrar shall endorse upon the application the word 'failed,' and may endorse thereon the words 'not of good moral character,' but if he endorses the latter on the application he shall state the facts and reasons why he finds applicant not to be of good moral character."

NOTE: The foregoing footnotes and this opinion refers to the House Bills under attack as set out in the complaint by reference to the Chapter in the Session Laws where they appear and are the same as those referred to as being sections of the Mississippi Code 1942 as contained in the majority opinion. Each section of the Session Acts now appears as a separate section of the Code though such references are to the same laws.

literally administering and enforcing, as written, this package of eight laws which this suit was filed to invalidate. Significantly, at the bar, counsel for the government disavowed any intention, or purpose by the suit to charge any discrimination whatsoever in the administration of these statutes by either one of these registrars. But paragraph 5 of the prayer in the original complaint requested the Court to: "Make a finding that the defendant county registrars have deprived negro citizens of the right secured by 42 U.S.C.A. § 1971(a); and that such deprivations have been and are pursuant to a pattern and practice of racial discrimination." Nowhere in the complaint is to be found any charge, or statement of any ultimate fact to the effect that either one of the sections of the Mississippi Constitution (§ 241–A and § 244) or either one of the statutes implementing said sections (Mississippi Laws 1962, Chapters 569, 570, 571, 572, 573 and 574) were wrongfully, or erroneously or discriminatorily applied in any manner to any colored person. The gravamen and sole basis of the action and claim against these registrars is that they very properly administered and applied these laws which are alleged to be unconstitutional, and that thereby a claim has accrued to the United States. The plaintiff accordingly asserts a demand, not for preventive relief, but for relief which could only be provided by a Mississippi legislative enactment as the opinion in chief sets forth and demonstrates.

Precisely, the claim against these registrars is that they are alleged to be engaged in administering these constitutionally invalid laws. The claim being more specifically that since only 5% of all adult negroes are registered, and since approximately 67% of all adult white citizens are registered, that the disparity and imbalance resulting from such circumstance will necessarily operate with discrimination against negroes. The fallacy of that claim is readily apparent.

The law and its application and enforcement with an even hand, and completely without regard to race or color, simply defies any tenable criticism of its constitutional validity.

The case of Darby v. Daniel, D.C., 168 F.Supp. 170, was a carefully studied and prepared opinion of a three judge court composed of three distinguished Federal jurists from Mississippi. That decision settled the law as to the constitutionality of § 244, Mississippi Constitution 1890 and implementing statutes and decided it correctly and no appeal was taken. There, the Court said: "We hold, therefore, that plaintiffs have wholly failed to establish that the amendment to Section 244 of the Mississippi Constitution of 1890 is void on its face, or because it was the product of base motives. We hold, on the other hand, that said amendment and the statutes passed in connection with it are valid on their face and in fact, are a legitimate exercise by the State of its sovereign right to prescribe and enforce the qualification of voters." That decision is decisive of most of the constitutional questions again presented here.

It is suggested that the literacy test in Mississippi is invalid because of the sweep of discretion thereby afforded a registrar in giving a test to an applicant. It will be noted that § 244[2] and the implementing statute[3] do not vest a registrar with any naked, unbridled power for arbitrary action on any application. Common sense, honesty, and fair play are the guiding stars of any genuine interpretation such as is contemplated here. In Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220, in referring to this laundry ordinance of the county which was designed to put the Chinese laundryman out of business, the Court in condemning it said: "The power given to them is not confided to their discretion in the legal sense of that term, but is granted to their mere will. It is purely arbitrary, and acknowledges neither guidance nor restraint." Likewise in Gomillion v. Lightfoot, 364 U.S. 339, 81

2. See Note 2 on Page 960.

3. See Note 3 on Page 960.

S.Ct. 125, 5 L.Ed.2d 110, the Court condemned a state statute which was designed and intended to change the boundary of Tuskogee so as to exclude substantially all negroes from the municipality. The Court said: "The complaint amply alleges the claim of race *discrimination*. Against this claim the respondents have never suggested, either in their brief or in oral argument, any countervailing municipal function which Act 140 [was] designed to serve." There is nothing in any statute before this Court which has any such intent, purpose or effect. Section 702, Mississippi Code 1942, captioned: "Rules—how words to be construed: All words and phrases contained in the statutes are used according to their common and ordinary acceptation and meaning; but technical words and phrases according to their technical meaning." The term good moral character requirement for citizenship is not a vague and meaningless term. It must be understood and construed according to the common acceptation of that phrase. *It does not mean to define or require prudery or matchless excellence in moral conduct and behavior.* It must be construed in its context as a requirement and qualification for suffrage that the applicant possess the commonly accepted standard of the average citizen for good moral character. A negro applicant need not measure up to the standard of the *highest class citizen in his community,* but the statutory standard would not be met by measuring up to the lowest standard of person who might enjoy the privileges of citizenship. The term does not lend itself readily to precise definition or exact standards. No comprehensive definition of good moral character has ever been attempted by any legislative body or judicial tribunal. Likewise, no court has ever comprehensively defined due process, probable cause, or due care, but down through the ages the courts and juries of this country have resolved thousands of controversies depending upon the meaning of those terms without a suggestion that the laws containing such nebulous terms were themselves invalid because of lack of standards and guide lines in such laws for the application of such terms. The standard of fairness and reasonableness of an honest person in properly applying such test has been accepted generally by the judiciary as a full compliance with all of the requirements of due process and fair play.

The vagueness doctrine does not condemn the phrase even if it appeared in a criminal statute. Words like "moral turpitude," "good behavior," and other such ambiguous and nebulous phrases have appeared in our statutes for almost a century. The courts have understood them and applied them according to the common understanding and practices with respect thereto. In Jordan v. DeGeorge, 341 U.S. 223, 71 S.Ct. 703, 95 L. Ed. 886 it is said: "We have several times held that difficulty in determining whether certain marginal offenses are within the meaning of the language under attack as vague does not automatically render a statute unconstitutional for indefiniteness. United States v. Wurzbach, 1930, 280 U.S. 396, 399 [50 S.Ct. 167, 168, 74 L.Ed. 508]. Impossible standards of specificity are not required. United States v. Petrillo, 1947, 332 U.S. 1 [67 S.Ct. 1538, 91 L.Ed. 1877]. The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. Connally v. General Construction Co., 1926, 269 U.S. 385 [46 S.Ct. 126, 70 L.Ed. 322]."

In Brukiewicz v. Savoretti, (5CA) 211 F.2d 541. This Circuit in affirming the findings of the examiner as to the good moral character of a petitioner for naturalization said: "A wide discretion is vested in the trial judge in determining whether or not 'good moral character' exists. It is to be determined as that term is generally understood, but petitioner's character must measure up to that of the average citizen in the community in which he resides before he is entitled to citizenship by naturalizaton."

In Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498, the ques-

tion before the Court was the constitutionality of a criminal obscenity statute said to violate due process because too vague to support conviction for crime. "Many decisions have recognized that these terms of obscenity statutes are not precise. This Court, however, has consistently held that lack of precision is not itself offensive to the requirements of due process. '* * * [T]he Constitution does not require impossible standards'; all that is required is that the language 'conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices * * *.' United States v. Petrillo, 332 U.S. 1, 7–8 [67 S. Ct. 1538, 1542, 91 L.Ed. 1877]. These words, applied according to the proper standard for judging obscenity, already discussed, give adequate warning of the conduct proscribed and mark '* * * boundaries sufficiently distinct for judges and juries fairly to administer the law * * *. That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense * * *.' Id., 332 U.S. at page 7 [67 S. Ct. at page 1542]. See also United States v. Harriss, 347 U.S. 612, 624, note 15 [74 S.Ct. 808, 815, 98 L.Ed. 989]; Boyce Motor Lines, Inc. v. United States, 342 U.S. 337, 340 [72 S.Ct. 329, 330, 96 L.Ed. 367]; United States v. Ragen, 314 U.S. 513, 523–524 [62 S.Ct. 374, 378, 86 L.Ed. 383]; United States v. Wurzbach, 280 U.S. 396 [50 S.Ct. 167, 74 L. Ed. 508]; Hygrade Provision Co. v. Sherman, 266 U.S. 497 [45 S.Ct. 141, 69 L.Ed. 402]; Fox v. State of Washington, 236 U.S. 273 [35 S.Ct. 383, 59 L.Ed. 573]; Nash v. United States, 229 U.S. 373 [33 S.Ct. 780, 57 L.Ed. 1232]."

In Marie Posusta v. United States, (2 CA) 285 F.2d 533, an applicant was denied citizenship for want of good moral character and the Court said: "Much has been written as to the scope of that phrase, and, as was inevitable, there has been disagreement as to its meaning. However, it is settled that the test is not the personal moral principles of the individual judge or court before whom the applicant may come; the decision is to be based upon what he or it believes to be the ethical standards current at the time. United States ex rel. Iorio v. Day, 2 Cir., 34 F.2d 920, 921; Repouille v. United States, 2 Cir., 165 F.2d 152, 153; United States v. Francioso, 2 Cir., 164 F.2d 163; Schmidt v. United States, 2 Cir., 177 F. 2d 450, 451, 452; Johnson v. United States, 2 Cir., 186 F.2d 588, 590, 22 A.L. R.2d 240."

In Kahm v. U. S., (5CA) 300 F.2d 78, in answer to an attack on a statute for vagueness it was said: "Nothing is more common than for a jury in a case involving charges of negligence, as for example negligent homicide, to determine whether the proven conduct measures up to the standards of a reasonably prudent man." United States v. Levine, (2CCA) 83 F.2d 156, says: "Thus 'obscenity' is a function of many variables, and the verdict of the jury is not the conclusion of a syllogism of which they are to find only the minor premise, but really a small bit of legislation ad hoc, like the standard care."

In Gundling v. City of Chicago, 177 U.S. 183, 20 S.Ct. 633, 635, 44 L.Ed. 725, an ordinance of the city of Chicago submitted to the mayor the question of the fitness of a party to have a license to sell cigarettes. This question was submitted for the exercise of discretion of a judicial nature. No standards are contained in the ordinance to guide the mayor in his decision. The Court in upholding that ordinance against Federal attack said: "Regulations respecting the pursuit of a lawful trade or business are of very frequent occurrence in the various cities of the country, and what such regulations shall be and to what particular trade, business, or occupation they shall apply are questions for the state to determine, and their determination comes within the proper exercise of the police power by the state, and unless the regulations are so utterly unreasonable and extravagant in their nature and purpose that the

property and personal rights of the citizens are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without due process of law, they do not extend beyond the power of the state to pass, and they form no subject for Federal interference. As stated in Crowley v. Christensen, 137 U.S. 86 [11 Sup.Ct.Rep. 13, 34 L.Ed. 620], 'the possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community.' Whether there is or is not a delegation of power by the common council to the mayor is not in this case a Federal question. We have no doubt that the ordinance, so far as the objection above considered is concerned, was clearly within the power of the state to authorize, and must be obeyed accordingly." Again in Breedlove v. Suttles, 302 U.S. 277, 58 S.Ct. 205, 82 L.Ed. 252, "The privilege of voting is not derived from the United States, but is conferred by the state and, save as restrained by the Fifteenth and Nineteenth Amendments and other provisions of the Federal Constitution, the state may condition suffrage as it deems appropriate."

It has been repeatedly held that a state may properly require a literacy test as a condition precedent to suffrage. It is significant that in paragraph (e) of this same 42 U.S.C.A. § 1971 in the fourth unnumbered paragraph of that subparagraph, provision is made for a literacy test wherein the act provides: "Where proof of literacy or an understanding of other subjects is required by valid provisions of State law, the answer of the applicant, if written, shall be included in such report to the court; if oral, it shall be taken down stenographically and a transcript included in such report to the court." The United States cannot reconcile its complaint in this case with the announcement of the Supreme Court of the United States in Minor v. Happersett, 21 Wall. 162, 88 U.S. 627, 22 L.Ed. 627, which held: "The United States has no

voters in the states of its own creation. The constitution of the United States does not confer the right of suffrage upon anyone." The sole function of the United States in this voting area is to prevent discriminations under the 14th, 15th and 19th Amendments, but the general prerogative of a state is to condition suffrage as it sees fit. Mississippi has seen fit and deemed it proper to require a voter (regardless of his color, race or origin) to be possessed of good moral character. That requirement was inserted in the organic law of the state by its insertion in § 241–A of the state constitution. It is complained that the term good moral character is not defined, and that no guide lines are supplied for its application, and that it is, therefore, a mere naked power subject to the capricious will of some irresponsible registrar. An examination of Chapter 573, Mississippi Laws 1962,[6] will demonstrate to anybody that arbitrary action in the application of such test as to good moral character cannot exist in any administration of such law. A full hearing is provided for. The entire hearing must be recorded by a reporter. Quick and inexpensive appeal procedure is written into this act in addition to the general sections for appeals from the administrative rulings of the registrar. His rulings have no finality or conclusiveness and has no binding effect upon the election commissioners, or upon the circuit court on the second successive appeal.

Chapter 569, Mississippi Laws 1962[5] is next assailed as being unconstitutional as being in conflict with 42 U.S.C.A. § 1974 which requires a registrar to preserve and retain certain records and papers coming into his possession relating to the registration processes for a period of twenty-two months. Section 1974 of that volume makes it a crime punishable by a fine and imprisonment for the destruction, concealment, mutilation or alteration of any such records. The pertinent part of the Mississippi act assailed provides that when no appeal has been taken by an applicant from a ruling of

6. See Note 6 on Page 962.

5. See Note 5 on Page 961.

the registrar upon his application or when his application is waived or abandoned by making another application for registration before final judgment or decision is rendered on any prior application, then *"the registrar is not required to retain or preserve any record made under the provisions hereof."* Clearly, the state act does not require a destruction of such records but provides that they need not be kept for any state purpose. The Federal act simply intervenes and supersedes and overrides the state enactment to require the preservation of such records even under those circumstances for twenty-two months after an election to enable the Attorney General of the United States to investigate such records within said time after an election to determine and resolve any question therefrom relating to that election. The constitutionality of that state enactment under such circumstances cannot be gainsaid.

Actually, a suit against a registrar is basically a local action. It cannot be treated as in this case as a joint and several action against these six defendant county registrars for their entirely separate and distinct and disconnected activities done in the performance of their duties done solely in their respective counties. That is necessarily so in this case where no registrar in one of the counties has ever done any official act in any other county and could not legally do so. But if any fallacy in law exists in that observation, then every registrar in each of the eighty-four counties in this state would be necessary and indispensable parties to this suit, and for lack of jurisdiction of anyone of whom, this Court could not proceed in their absence under Civil Rule 19.

This is not a diversity suit, and under the general venue statutes in this Court an action which is local in nature can be instituted only in the district of the residence of the defendant. The important considerations here, however, lie in the fact that the complaint nowhere charges that anyone of these registrars ever wrongfully did anything to deprive any negro of the right to register to vote in Mississippi. This is not a case wherein relief is sought against a registrar for discrimination. These registrars are charged with having applied the election laws of this sovereign state with an even hand to all citizens alike. It does not state a right of action of any kind against either one of these registrars. We are, therefore, undeniably faced with a complaint which fails to state a claim upon which any relief can be granted.

It is the clear and positive duty of the Court to consider and act upon motions like these before the Court in this case in limine to forestall any unnecessary delay or expense in protracted litigation. That is the unmistakable teaching of such cases as Flanders v. Coleman, 250 U.S. 223, 228, 39 S.Ct. 472, 63 L.Ed. 948; Kvos v. Associated Press, 299 U.S. 269, 278, 57 S.Ct. 197, 81 L.Ed. 183; State of Rhode Island v. Com. of Mass., 12 Pet. (37 U.S.) 657, 718, 9 L.Ed. 1233; Walmac Co. v. Issacs, (1CA) 220 F.2d 108, 111; Battaglia v. General Motors Corp., (2CA) 169 F.2d 254, 256, cert. denied 335 U.S. 887, 69 S.Ct. 236, 93 L.Ed. 425. This Court in its exercise of a sound judicial discretion received and considered the motions of the defendants for lack of jurisdiction and for failure to state a claim against the defendants upon which relief could be granted, as provided by Civil Rule 12(b), and properly sustained those motions for the reasons indicated when it became perfectly apparent to the Court that there was no possible substance in the complaint.

Civil Rule 8(a) requires a complaint to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief" and "a demand for judgment for the relief to which he deems himself entitled." That rule permits the full application of the Notice Pleading Doctrine to any complaint filed under this rule in a Federal Court. Nevertheless, a pleader must state enough of the ultimate facts and circumstances relied upon to give the adversary some reasonable notice under the rules of fair play to apprise him of the claim asserted

against him. Mere conclusions of the pleader without some ultimate factual basis, and bare statistics without some causal connection assigned thereto other than shallow insinuations or unsupported inferences does not satisfy the Rule 8(a) requirement for a short and plain statement of the claim. The complaint contains thirty-five legal cap pages, arranged in seventy paragraphs, so it is not short and is equally and as certainly not plain. The Court in McGuire v. Todd, (5CA) (1952) 198 F.2d 60, affirmed a dismissal of a Civil Rights suit by the trial court for such infirmity and lack of substance as here. Cf: Haley v. Childers, (8CA) 314 F.2d 610, 613, where it is said: "But a mere conclusion of law or, as here, a naked conclusory allegation that a bargaining contract violates a federl statute, has no efficacy and is wholly insufficient to confer jurisdiction upon the federal court where such allegation is unwarranted by the asserted facts and is contradictory to well pleaded facts." Stripped of such conclusions and deductions of the pleader, the complaint in this case simply seeks a declaratory judgment to have this court declare that two sections of the Mississippi Constitution 1890, and six statutes enacted in 1962 to implement those constitutional provisions as being invalid. United States counsel at the bar readily admitted in questions from the bench that discrimination was not involved in this suit; that the plaintiff relied upon § 1971(c) as its sole authority for this suit, and that there was no authority for this suit unless expressly found in that act. There is an absolute dearth of any notice to be found anywhere in this complaint that any one of the defendants ever violated § 1971(a), except by enforcing those state laws exactly as written. Attacks on those laws constituting the backbone of the entire election machinery of this state are predicated upon alleged constitutional weaknesses and infirmities in such laws themselves. It is not asserted that the State of Mississippi as a sovereign entity ever did anything to or

against any citizen in the execution of such laws. Similarly, it is not asserted that the State Election Commissioners (composed of the Governor, Secretary of State and Attorney General) ever did anything other than prepare the form of application for use of the applicants to register, and it is not asserted that their legislative action was not performed exactly as directed by the Legislature (Chapter 569, Laws 1962).[5] Likewise, it is not asserted that any one of the six county registrars in this suit ever did anything, or threatened to do anything other than administer those laws exactly as written.

A state has the right to declare all of the qualifications for voting within the state. The Federal government has no power, or authority whatever in this field, except to prevent any discrimination among voters and any denial of the right of any citizen to vote on account of his race or color. Any extension of such power or authority of the Federal government would be an usurpation of state authority and an encroachment upon its sovereign domain. "[T]he privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution. * * * The question whether the conditions prescribed by the state might be regarded by others as reasonable or unreasonable is not a Federal one." Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817. Speaking of the 15th Amendment, the Court in Guinn & Beal v. United States, 238 U.S. 347, 35 S.Ct. 926, 930, 59 L.Ed. 1340, the Court said: "Beyond doubt the Amendment does not take away from the state governments in a general sense the power over suffrage which has belonged to those governments from the beginning, and without the possession of which power the whole fabric upon which the division of state and national author-

5. See Note 5 on Page 961.

ity under the Constitution and the organization of both governments rest would be without support, and both the authority of the nation and the state would fall to the ground. In fact, the very command of the Amendment recognizes the possession of the general power by the state, since the Amendment seeks to regulate its exercise as to the particular subject with which it deals."

The United States answered interrogatories propounded by the defendants and took some depositions out of which the gossipy and irrelevant material found in the last half of the dissenting opinion herein was lifted. This material came from the thesis of a political science student at Ole Miss who was writing for his Master's Degree, probably with no thought of playing such an important and prominent role in a court opinion. It is my firm conception of the law that statements subsequently or even precedently made by a member of a constitutional convention as to its purpose and intent could have no possible legal effect upon the validity of the convention product. What some state Supreme Court judge said in a book on the Mississippi Constitution as to the problems before the convention and its solution of the race problem in the state, certainly could not claim relevancy for its production.

The meaning, intent and purpose of an unambiguous act must be obtained from the act itself and not from the expressions of legislators or their committees. Marche v. United States, (5CCA) 126 F. 2d 671. United States v. Ogilvie Hardware Company, (5CCA) 155 F.2d 577. It is never permissible to allow the discussions and views of legislators, friendly or unfriendly to such legislation, to disparage the validity of the ultimate work product of the legislative body. Any such impeachment in such manner of an unambiguous enactment would violate every principal of estoppel. The speeches of a legislator and the discussions of an enactment in committee, or even explanations of a witness before the committee as to the meaning, or intention or purpose of a statute is universal-ly considered a very poor and impoverished source on which to rely to glean the legislative intent. A legislative body is presumed to say what it means, and to mean what it says. It is not within the province of any legislator or member of a constitutional convention to disparage the validity of an enactment of such legislative body by materials of such source. That does not mean to say that a Court should close its eyes and ears to facts and circumstances surrounding an enactment when clarity of expression makes it necessary to resort to extraneous evidence to determine the meaning and intent of an ambiguous statute, or constitutional section. But there is nothing hidden, or concealed or built-in to either of these statutes which would affect its validity. These statutes and constitutional sections here contain nothing invidious, or insidious, as in Gomillion, and in Yick Wo, so strongly relied on in the dissent. These election statutes are paragons of equity of treatment of all citizens of both races alike.

According to the universal rule of statutory construction, there is the very strongest presumption in favor of the validity of each of these statutes. It is a strange philosophy which seizes upon every charge of discrimination and every claim of unconstitutionality in a statute as affording an opportunity if not an open invitation to invalidate such statute rather than sustain it. That presumption of validity must attend every statute throughout the trial of any case and be overcome only by the clearest and most convincing evidence to the contrary. In this case we are met with the extremely tenuous claim that these statutes in this case were bred and born in an atmosphere of inequity and invalidity and such evils inhere therein to invalidate them regardless of the fairness and impartiality with which such laws function and are administered. In Fleming v. A. H. Belo Corporation, (5CCA) 121 F.2d 207, in speaking of Congressional debates as reflecting upon the intent of Congress in an enactment, it is said: "It is just because of this fact, that legislation is

compromise, that the views of the proponents and of the opponents, as to the purposes and effect of the legislative act, are never regarded as of value in a construction of it, and that it is settled law that statutes must be construed in accordance with the intent of the legislature as expressed in the language of the act as a whole. Its meaning may not be sought by the courts in the vague penumbrae of the wishes and desires of its proponents or its opponents as these are expressed in debates."

In United States v. Trans-Missouri Freight Ass'n., 166 U.S. 290, 17 S.Ct. 540, 550, 41 L.Ed. 1007, the Court said: "There is, too, a general acquiescence in the doctrine that debates in congress are not appropriate sources of information from which to discover the meaning of the language of a statute passed by that body. U. S. v. Union Pac. R. Co., 91 U.S. 72, at page 79 [23 L.Ed. 224]; Aldridge v. Williams, 3 How. 9–24 [11 L.Ed. 469], Taney, C. J.; Mitchell v. [Great Works Milling &] Manufacturing Co., 2 Story, 648, at page 653, Fed.Cas.No.9,662; Reg. v. Hertford College, 3 Q.B. Div. 693, at page 707. The reason is that it is impossible to determine with certainty what construction was put upon an act by the members of a legislative body that passed it by resorting to the speeches of individual members thereof. Those who did not speak may not have agreed with those who did, and those who spoke might differ from each other; the result being that the only proper way to construe a legislative act is from the language used in the act, and, upon occasion, by a resort to the history of the times when it was passed."

Section 244, Mississippi Constitution 1890 was before the United States Supreme Court in 1898 in Williams v. State of Mississippi, 170 U.S. 213, 18 S.Ct. 583, 42 L.Ed. 1012, where it was complained that this 1890 convention by this § 244 discriminated against the characteristics and the offenses to which negro members are prone; and that the section contained no standards for use by the registrar in applying his test to a citizen desiring to register to vote and that such discretion was thus unlimited and unreasonable and invalid. Yet, the Federal Supreme Court said that the Mississippi Constitution and laws passed pursuant thereto prescribing the qualifications of the voter and investing administrative officers with a large but sound discretion in determining what citizens have the necessary qualifications, cannot be held repugnant to the 14th Amendment merely on a showing that they operate as a discrimination against the colored race. As the complaint states [paragraph 50(b)] that § 241–A, providing the good moral character requirement provided "an additional device with which registrars *could* discriminate against negro citizens who seek to register to vote." Such an averment is merely a suggestion of a possibility and nothing more which was discarded by the Court as ineffectual in Williams v. State of Mississippi, supra, to assail the validity of an act. Unless all of these eight state laws are facially invalid, the entire suit must fail. Environment of a legislative body, even an evil intent of its membership and an unlawful purpose cannot serve to invalidate its legislation because thereof. It is not contended or even suggested that all unregistered white people who apply for registration do not have to comply with all of the requirements of this entire package of laws and satisfy and demonstrate to the registrar that they possess all of the qualifications and none of the disqualifications to register to vote. The fact that such laws may discommode or inconvenience a negro citizen or even work a hardship upon him to comply with such requirements to entitle him to register to vote, does not present any constitutional infirmity in such laws. The sovereign State of Mississippi has the right to declare the qualifications of its citizens to register to vote, and every one of the qualifications in this state therefor have been repeatedly approved as valid. Substantially all requirements of the State of Mississippi for registration to vote have been uniformly approved without exception.

United States v. Atkins, (5CA) 323 F.2d 733; Trudeau v. Barnes, (5CCA) 65 F.2d 563; cert. denied 290 U.S. 659, 54 S.Ct. 74, 78 L.Ed. 571; Lassiter v. Northhampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072.

This is not a school case. It is not a public accommodations case. These collateral questions may not be desperately drawn into this case to confuse the sharp and clear issues as to the validity vel non of these Mississippi election laws. Statistics are resorted to frequently by those advocates who find themselves without substantial factual support in the genuine issues at hand. Here, much is made in the complaint and in the dissent about only 5% of the adult negro citizens being registered while 67% of the adult white citizens are registered. This Court judicially knows that negroes never manifested any substantial interest in registering or voting in Mississippi prior to a direct appeal to them from President Kennedy to do so. The weakness of such statistics is more apparent when it is realized that the complaint in this case does not undertake to link the registrars with any responsibility therefor and actually assigns no causal reason therefor; doubtless because it could not be truthfully said and certified that very many qualified negro citizens (possessing all of the qualifications and none of the disqualifications) had applied to some registrar to register and had been rejected. Surely, a qualified colored citizen who did not care to register and had never bothered about voting, could not expect to find his name on a registration roll unless he had exerted himself to do the necessary to put it there.

Since the registrars are thus parties to this suit instituted for the sole purpose of having these eight laws in a package declared unconstitutional, and since this case, therefore, does not involve an instance where anyone of these registrars has done anything to wrongfully deny any negro the right to register to vote in his county, it must follow that this Court has no jurisdiction of the sovereign state, and that the complaint fails to state a claim against the other defendants upon which relief can be granted. If this suit were not an attack on the validity of these election laws, but only an attack on the enforcement thereof by these registrars, it would not be a three judge case as it is. It is said in Sealy v. Department of Public Instruction of Penn., et al., (3CA) 252 F.2d 898; cert. denied 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1149, *"Mere attack on regulations or method of enforcement of a statute is not sufficient to justify the interposition of a three-judge court.* Ex parte Bransford, 1939, 310 U.S. 354 [60 S.Ct. 947, 84 L.Ed. 1249], William Jameson & Co. v. Morgenthau, 1938, 307 U.S. 171 [59 S.Ct. 804, 83 L.Ed. 1189]."

The election machinery in this state contains every constitutional safeguard against any possible invalidity, including that of due process. Under § 3217–03, Mississippi Code 1942, the registrar "who is an administrative officer of the county in which he serves as registrar" is vested with the full power and authority to conduct administrative hearings and render his decision upon any application to register at the time or he may take the matter under advisement as a court may do. Under § 3217–04, Mississippi Code 1942, provision is made for hearings in the county on such applications to register. He may issue subpoenas for witnesses under § 3217–05. Section 3217–07, Mississippi Code 1942, requires the registrar to have all testimony taken before him to be taken down by a competent reporter and a transcript thereof filed with and retained by him in his office. Section 3217–09, Mississippi Code 1942, provides that an applicant may appear in person or by counsel at such a hearing and may examine or cross-examine witnesses as in the circuit court. Section 3217–10, Mississippi Code 1942, provides for an appeal from any decision of the registrar to the Board of County Elections Commissioners. A general section of the Code provides for a further appeal to the circuit court and even to the Supreme Court of the state. Chapter 573, Mississippi Laws

1962 provides for an appeal to the circuit judge in term time or in vacation on the good moral character requirement of the act. Liberal provision for hearings and quick decisions on appeals differentiate this entire election system from others which have been condemned because a registrar's acts were unlimited as to discretion and contained naked powers for arbitrary and capricious actions which were final and conclusive.

These Mississippi election laws at bar fairly demonstrate upon their face the recognition and application of all of the rules of fair play and impartial treatment of all citizens of both races alike. The majority opinion and ensuing judgment in this case in its entirety is irrefragably correct and I concur therein.

JOHN R. BROWN, Circuit Judge (dissenting):

In the opening bars, the Court [1] sounds the theme of a clash between the indestructible union and the indestructible state. The tone of indestructibility is good. For history tells us that no political institution is indestructible. If it is to survive, it must save itself from destruction. It is the peril of destruction which is what this case is all about. For no state, and no nation, can survive if, professing democratic rule of the governed, it flagrantly denies the voting right through racial or class discrimination.

The resulting facts are not in dispute. Mississippi must candidly admit that no more than 5% of its adult Negro citizens are registered to vote. This means that public rule comes from the 67% of white adults who are. The contest is whether this is the result of discriminatory state "Constitution, laws, customs, or usages" in violation of the Civil Rights Act, 42 U.S.C.A. § 1971(a).

That contest is a big one. It is no little controversy between one or more individual Negro voters and individual Registrars. It is between all Negro adults and the State. Indeed, it is between all citizens of the United States and the State. In that setting, it is fitting that the protagonists appear to be what they really are—the United States and the State of Mississippi. The decisive question is, therefore, whether the United States may maintain this suit and whether it may be maintained against the State of Mississippi. Once that is decided, nearly everything falls into place, or becomes a matter of superficial consequence.[2] Once that is established, even the sketchy analysis enforced by time [3] will demonstrate two things. First, in dismissing the complaints for failure to state a claim, F.R. Civ.P. 12(b), the majority ignores settled principles of federal procedure. Second, on application of correct principles, the Government's complaint and the supplemental showing by answers to interrogatories is more than adequate to demonstrate that the Government might prevail in whole or substantial part.

Such consideration of the constitutional attacks will also expose the ma-

1. As discussion of court decisions, opinions, etc., inevitably calls for use of terms, such as "the Court," or "this Court," I refer hereafter to the Court's decision and opinion in the instant case as the majority. Likewise, by the abbreviation "Fifth Circuit," I refer to the United States Court of Appeals for the Fifth Circuit of which Judge Cameron and I are members.

2. See, for example, dismissal of the State Board of Election Commissioners (the Governor, Secretary of State, Attorney General) majority opinion Part VI; misjoinder of causes of party defendants, Part VII; lack of jurisdiction over per-

son of three registrar defendants, Part VIII; improper venue as to one registrar defendant, Part VIII; or necessity for separate trials as to each registrar to obtain a pattern or practice, finding and remedy, Part VIII.

3. In publishing its opinion without awaiting time for preparation of this dissent, the majorty presumably thought it desirable that this case reach the Supreme Court along with, or at least not too long after, the appeal in United States v. State of Louisiana, D.C.La., 1963, (3-Judge) 225 F.Supp. 353–403. I would agree with this objective.

jority's fundamental misconception of the nature of the Government's suit. It is not, as the majority repeatedly emphasizes, one attacking the statutes on their *face*. Nor is it one seeking relief because statutes valid on their face, and valid in fact, are being discriminatorily applied.

Discrimination is, to be sure, an important element of the Government's thesis. But the discrimination sought to be proved, both in practice and in result, has a far greater function. For the Government's theory—which it seeks an opportunity to establish factually—is simply this: The underlying Mississippi constitutional provisions and the implementing statutory law regulating registration of voters came into being—and are currently maintained—out of a purpose by the organized State to deny Negroes the right to vote by contriving a structure having the appearance of legality, but having known, built-in devices which would, and did, effectually deny or overwhelmingly discourage the Negroes' effort toward full citizenship. The immediate means—the understanding test—must be judged, both in its purpose and in its effect, by the segregated policy of education and the wide disparity in the quality and quantity of education afforded by Mississippi to its white and Negro children. Likewise, these registration enactments must be considered against the background of official State action denying an effective use of voting rights by Negroes fortunate enough to be registered. One interesting facet of this Grand Design is the speed and apparent effectiveness of the State's reflex to Federal Court decisions or congressional enactments which tend, or seem, to restore some small portion of the Negro citizens' rights.

## I.

### The United States May Sue

As I read Part IX, the majority declares that this character of broad attack may not be brought by the United States because it has not been "expressly authorized to sue by Act of Congress." 28 U.S.C.A. § 1345. To avoid some supposed constitutional restrictions on the right of the national sovereign to authorize itself to sue in its own Courts to protect the rights of its citizens, the majority reads 42 U.S.C.A. § 1971(c) and (d) narrowly. This leads to the conclusion that although Congress has authorized suits by the Government to protect identifiable individuals from actual or threatened discrimination by identifiable State officials in the administration of valid laws, the Government may not, under this statute, maintain a suit attacking the constitutionality of statutes or State constitutional provisions which bring about like discrimination, only wholesale. An odd reverse of the discarded notion that "The King Can Do No Wrong," it is a declaration that an indestructible nation can right only little wrongs, not big ones.

There are a number of answers which may be briefly put. First, I can conceive of no constitutional hazard. The Fourteenth and Fifteenth Amendments are ample resources if specific legislation is required. I would have considerable doubt that specific legislation is needed. Jurisdiction, as such, while always a threshold question, is here of no moment. Whatever might be the affirmative grant of jurisdiction, it is clear that Congress has not prohibited such suits. The proviso of 28 U.S.C.A. § 1345 is thus irrelevant, and the balance of the section imposes no requirement that a suit "commenced by the United States" be expressly authorized by an Act of Congress. This latter requirement is confined to suits commenced "by any agency or officer" of the United States.[4]

4. 28 U.S.C.A. § 1345. "Except as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agency or officer thereof expressly authorized to sue by Act of Congress."

Whether in a given situation the United States has standing to sue on behalf of citizens may present a problem. But it does not go to the jurisdiction of the Court as is here supposed. And as to standing to sue in vindication of fundamental, vital rights of citizenship of a kind which Congress recognizes may be vindicated at the behest of a private person,[5] I join with Judge Wisdom in United States v. City of Jackson, Mississippi, 5 Cir., 1963, 318 F.2d 1, 14–16; 320 F.2d 870. I would hold that, apart from the Fourteenth Amendment, the Commerce Clause there, and the Fifteenth Amendment here, invest the national sovereign with the power to institute in its own Court appropriate judicial action "to promote the interest of all" by eradicating engrained official patterns of conduct which "collides with national policy as embodied in the Constitution." In re Debs, 1895, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092;[6] United States v. San Jacinto Tin Co., 1888, 125 U.S. 273, at 279, 8 S.Ct. 850, 31 L.Ed. 747; United States v. American Bell Telephone Co., 1888, 128 U.S. 315, 367, 9 S.Ct. 90, 32 L.Ed. 450; Sanitary District of Chicago v. United States, 1925, 266 U.S. 405, 425–426, 45 S.Ct. 176, 69 L.Ed. 352.

But none of these problems exist here. Congress has laid down the substantive standard in § 1971(a), has prescribed the machinery to effectuate such rights in § 1971(c) and has invested the District Courts with jurisdiction by § 1971(d). Under this structure whenever "any person," which includes the State, is enagaging "in any act or practice which would deprive any other person of any right * * * secured by subsection (a) * * * the Attorney General may institute * * * in the name of the United States, a civil action or other proper proceeding for preventative relief * * *."[7] Here, of course, it is categorically alleged that the State of Mississippi and the other named defendants are depriving adult Negro citizens of Mississippi "who are otherwise qualified by law to vote" of their right to "be entitled and allowed to vote * * * without distinction of race, color, * *." Of course, the phrase "who are otherwise qualified by law to vote" is important. Injunctive relief or the benefits of the referee machinery, § 1971(e), extend only to those "otherwise qualified." But to read it as narrowly as does the majority would make the statute ineffectual and virtually useless. "Otherwise qualified" simply means that had there been either (a) no invalid statu-

5. 42 U.S.C.A. § 1983; cf. Monroe v. Pape, 1961, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492.

6. As the Court pointed out, "*Debs* has been relied on as a basis for standing in three recent cases in this circuit: United States v. Lassiter, W.D.La.1962, 203 F.Supp. 20, aff'd 371 U.S. 10 [83 S.Ct. 21, 9 L.Ed.2d 47]; United States v. Klans, M.D.Ala.1961, 194 F.Supp. 897; and United States v. City of Montgomery, M.D.Ala.1962, 201 F.Supp. 590." 318 F.2d 14.

7. 42 U.S.C.A. § 1971(c). The portion here under discussion was Civil Rights Act of 1960, § 601(b), 74 Stat. 90, and the section now reads: "(c) Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b) of this

section, the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventative relief, including an application for a permanent or temporary injunction, restraining order, or other order. In any proceeding hereunder the United States shall be liable for costs the same as a private person. Whenever, in a proceeding instituted under this subsection any official of a State or subdivision thereof is alleged to have committed any act or practice constituting a deprivation of any right or privilege secured by subsection (a) of this section, the act or practice shall also be deemed that of the State and the State may be joined as a party defendant and, if, prior to the institution of such proceeding, such official has resigned or has been relieved of his office and no successor has assumed such office, the proceeding may be instituted against the State."

tory provision or (b) no discrimination in the application of a valid statute, the applicant would have fulfilled substantively all of the applicable legal requirements for voting.

Without a doubt the Government can be the adversary to champion the rights of its citizens who are the victims of state discrimination, United States v. Raines, 1960, 362 U.S. 17, 27, 80 S.Ct. 519, 4 L.Ed.2d 524, 533,[8] and it may be done when the discrimination comes from rank partiality in administrative practices. United States v. Lynd, 5 Cir., 1962, 301 F.2d 818; 1963, 321 F.2d 26, cert. denied, 1964, 375 U.S. 968, 84 S.Ct. 486, 11 L.Ed.2d 416. But in the broad language authorizing the Government to institute "a civil action or other proper proceeding for preventive relief, including * * * a permanent or temporary injunction, * * * or other order," there is no indication that Congress meant to impose any artificial restrictions because of the source of the discriminatory deprivation of voting rights. Discriminatory denial of voting rights, on a retail or wholesale basis, whether from discriminatory practice or invalid statutes, was to be attacked.

What is at stake is the right of disfranchised Negroes to parity of treatment so that the bare 5% of Negro registrants may approach equality with the 500,000 white registrants (67%). If—and to resolve that if a trial is sought—the disparity is due to discrimination,[9] there is nothing in the statute to compel the Government to pursue the tortuous snail's pace on behalf of individual voters in individual counties.

## II.

### The State of Mississippi May Be Sued

The majority's conclusion that Mississippi may not be sued is a curious one. Beset by similar constitutional apprehensions, the majority—as it did in dealing with the right of the United States to sue—reads § 1971(c) narrowly to avert a declaration of unconstitutionality. But having done this, it comes out at the same place by holding that, the State being a perfect idealism, Congress may not constitutionally impute to it as its own act and deed the actions of its official representatives. Thus is § 1971 (c) [10] drummed out of the Act for all but that rare instance in which there are no personal officers to sue.

The statute is plain and for this case it is plainly constitutional. Two things are accomplished by § 1971(c). First, as a substantive matter, it declares that "any act or practice constituting a deprivation" of subsection (a) rights committed by "any official of a State or subdivision thereof" shall "be deemed that of the State." Second, it provides a procedural remedy to enforce that substantive right. It does this by prescribing two things: (a) the "[s]tate may be *joined* as a party defendant"; and (b) if there is no person holding the office capable of being sued as a defendant to which the state may be *joined,* then "the proceeding may be *instituted* against the State." (Emphasis supplied.) Thus there is no room, or need for, statutory construction to determine when a state may be *joined* with other defendants.

8. "It is urged that it is beyond the power of Congress to authorize the United States to bring this action in support of *private constitutional rights.* But there is the highest public interest in the due observance of all the constitutional guarantees, including those that bear the most directly on private rights, and we think it perfectly competent for Congress to authorize the United States to be the guardian of that public interest in a suit for injunctive relief." 362 U.S. 17, at 27, 80 S.Ct. 519, at 526, 4 L.Ed.2d 524.

9. A finding of discrimination was the end result in United States v. Lynd, 5 Cir., 1963, 321 F.2d 26, cert. denied, 1964, 375 U.S. 968, 84 S.Ct. 486, 11 L.Ed.2d 416, earlier opinion 301 F.2d 818; and the District Court found, and the Fifth Circuit affirmed, the finding of flagrant, rank discrimination in United States v. Ramsey, 5 Cir., 1964, 331 F.2d 824.

10. 42 U.S.C.A. § 1971(c) is set out in full at note 7, supra.

And assuming, as in Atkins and Ramsey,[11] the District Court may sometimes refuse relief against the state at the end of the trial, this is no reason for throwing out the state before the trial even begins.

A state has no general immunity from suit by the national sovereign. United States v. Texas, 1892, 143 U.S. 621, 642–646, 12 S.Ct. 488, 36 L.Ed. 285.[12] And Congress can prescribe the forum in which the suit is to be commenced as it has done in § 1971(c) and (d). Case v. Boles, 1946, 327 U.S. 92, 97, 66 S.Ct. 438, 90 L.Ed. 552; United States v. California, 1936, 297 U.S. 175, 187, 56 S.Ct. 421, 80 L.Ed. 567; 28 U.S.C.A. § 1251(b) (2).

The fact that in the brief per curiam so heavily stressed by the majority, the Supreme Court in United States v. Alabama, 1960, 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed.2d 982,[13] did not affirmatively hold § 601 constitutional is a far cry from either a holding of unconstitutionality or an expressed apprehension on constitutionality. What, and all, it did

was to foreclose the inference that, in remanding the case to permit trial against the State, the Court silently passed on the issue. But in both Dogan and Lynd [14] the Fifth Circuit, emphasizing the wide nature of the relief afforded by § 1971 against voter discrimination, recognized that the remedy may run against the state as such.[15] And the second State of Alabama v. United States, 5 Cir., 1962, 304 F.2d 583, aff'd, 1962, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112, is highly significant. After a trial on the merits following the remand by the Supreme Court pursuant to § 601, the District Court found discriminatory practices on the part of the voting registrars. Even though there were successor registrars as parties to the suit,[16] the District Court rendered a decree against the State of Alabama. Additionally, on the basis of findings of discrimination, it declared that 54 specifically named applicants were to be registered. The Supreme Court affirmed this holding that the State was subject to orders against it and the form of relief granted was appropriate.[17] Similarly, a

11. United States v. Atkins, 5 Cir., 1963, 323 F.2d 733, 739; United States v. Ramsey, 5 Cir., 1964, 331 F.2d 824.

12. See also: State of New York v. United States, 1946, 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326; United States v. Arizona, 1935, 295 U.S. 174, 55 S.Ct. 666, 79 L.Ed. 1371; United States v. Michigan, 1903, 190 U.S. 379, 23 S.Ct. 742, 47 L.Ed. 1103.

13. Of this disclaimer, the Fifth Circuit in Atkins, supra, stated: "We follow the same course in the present case." 323 F.2d 733, 739, n. 7.
 But the Court earlier had stated: "It should be recalled that the State of Alabama is a party to this action and is responsible for the discriminatory acts and practices of the registrars. This is expressly provided for in 42 U.S.C.A. § 1971(c) as amended by the Civil Rights Act of 1960, § 601(b)." 323 F.2d 733, 739.

14. United States v. Dogan, 5 Cir., 1963, 314 F.2d 767; Kennedy v. Lynd, 5 Cir., 1962, 306 F.2d 222, at 228, cert. denied, 371 U.S. 952, 83 S.Ct. 507, 9 L.Ed.2d 500.

15. In a series of proceedings instituted by the Attorney General under § 1974(b) and (d) to obtain voter records, constitutionality has repeatedly been upheld against specific attack. In re Dinkens v. Attorney General, 5 Cir., 1961, 285 F.2d 430, approving and adopting, Alabama ex rel. Gallion v. Rogers, M.D. Ala., 1960, 187 F.Supp. 848; Kennedy v. Bruce, 5 Cir., 1962, 298 F.2d 860; United States v. Lynd, 5 Cir., 1962, 301 F.2d 818; Coleman v. Kennedy, 5 Cir., 1963, 313 F.2d 867, cert. denied, 373 U.S. 950, 83 S.Ct. 1681, 10 L.Ed.2d 705; Kennedy v. Owen, 5 Cir., 1963, 321 F.2d 116; Kennedy v. Lewis, 5 Cir., 1963, 325 F.2d 210.

16. Although the successor administrators were still parties, they were absolutely indifferent or noncommittal. 304 F.2d 583, at 588.

17. The District Court set up an elaborate policing machinery consisting of monthly reports to both the Court and the United States Attorney which were subject to verification by checks on the voting records by agents of the United States. 304 F.2d 583, at 584. Similar relief was prescribed by the Fifth Circuit in Unit-

direct injunction against the State of Mississippi was issued by the Fifth Circuit pending appeal in United States v. Lynd, 5 Cir., 1962, 301 F.2d 818, and affirmed after argument on the merits, 5 Cir., 1963, 321 F.2d 26.[18]

The majority's conclusion of unconstitutionality rests on what may best be described as the Eleventh Amendment dialectic. Underlying this approach is the literal extension of the philosophic discussions of political economy of the kind found in Ex parte Young, 1908, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714.[19] (See Part V.) In this approach the State is regarded as an idealism, existing separate and apart from the human beings who carry out its functions, and wholly incapable of anything wrong or unlawful. Logically, when the State through the power of its instrumentality achieves an illegal, unlawful end, it has not been the State at all, merely individuals acting in excess of the maximum authority which might have been granted. This result then pushes the proponents into another fiction. Logically, of course, there would be no constitutional federal judicial redress against such "illegal" excesses since this would not be "State action" as the concept is used in the Fourteenth Amendment or in the implementing Civil Rights Acts. E. g., 42 U.S.C.A. §§ 1983, 1971(a). Consequently, Mississippi concedes and the majority holds that these actions, if unauthorized, constitute State action. But admitting that this is State action to allow redress against the transgressing individuals, thereby overcoming the bar of the Eleventh Amendment under the Ex parte Young doctrine, the majority insists that it is not State action so as to be imputed to the State where Congress, unfettered by the Eleventh Amendment, expressly provides for suit by the national sovereign against the State.

Were this the inevitable consequence of fictions—useful as they are for solutions of some of the law's formal incongruities, cf. Douglas, J., dissenting in Parker v. Ellis, 1960, 362 U.S. 574, 595, 80 S.Ct. 909, 4 L.Ed.2d 963—a good deal of judicial history would have to be erased. Worse, it would close the courthouse to the resolution of conflicts between the national and state governments whether they concern ownership of offshore tidelands, United States v. Texas, 1950, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221, or interference with the orders of a Federal Court.[20]

This is not the case in which ordinary actions of Government officials perhaps in excess of authority are sought to be imputed to the State to make the State directly responsible therefor. Here the actions taken by individuals relate to a function which is governmental in nature and wholly unrelated to private, personal

---

ed States v. Ramsey, 5 Cir., 1964, 331 F.2d 824.

18. The Court by separate unpublished order and findings in the proceeding for contempt held the Registrar Lynd in civil contempt for violations of the injunction pending appeal. Certiorari was denied, Lynd v. United States, 1964, 375 U.S. 968, 84 S.Ct. 486, 11 L.Ed.2d 416. The civil contempt order also required that the registrar (a) immediately register approximately 40 named Negro applicants; (b) use specified sections of the Mississippi Constitution for the "understanding" test; (c) cease rejecting applications for errors if the person met the standards specified in the order; and (d) inform the applicant of the exact errors and deficiencies in the application.

19. See also: Ex parte Virginia, 1880, 100 U.S. 339, 25 L.Ed. 676; Cooper v. Aaron, 1958, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed. 2d 5; United States v. Raines, 1960, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524; Poindexter v. Greenhow, 1885, 114 U.S. 270, 5 S.Ct. 903, 29 L.Ed. 185.

20. See Mississippi v. Meredith, 1963, 372 U.S. 916, 83 S.Ct. 722, 9 L.Ed.2d 723, granting motion of the United States for leave to be named party respondent and denying certiorari from judgments holding the Governor and Lt. Governor of the State of Mississippi in civil contempt in proceedings instituted by the United States as amicus curiae-intervenor, Meredith v. Fair (United States v. Mississippi), 5 Cir., 1962, 313 F.2d 532; Meredith v. Fair (United States v. Mississippi), 5 Cir., 1962, 313 F.2d 534.

activity. For here every action relates to the elective process. Under no circumstances could any official, high or low, involved in the registration-elective process be regarded as a private person. Each " * * * takes its character as a state agency from the duties imposed upon it by state statutes; the duties do not become matters of private law because they are performed by * * * " a private person, Smith v. Allwright, 1944, 321 U.S. 649, 658, 663, 64 S.Ct. 757, 88 L.Ed. 987; Terry v. Adams, 1952, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152; Baldwin v. Morgan, 5 Cir., 1958, 251 F.2d 780, 790; 1961, 287 F.2d 750, at 754–755, n. 9; Boman v. Birmingham Transit Co., 5 Cir., 1960, 280 F.2d 531, 535. By their structure and express provision, the Mississippi voter statutes reflect that the action of all is that of the State and the State alone.[21]

These principles are more than ordinarily applicable if the basic theory of the Government's suit is kept carefully in mind. Unlike those charging that Negro voters are deprived of constitutional rights because of discrimination in the administration of otherwise valid statutes, the thesis is here that these voter registration laws (and Constitution) are themselves invalid because, in their setting, they established a structure which was intended to, and in fact did permit effectual denial to the Negro of the right to vote, the final proof of which, being in the pudding's eating, is the disparate results of 67% vs. 5%. On such a theory, it is conceptually impossible for statutes (and constitutional provisions) to be anything other than State actions, as the State, by the State, and for the

State. Everything under attack here— the understanding test, promulgation of the registration application form, the duty to fill it out without assistance, prohibition against advice concerning errors, the good moral character test, the right of citizen challenge—are all strictly prescribed in the Mississippi Constitution and statutes. Acts done thereunder are truly acts of the State, not merely State actions by individual persons.

Substantively, there can at this late date be no question of the constitutional power to charge the State directly for denial of voter rights accomplished by the statutory structure or its administration. Under § 1971(a) the right is guaranteed to vote without distinction of race " * * any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding." Discriminatory State Constitutions and laws which were found to be unconstitutional in themselves have been voided by the Supreme Court pursuant to this subsection.[22] Guinn v. United States, 1915, 238 U.S. 347, 355–356, 35 S.Ct. 926, 59 L.Ed. 1340; Myers v. Anderson, 1915, 238 U.S. 368, 35 S.Ct. 932, 59 L.Ed. 1349.

The rich experience in voter discrimination affords an ample basis for the conclusion that there is a reasonable connection between the congressional determination that in voting suits, the acts of local representatives of government may be deemed to be the acts of the State on the one hand, and the rights to be secured under the Fourteenth and Fifteenth Amendments on the other. The scope of congressional power under the Fourteenth and Fifteenth Amend-

---

21. See, e. g., Miss.Code § 3210.5: "The county registrar, while acting within his jurisdiction and under the authority of this act, shall not be liable personally for any error of judgment." And see also Miss.Code of 1942, § 3230: " * * *. Costs shall not, in any case, be adjudged against the commissioners or the registrar."

22. 42 U.S.C.A. § 1971(a) was designated Rev.Stat. § 2004 when Guinn and Myers

were decided. It is clear from the legislative history that 42 U.S.C.A. § 1971(c) imposes no substantive limits on the scope of the rights protected by § 1971 (a). Section 1971(c) provides an enforcement procedure to implement § 1971 (a) similar to that available by virtue of Rev.Stat. § 1979 (now 42 U.S.C.A. § 1983) to enforce Rev.Stat. § 2004. H.R. Rep.No.291, 85th Cong., 1st Sess. 12 (1957) U.S.Code Congressional and Administrative News p. 1966.

ments is surely broad enough for the adoption of any remedial legislation "necessary and proper for counteracting such laws as the states may adopt or enforce, and which, by the amendment, they are prohibited from making or enforcing, or such acts and proceeding as the states may commit or take, and which by the amendment they are prohibited from committing or taking." Civil Rights Cases, 1883, 109 U.S. 3, 14, 3 S.Ct. 18, 27 L.Ed. 835.

### III.

#### Majority Applies Incorrect Standards for Dismissal

While professing to follow the standards epitomized in Conley v. Gibson, 1957, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80,[23] the majority commits a basic procedural error. It subjects the Government's complaint to tests no longer appropriate under the Federal Rules of Civil Procedure.

The majority is preoccupied with two things, each contrasting the other. Its approach emphasizes that the allegations must be of *facts*, as distinguished from *legal conclusions*. This becomes vital to its thesis since technically it is said the motion to dismiss admits only facts well pleaded.[24] But F.R.Civ.P. 8(a) (2) does not require that facts be pleaded, only that the complaint "shall contain * * (2) a short and plain statement of the claim showing that the pleader is entitled to relief * * *." Professor Wright points out that a

"Claim for relief stated in general terms and legal conclusions may be sufficient to inform the adversary

and to withstand a motion to dismiss; * * * the sufficiency of a claim so stated is not tested by the strict standards once applied to determine whether a 'cause of action' was sufficiently stated." 1A Barron & Holtzoff, Federal Practice and Procedure § 356, at 360 (Wright ed. 1960).

But I do not press this as a technical principle because the complaint charges discriminatory purpose and effect in the most positive, direct and simple terms. For example, after reciting factual, statistical and historical details in the first 15 paragraphs, it charges that "one of the chief purposes" of the newly adopted Constitution of 1890, " * * * was to restrict the Negro franchise and to establish and perpetuate white political supremacy and racial segregation in Mississippi." This was accomplished, the complaint charges, through the understanding clause. The complaint goes on to allege that later, under the stimulus of a decision of the Fifth Circuit[25] which construed Article 244, the "read *or* understand" provision, disjunctively and the 1954 school decision, an amendment was adopted requiring ability to read *and* understand. The effect of this was to subject the vast body of unregistered adult Negroes (numbering over 475,000) to new and stringent requirements to which the mass of white voters (numbering 500,000) had not been subjected. This amendment, it is alleged, was "designed to perpetuate in Mississippi white political supremacy, a racially segregated society, and the disenfranchisement of Negroes."

23. See Majority Opinion, note 1 and accompanying text.

24. In the instant case the Court unanimously overruled all motions of all defendants which sought to compel the Government to plead allegations of discrimination with factual specificity under F.R.Civ.P. 9(b) on the asserted theory that these were equivalent to charges of fraud. This ruling was clearly correct. United States v. Lynd, 5 Cir., 1963, 321 F.2d 26, 27, cert. denied, 1964, 375 U.

S. 968, 84 S.Ct. 486, 11 L.Ed.2d 416; United States v. Lynd, 5 Cir., 1962, 301 F.2d 818, 822, cert. denied, 371 U.S. 893, 83 S.Ct. 187, 9 L.Ed.2d 125.

25. Peay v. Cox, 5 Cir., 1951, 190 F.2d 123. This case is heavily stressed by the majority. See Parts V, n. 17, XIII, n. 59. The aspect of the case requiring a voter to exhaust administrative remedies has been legislatively overruled. 42 U.S. C.A. § 1971(d).

Similarly, in the "fourth claim" the complaint recites in detail the 1960–1962 efforts of the Government through the Federal Court proceedings to obtain voter registration records in Mississippi, and in other proceedings to enjoin discriminatory practices, chiefly in Forrest County.[26]

After factually alleging developments in the court proceedings, the complaint goes on to state that to overcome specific provisions of the Fifth Circuit's injunctive order—especially those requiring assistance to Negro applicants on an equality with whites—the Mississippi Legislature enacted a package of laws.[27] These are alleged to be unconstitutional for a number of specific reasons. These include the unreasonable, arbitrary disqualification for formal, technical, inconsequential errors, "freezing in" white voters while "freezing out" unregistered Negroes by more stringent standards and requiring publication of the names of applicants, thus subjecting Negroes to harassment [28] by whites, etc.

Of course these serious charges cannot be brushed off as "legal conclusions." The majority takes a double tack to circumvent them. The first seems to be that the truth of these charges—i. e., discriminatory purpose and effect—is of no legal consequence since this goes to the motivation of legislation and this is a subject free from judicial scrutiny. If—and the if is a very tiny one—that ever were the law, Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed. 2d 110, now makes it clear that unconstitutional racial discrimination gets no cloak of judicial immunity simply because the means used is State legislation. The supposed "motivation" of the legislators is no haven and affords no insulation from judicial inquiry.

The second seems to be that, assuming them to be legally significant, there are no possible evidentiary ways of establishing the truth of the charges. The majority reasoning in this facet seems to run this course. The Government by pretrial interrogatories from the defendants was required to state the exact factual basis for these charges, the witnesses to be used on the trial in support thereof, etc. The Government filed detailed responses and presumably put its best foot forward. Consideration of these materials by the Court reveals that these "facts" cannot be established since all of this is either hearsay or otherwise inadmissible.[29] In other words, the majority in concluding that no claim is set forth looks to interrogatories to establish that no claim can be *proved*. But on a motion to dismiss [30] under F.R.Civ.P. 12(b) (6), this may not

26. This battle was on many fronts. In Kennedy v. Lynd, 5 Cir., 1962, 306 F.2d 222, cert. denied, 371 U.S. 952, 83 S.Ct. 507, 9 L.Ed.2d 500, the Government sought, and after reversal in the Fifth Circuit, obtained the right to voter records under § 1974(b). A few months earlier in United States v. Lynd, 5 Cir., 1962, 301 F.2d 818, the Fifth Circuit issued its own injunction which was affirmed after hearing on the merits, 5 Cir., 1963, 321 F.2d 26, cert. denied, 1964, 375 U.S. 968, 84 S.Ct. 486, 11 L. Ed.2d 416. Simultaneously the Fifth Circuit by order found Lynd in civil contempt. See note 18, supra.

27. These were described as House Bill 900, amending § 3213; H.B. 901 amending § 3232; H.B. 905 amending § 3209.6; H.B. 822, 904; H.B. 903.

28. Cf. N.A.A.C.P. v. Alabama, 1958, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488; Bates v. Little Rock, 1959, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480; Gibson v. Florida Legislative Investigation Committee, 1962, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929.

29. The majority passes it off in this fashion:
"[We further find] that the interrogatories [have] been answered and sworn to by various attorneys for the plaintiff and set forth the results of their investigations and [are] made up of legal or factual conclusions from hearsay evidence or [are] otherwise inadmissible in evidence." Majority Opinion, Introduction 2, n. 1.

30. No motion for summary judgment was filed or granted so these materials do not become pertinent under F.R.Civ.P. 12(c) and 56(a).

be done. Mullins v. De Soto Securities Company, 5 Cir., 1943, 136 F.2d 55; Kohler v. Jacobs, 5 Cir., 1943, 138 F.2d 440; 2A Barron & Holtzoff § 778, at 391.

This is far from saying, however, that the interrogatories are irrelevant at this stage. Quite to the contrary, once the proper standard is applied, these become the best proof that the Government has at least an arguable basis for establishing its claim on a trial. This brings us to the simple standard of Conley v. Gibson [31] that "the accepted rule" is "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Of this problem, the Fifth Circuit has said, "[F]inal disposition of a civil action on the basis of bare bones pleading is a tortuous thing. How a standard so simply expressed, so often repeated, is apparently so often overlooked * * * is hard to understand. * * * We have phrased it and rephrased it in these terms. '* * * A motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim * * *' Des Isles v. Evans, 5 Cir. (1952), 200 F.2d 614, 615 * * *." Arthur H. Richland Co. v. Harper, 5 Cir., 1962, 302 F.2d 324, 325. Of course the principle is a series of negatives, each of which the movant (Mississippi) had to overcome. The complaint [1] "should not be dismissed * * * unless" [2] it is made to appear "beyond doubt" that the plaintiff [3] "can prove no set of facts" entitling him to relief. Apart from the notion of immunity of legislative motivation, now thoroughly discarded by Gomillion v. Lightfoot, supra, nothing in the majority opinion even remotely reveals how the defendants car-

ried this burden. But I need not rest on concepts of burden since these interrogatories establish firsthand in great factual detail historic materials from which a trier can infer that these legislative-constitutional provisions came into being to provide the mechanism by which the Negro would be denied the right to vote and how—faithful to its conception—it has worked so well to achieve the present startling disparity. Testing the complaint from the restricted vantage of a motion under F.R.Civ.P. 12(b), the Court cannot at this stage make a blanket ruling against the admissibility of all of this material. Indeed, all, or nearly all, will be plainly admissible under the liberal approach of F.R.Civ.P. 43(a). Dallas County v. Commercial Union Assurance Co., 5 Cir., 1961, 286 F.2d 388; Monarch Ins. Co. of Ohio v. Spach, 5 Cir., 1960, 281 F.2d 401; [32] Hall v. St. Helena Parish School Board, E.D.La., 1961, 197 F.Supp. 649, aff'd mem., 1962, 368 U.S. 515, 82 S.Ct. 529, 7 L.Ed.2d 521; Davis v. Schnell, S.D.Ala., 1949, 81 F.Supp. 872, aff'd mem., 1949, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093; Morris v. Harmer's Heirs' Lessee, 1883, 32 U.S. [554] 348, 351 (7 Pet.) 8 L.Ed. 781 (per Story, J.).

### IV.

#### Abundant Likely Evidence to Establish Prima Facie Case

A consideration of a very small part of the material will illustrate the substantial basis for the Government's claim. This material both acquires a meaning from its setting and offers additional proof of that setting. This is vital as the Supreme Court, analyzing the holding in Davis v. Schnell, S.D.Ala., 3-Judge (81 F.Supp. 872, 1949, aff'd mem., 1949, 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093) which struck down an "understanding and explain" test had this to say. "The

31. 1957, 355 U.S. 41, 46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80.

32. This approach has effectually been adopted by the Special Committee on Evidence of the Judicial Conference of

the United States in its Preliminary Study of the Advisability and Feasibility of Developing Uniform Rules of Evidence for the Federal Courts, 30 F.R.D. 73, 79 (1962).

legislative setting of that provision and the great discretion it vested in the registrar made clear that a literacy requirement was merely a device to make racial discrimination easy." Lassiter v. Northampton County Bd. of Elections, 1959, 360 U.S. 45, 53, 79 S.Ct. 985, 3 L.Ed.2d 1072. Of course a part of that setting is what the Fifth Circuit has described as the Mississippi "steelhard, inflexible, undeviating official policy of segregation." United States v. City of Jackson, Mississippi, 5 Cir., 1963, 318 F.2d 1, 5. The policy takes many forms. It "is stated in its laws.[33] It is rooted in custom." [34]

33. The policy finds frequent, formal and legislative expression. Emphatic is the Resolution of Interposition, Senate Concurrent Resolution No. 125, adopted by the Legislature of the State of Mississippi on February 29, 1956. See also Miss.Code of 1942, § 4065.3 commanding that all employees of the State and its subdivision "be and they and each of them, in their official capacity are hereby required" to give "full force and effect in the performance of their official and political duties to the Resolution of Interposition * * * and are further directed and required to prohibit, by any lawful, peaceful and constitutional means, the implementation of or the compliance with the Integration Decisions of the United States Supreme Court of May 17, 1954, * * * May 31, 1955, * * * and to prohibit by any lawful, peaceful and constitutional means, the * * * mixing or integration of the white and Negro races in public schools, public parks, public waiting rooms, public places of amusement, recreation or assembly in this State, by any branch of the federal government, any person employed by the federal government, any commission board or agency of the federal government * * * and to prohibit, by any lawful, peaceful and constitutional means, the implementation of any orders, rules or regulations of any board, commission or agency of the federal government, based on the supposed authority of said Integration Decisions * * *. * * * *. The prohibitions and mandates of this Act are directed to the aforesaid executive branch * * * and all individuals thereof in their official capacity only. Compliance with said prohibitions and mandates of this act * * * shall be and is a full and complete defense to any suit whatsoever in law or equity, or of a civil or criminal nature which may hereafter be brought against the aforesaid executive officers * * * or employees * * * by any person, * * * the State of Mississippi or any other state or by the federal government of the United States, any commission, agency, subdivision or employee thereof."

Part and parcel of this program is the State Sovereignty Commission, Miss. Code of 1942, §§ 9028–31–48 [Laws 1956] of which the Governor is the Chairman. It is charged with the duty " * * * to do and perform any and all acts and things deemed necessary and proper to protect the sovereignty of the State of Mississippi * * * from encroachment thereon by the Federal Government or any branch, department or agency thereof * * *." Miss.Code of 1942, § 9028–35. Segregation is specifically ordained for: Public schools: Miss. Const., 1956, art. 8, § 207; Miss.Code of 1942, §§ 6220.5 (integration is a criminal offense), 6766, 6475–14, 6336–05, 6336–06(a). Public transportation and terminals: Miss.Code of 1942, §§ 2351.5, 2351.7, 3499, 7784, 7785, 7786, 7786–01, 7787, 7787.5. County and municipal jails and state prisons: Miss.Const. § 225; Miss.Code of 1942, §§ 3374.5, 4259, 7913, 7971. Insane and charity hospitals: Miss.Code of 1942, §§ 6881–83, 6927, 6973–74. Further, it is a crime to conspire to overthrow the segregation laws of the State, Miss.Code of 1942, § 2056.

Meredith's admission to the University of Mississippi produced a flood of like enactments. H.B. 2, First Extraordinary Session, 1962, 7 Race Rel.L.Rep. 1247 (1962), provides that "every word spoken * * * and every official act done * * * heretofore or hereafter by any officer, agent or employee of the State of Mississippi in anywise connected with or incident to keeping the Institutions of Higher Learning and the public schools and colleges of this state racially segregated * * * is hereby declared to be and established as the sovereign act or acts of the sovereign State of Mississippi * * * and not the individual act of such person * * * and shall be given full force and effect as the substantive law of this state as the official sovereign act * * * of this state and not the private or individual act * * * of such persons * * *." House Concurrent Resolution No. 18, First Extraordinary Session, 1962, 7

34. See Note 34 on Page 985.

The historical materials reveal that a policy so open, so frank, so candid did not accidentally pass by the voter problem. The Fifteenth Amendment, with its plain prohibition, posed difficulties. But a way was found to make segregation complete and total. This was to be accomplished through a number of steps.[35]

### Discriminatory Purpose of 1890 Constitution

On February 5, 1890, Mississippi Legislature called for a constitutional convention to revise the Constitution of 1869.[36] Although more than 50% of the population of Mississippi was negro, only one of the 134 delegates elected to the Convention was a Negro. The Convention opened on August 12, 1890, and by November 1 adopted a new Constitution. Under the 1869 Constitution, all males over the age of 21 years, registered to vote, resident in the State six months and not disqualified by insanity, idiocy, or conviction of certain crimes were eligible.[37] The significant changes in the 1890 Constitution were residence for two years, payment of taxes including the annual poll tax, and a requirement that the applicant be able to read or understand any section of the State Constitution.[38]

The Negroes' presence in the State posed a real problem. Constituting 53.7% of the population in 1870, the Negroes represented 57.6% in 1890. Whites were in control throughout the State, but not without some difficulties which one of the delegates described as "preserving the ascendency of the white people by revolutionary methods" consisting, "in plain words" of "stuffing ballot-boxes * * * carrying the elections by fraud and violence until the whole machinery for elections was about to rot down." Anticipating the Convention, Senator George outlined its work. "Our first duty", he is reported to have said, "is to devise such measures, consistent with the Constitution of the United States, as will enable us to maintain a home government, under the control of the white people of the state."

From the opening note of the Convention, the theme was the single one. President of the Convention, Calhoon, described the race for racial supremacy as "one of the problems you have to encounter" and their challenge was to so arrange "this ballot system * * * as to effect one object." He was soon to spell that out. The temper of the Convention was reflected by the Resolution of the Preamble Committee. It first re-

---

Race Rel.L.Rep. 1248 (1962), recites the developments on the admission of James H. Meredith and the use of federal troops, and petitions the Government of the United States for a redress of grievances including the removal of Meredith from the University.

34. The Court took judicial notice of this in Meredith v. Fair, 5 Cir., 1962, 298 F. 2d 696.

35. These were:
(1) An understanding test
(2) Careful districting of white versus black counties
(3) An electoral system to preserve white control on executive and judicial elections
(4) Use of the pure white democratic primary and
(5) Restriction of party membership.

36. In the discussion of this subdivision I draw on materials furnished in response to interrogatories requesting specific facts on which the Government based the

claims in paragraphs 16 and 17 of its complaint that the chief purpose of the 1890 Convention was to restrict the Negro franchise and to perpetuate white supremacy. The Government filed detailed, voluminous answers titled "Purpose of Laws", all of which I incorporate by reference. At this stage of the proceeding, it is not the Court's function (nor mine) to credit or otherwise determine its truth other than to recognize that it is plausibly available as evidence or may lead to evidence. F.R.Civ.P. 26 (b).

37. Mississippi Constitution 1869, Art. VII, § 2.

38. Mississippi Constitution 1890 art. 12, §§ 241, 243, 244. Miss.Const. § 244 requires, among other things, that a voter shall "be able to read any section of the Constitution of this state; or he shall be able to understand the same when read to him, or give a reasonable interpretation thereof."

cited in a number of "Whereas" clauses the existence in Mississippi of the two races, their distinctive prejudices and instincts, the unchanging nature of racial differences so that "one race or the other must have charge and control [of] the governments of such states," which would lead to instability "and in as much as the white people only are capable of conducting and maintaining" government, the "negro race * * * being wholly unequal to such great responsibility * * *." It then resolved that it was the deliberate judgment of the Convention that "the true and only efficient remedy for the great and important difficulties" described "lies in the repeal of the XV Amendment of the Constitution * * * ", so that "such restrictions and limitations may be put upon negro suffrage, by the several States, as may be necessary and proper for the maintenance of good and stable governments * *." 39

One delegate referring to the large adult Negro population of "70,000 * * in excess of the white vote" declared it to be their duty to prevent the Negro majority from overthrowing the present civil government, and then offered a solution in this exclusive method: "How is this end to be accomplished? Only, in my judgment, by such an adjustment of the basis of suffrage as will secure to the white race a fixed and permanent majority. The white people * * * want to feel and know that they are protected * * * against * * * the possibility of Negro rule * * *. They demand this at our hands * * * and nothing short of this will satisfy them or excuse us. The remedy is in our hands. We can if we will afford a safe, certain and permanent white supremacy in our state." Another delegate recognizing that "the powers of government are politically and constitutionally lodged in the Negro race" declared that "the para-

mount object of this Convention is to transfer it to and invest it in the white race." Apart from repeal of the Fifteenth Amendment "this could be accomplished" in several ways, one being "by an educational * * * qualification." Others echoed. "That is what we are here for today to secure the supremacy of the white race." With poetic overtones, one remarked, "We are embarked in the same ship of white supremacy, and it is freighted with all our hopes." And President Calhoon made crystal clear the more generalized eloquence of his opening address. Of the Negroes, he is reported to have said: "We want them here, but their own good and our own demands that we shall devise some means by which they shall be practically excluded from government control."

These contemporary views of the delegates are borne out by the long look of history. There have been at least two reunions of the surviving delegates of the Constitutional Convention, one in 1910, another in 1927. These proceedings clearly reveal the purpose of the Convention. The "primary purpose of it was to adopt some provision * * * which would secure to the State a good and stable government, freed from the incubus of Republican or negro rule. * * * All understood and desired that some scheme should be evolved which would effectively remove from the sphere of politics in the State the ignorant and unpatriotic Negro. * * *." 40 In the 1927 meeting, the reunion was called to order with the statement that " * * * on that day, thirty-seven years ago, the Constitutional Convention of 1890 enacted an organic law which gave Mississippians Anglo-Saxon government, and adjourned." 41 Discussing the achievements of this Convention, the Chairman of the surviving delegates modestly declared: "It was no easy task for the

39. Journal of the Proceedings of the Constitutional Convention of the State of Mississippi (Jackson, Mississippi: E. L. Martin, 1890) 303-04.

40. Mayre Dabney, The Proceedings of the Reunion of the Surviving Members of the

Constitutional Convention of 1890 (1910).

41. The Proceedings of the Reunion of the Surviving Members of the Constitutional Convention of 1890, 5 (1927).

convention * * * to enact a state constitution practically eliminating from the electors of the State at least eight-tenths of its colored people, citizens of the United States, in the face of the fifteenth amendment * * *." The "fifteenth amendment * * * was not violated" by this Constitution. Rather, it was "only circumvented by Anglo-Saxon ingenuity." Of "the effort * * * to practically disfranchise the Negro race" in the face of the Fifteenth Amendment, another described the "three full weeks" of "debating this momentous issue" and the result that " * * * out of the mill was ground the franchise article in our present constitution, which will ever protect us from an irresponsible class." Convinced that "civilization depended upon the supremacy of the white race in Mississippi," but knowing full well that the right of "the colored man to vote" could not be defeated because of "race, color, or previous condition," the work of the Convention was described as one in which "we belted the whole circle of expedients in legislating against his habits and weaknesses, and, without infringing the provisions of the Constitution of the United States, we provided for perpetual white supremacy in the State of Mississippi * * *."

Judge Thompson, one of the delegates, after remarking that there was "scarcely a conceivable scheme having the least tendency to eliminate the Negro vote that was not duly considered by the convention" then declared, "It is regrettable that all the suggestions * * * were not recorded; had they been preserved, the record would be a monument to the resourcefulness of the human mind." [42]

One delegate reciting in detail the problems besetting the State described the four-step structure of legislative apportionment (districting to favor white counties), the electoral plan for the Executive and Judiciary, limiting Negro suffrage by the annual poll tax, and the adoption of the understanding clause. He concluded that these "several suffrage requirements combined" have "as they were intended, reduced the Negro majorities to a negligible political quantity." He then characterized the problem and its solution in these doleful terms. "Concisely and correctly summed up, of the two ills Mississippi chose the lesser. She has exchanged an organic malady for a functional disorder. The Convention substituted a desiccated for a diseased electorate. The ensuing ills of the present state are within the check and correction of the white citizens." [43]

### The Understanding Test

The understanding test was early proposed. Despite the considerable advantage this would work in favor of the whites because of the lower white illiteracy rate (white—11%; Negro—76%), some, opposing it, expressed the "fear [that] it will lead to trickery and fraud." Adopting this test "placed in the hands of the officer who is to apply the test the power to defraud and disfranchise." Recognizing in those early days what Negro applicants in the Twentieth Century were to experience [44] the test was criticized in blunt language that it didn't "look honest, straight-forward or manly." Rather, it "looks like a farce to make a registration officer decide whether a voter rightly interprets a clause of the Constitution." [45] Disclaiming re-

42. R. H. Thompson, Mississippi Constitution of 1890—An Address Delivered to the Mississippi State Bar Association (Biloxi, Mississippi: 1923) 16–17.

43. J. S. McNeilly, "History of the Measures Submitted to the Committee on Elective Franchise, Apportionment, and Elections in the Constitutional Convention of 1890," Publications of the Mississippi Historical Society. (Oxford,

Mississippi: Printed for the Society, 1902) 129–140.

44. See notes 9, 18, and 26 as to Forrest County and the Lynd contempt case; also notes 9 and 11, United States v. Ramsey, 5 Cir., 331 F.2d 824.

45. "Persuaded that the understanding clause was based on fraud," Louisiana rejected the Mississippi example. See United States v. State of Louisiana, D.C.

sponsibility for "anything so vague in its application and uncertain in its effect" one delegate from a black county reported he had acquiesced on the simple proposition that "half a loaf is better than no bread." There was substantial public approval for the view expressed by one that "the people sent the delegates to the Convention to secure white supremacy, not by a trick or artifice, not by fraud, stratagem, or subterfuge, but by brave, open, honest and honorable methods," declaring that this understanding "section was a fraud upon its face and the trail of the serpent was on it all," he concluded that "the mephitic vapor which arises from the section * * makes one feel like stuffing the registration books."

One of Mississippi's distinguished legal scholars and Justice of its Supreme Court, George H. Ethridge,[46] does not flinch at the word "discriminate." Of § 241 he remarked, "It is said that this section while it does not discriminate against any person or race, it discriminates as to their character and nature." Not elaborating this dialectic, he then recognized that "this is one of the methods of disfranchising the Negro." As a Mississippi lawyer and Mississippi judge, he saw as federal judges were to see a quarter of a century later that with the understanding test of § 244, " * * * a person who cannot read would be largely at the mercy of the registrar * *. The registrar could pick out any section he desired and read it to him and call on him to explain it." [47]

## The White Man's Democratic Primary

Few as they are, difficult as it is for them to become registered, Negro voters are effectually excluded in the elective process through the means of the democratic primary.[48] The heavy hand of the State has been in this too.

Beginning in 1902 with the statutory advent of primaries,[49] the various executive committees of the Decocratic Party, state and county, categorically allowed white democrats only to participate. Typical of these actions was the resolution of the State Committee in 1907. "Resolved, in addition to the qualifications prescribed by law for voters in said primaries, all voters therein shall be white democrats." In 1915 the State Committee, rejecting the implication in other resolutions that "unjustly reflect on the white democratic elections in this state," declared that " * * * the election just concluded [was] an honest and patriotic expression of the choice of the white democrats of Mississippi."

Perhaps forecasting like indifference to the school decisions ten years later, the decision by the Supreme Court in 1944 holding "white primaries" to be unconstitutional [50] caused no change in result, only in methods. The first big test came in the July 1946 Democratic Primary election for United States Senator resulting in the renomination of Senator Theodore Bilbo. The practices were the subject of investigation by special com-

La., 1963, 225 F.Supp. 353, 371, n. 46; also many of these, or similar materials, are discussed by Judge Wisdom in notes 45, 46, and 58.

46. George Ethridge, Mississippi Constitution 424–29, 435, 439, 445 (Jackson, Mississippi: Tucker Printing House 1928).

47. He also discussed with frankness §§ 251 (timing of registration) and 254 (apportionment) and 256 (reapportionment).

48. These materials also are in the answer volume entitled "Purpose of Laws" in response to interrogatories requiring the Government to state the factual detail in support of paragraph 21 of the complaint that from 1899 to 1952 white political supremacy was promoted by, among other things, Negroes being excluded from the Democratic Primary elections. I treat this as outlined in note 36, supra.

49. Miss.Sess.Laws 1902, ch. 66.

50. Smith v. Allwright, 1944, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987; Terry v. Adams, 1952, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152.

mittee of the Senate.[51] One member of the State Democratic Executive Committee, after acknowledging that "back in the old days, the State Democratic executive committee * * * specified that only white Democrats * * * take part" and the meeting held in 1946 to resolve the question posed by the Supreme Court decision, testified that while all thought the Negro "had a legal right to vote" nevertheless " * * * it was the unanimous opinion—although nothing was spread on in this about it—that they didn't want [the Negro] to vote, therefore, he wouldn't vote * *." The conclusion, he went on, was that "we thought the best thing to do was to say nothing and not agitate the matter one way or another and let matters take their course, and so that course was pursued." [52]

This "do nothing" plan seemed to work.[53] The Government's material shows specific places and names of Negroes attempting to vote in that primary who were turned away.[54]

But the "do-nothing policy" did not long prevail. In 1947 the Mississippi Legislature enacted laws to require that in order to vote in a primary, participants must be in accord with the principles of the particular party.[55] Any person may be challenged at the polls as to his qualifications and accord with the principles of the party.[56] The party organization was not slow to act. Beginning in 1948 by successive actions, it has adopted principles that Negroes could not subscribe to.[57] And these principles soon had the imprimatur of the State of Mississippi.[58]

The answers show by name, date, place and county that the system worked. Negroes trying to vote in primaries were successfully challenged. This continues up to the most recent primaries of 1962. Typical, though spectacular, was the incident in the August 1955 primary and run-off in the all-Negro town of Mound Bayou, Mississippi, Bolivar County. Accompanying the ballot boxes was a written challenge signed by each of the candidates challenging all voters from this precinct (known to be Negroes only) as such voters were not in accord with the declared principles of the Democratic Party.[59] Although there were 295 registered Negro voters, none were allowed to vote. Another device frequently used was the maintenance of two separate poll books by the county registrars, one being the general election poll book which included the names of qualified Negro voters. The other, a primary poll book pursuant to instructions from respective Democratic Executive Committees, excluded Negro registrants.

51. Hearings Before The Senate Special Committee to Investigate Campaign Expenditures, 1946, 79th Cong., 2nd Sess. [hereinafter cited Hearings].

52. Hearings 371–72.

53. The Senator, as a candidate for renomination, on the eve of the election described it as "Mississippi's white senatorial primary election" and urged "every white Democratic man and woman" to participate in it. Hearings 382.

54. A number of Mississippi Negro voters testified of their unsuccessful efforts to register or vote, or both. See pp. 140–141, 120–121, 281–282, 225–226, 250–263, 283–284, 298, 317–320, 124–125, 213–215 of the Hearings.

55. Miss.Sess.Laws 1947, Ex. ch. 17.

56. Miss.Code of 1942 § 3129.

57. Resolutions of Mississippi Democratic Party 1948, 1952, 1960.

58. See 1952 Resolution setting out and endorsing the principles adopted by the Democratic State Executive Committee, Miss.Sess.Laws 1952, Ch. 464.
 These principles, legislatively approved, declared among other things: "We believe in the segregation of the races and are unalterably opposed to the repeal or modification of the segregation laws of this state, and we do not favor the practice of nonsegregation."

59. A copy of the Resolution, H.C.R.No.57, Ch. 464, Miss.Acts of 1952 (see note 58, supra) was attached.

## Separate But Not Equal Education for Negroes

Segregation of the schools, as such, may not appear to be directly involved in voter registration. Certainly a voter registration case cannot be made the vehicle to bring about this change in state custom and practice. But in the massive assault on voter registration here, it is a direct element of the Government's thesis. The charge is that the understanding test, as first conceived in Miss. Const. § 244 and as later amended in 1954 to include read and understand, was, and is, a ready mechanism to disfranchise the Negro because of inferior education. It is the *inferior* education, not its segregated characteristic, that is important. Any appraisal of the quality of education must, of course, reckon with the open, frank policy of segregation.[60]

Although Negro children of school age have always exceeded the number of white children,[61] the general level of Negro teacher training is below that for whites.[62] Likewise, the amount spent, including teachers' salaries, is far less for Negroes despite recent spectacular increases.[63]

60. The matters discussed in this subdivision come from the volume of answers to interrogatories entitled "Comparison of Education for Negroes and White Persons 1890–1963," comprising 89 pages in response to a request for the factual detail in support of the contention in paragraph 31 of the complaint that public educational facilities for Negroes were and are inferior to those provided for white persons. I treat these as in notes 36 and 48, supra.

61. State of Mississippi School Census

| Year | White | Negro |
|---|---|---|
| 1890 | 207,652 | 292,581 |
| 1910 | 301,548 | 410,089 |

| Year | White | Negro |
|---|---|---|
| 1929 | 379,678 | 493,987 |
| 1949 | 393,804 | 492,349 |
| 1960 | 329,215 | 337,871 |

62. For example, in 1929–1930 out of a teacher corps of approximately 3,900 white teachers and 3,100 Negroes, 3,263 whites were college graduates whereas 2,719 Negroes were not even high school graduates. By 1954 there was considerable improvement, but white teachers with college degrees out-numbered their Negro counterparts by three to one.

63. The instructional cost per child in average attendance is graphically different:

| | 1900–1901 | 1929–1930 | 1939–1940 | 1949–1950 | 1956–1957 | 1960–1961 |
|---|---|---|---|---|---|---|
| White | $8.20 | $40.42 | $31.23 | $78.70 | $128.50 | $173.42 |
| Negro | 2.67 | 7.45 | 6.69 | 23.83 | 78.70 | 117.10 |

The following are selected comparisons of expenditures above the state minimum program listed on a per child basis:

| District | White | Negro |
|---|---|---|
| Amite Co. | $ 70.46 | $ 2.24 |
| Benton Co. | 59.42 | 15.63 |
| Claiborne Co. | 142.64 | 19.88 |
| Coahoma Co. | 139.33 | 12.74 |
| Hinds Co. | 80.24 | 10.41 |
| Leflore Co. | 175.38 | 9.52 |
| Madison Co. | 171.24 | 4.35 |
| Yazoo Co. | 245.55 | 2.92 |

During 1954–1955 every school district spent more for whites than Negroes. It ran from a high of $600, Glenwood District, Tallahatchie County (whites) to a lot of $45, Senatobia District, Tate County (Negroes) averaging as follows:

| | White Per Pupil Cost | Negro Per Pupil Cost |
|---|---|---|
| County average | $161.00 | $ 87.00 |
| Separate district average | 181.00 | 106.00 |

Even these figures may be deceptive. In the Report of a Study of the Education for Negroes in Sunflower County, Mississippi (Bureau of Educational Research, School of Education, University of Mississippi: March 1950), it was pointed out, at 134–35, "Sunflower County in 1939–40 received $73,626 per capi-

Only recently, and then under the impetus of the 1954 school decisions, has there been any near parity as to the number of consolidated versus unconsolidated (one and two-teacher schools).[64] The same is true of enrollment in high schools, a matter of much consequence in a test designed to elicit interpretation and understanding of a constitutional provision and the duties of citizenship.[65]

This is not a mere matter of statistics. The responsible officials of Mississippi have publicly recognized the disparity in educational facilities and the necessity for substantial improvement.[66] Governor Wright in 1950 urged action. "We face," he told the joint session of the Legislature, "a serious problem in the matter of providing comparable educational opportunities for the two races in our State." He identified the problem in the three phases of teacher salary adjustments, transportation, and building

facilities. He recommended legislation for equalization of teacher pay "and removing any discrimination as between the races." Recognizing that what existed was not separate and equal, he urged "that a program be enacted providing for equal facilities between the races recognizing that children of both races are entitled to equal opportunities," in, of course, segregated facilities.[67] The same views were echoed by Governor White two years later. "It is true that there is a wide variation in educational opportunities between the races."[68]

And various official biennial reports of the State Superintendent of Public Education have portrayed this great disparity in graphic terms. Over a wide space of years, they pinpoint the causes. For example, "in many counties * * Negro children are forced to attend school in mere shacks or in church houses."[69] As of 1930–1931, "98.3 per-

---

ta fund. Since 79 per cent of the educables at that time were Negroes, $58,165 was the amount received on the basis of the Negro children. However, only $35,-564 was spent for 'instruction' for the Negro children. Evidently $22,601 of

this amount was expended elsewhere—probably on the schools for the whites. In the last two years the difference in the amount received and the amount [not spent for Negro children] is more than twice the $22,601 figure."

---

64. Between 1910 and 1930 Negro schools were not consolidated. As of 1930–1931, the make-up of the schools was as follows:

| | Number Consolidated Schools | Number Unconsolidated Schools | Number One-teacher Schools | Number Two-teacher Schools |
|---|---|---|---|---|
| White | 959 | 789 | 515 | 202 |
| Negro | 16 | 3484 | 2411 | 832 |

---

65. In 1930–1931 out of 752 secondary schools, only 46 were Negro with an enrollment of 5,012 about 1/10th of that for whites (49,742). By 1953 the enrollment ratio was still nearly three to one (474—285 schools) with Negro enrollment 26,667 compared with 61,323 whites. Fortunately for present and future generations, 1961–62 shows much improvement (white 77,694; Negroes 48,-798).

66. It was not always so. Governor Vardaman recalling his proposal for a constitutional amendment to "control the distribution of a public school fund so as to stop the useless expenditure in the black counties" is reported as saying of

a bill providing money for a Negro school in Holly Springs, "Did I sign it? No. I killed the bill when I killed the school * * *."

67. Message by Governor Fielding L. Wright to the Joint Session Mississippi Legislature, January 3, 1950.

68. In 1953 Extraordinary Session Senate Journal 970.

69. Biennial Report and Recommendations of the State Superintendent of Public Education to the Legislature of Mississippi for the Scholastic Years 1929–30 and 1930–31, 45 [hereinafter cited Biennial Report].

cent of all children in schools for the colored race were in grades one to eight inclusive and 1.7 percent in grades nine to twelve. The great majority of colored children never got beyond the sixth grade." [70] The fact is "that we spend less money in Mississippi per child in the schools for the Negro race than in the schools for the white race." [71]

Teacher quality for Negroes suffered from lack of adequate colleges. As a consequence "the quality of work done in the school room by the majority of negro teachers would not rank very high when measured by any acceptable minimum known to the leaders in educational thought." [72] The Negro teaching force had "an average of 50 enrolled pupils each", but the average was deceptive since "teachers in the lower grades frequently have in their charge from seventy-five to one hundred and fifty pupils. * * *." [73] In 1933–35, out of 3,700 Negro school houses, only two-thirds were publicly owned. For the other third (1,440), schools were "conducted in churches, lodges, old stores, tenant houses, or whatever building is available." [74]

As late as 1937 "ninety-four percent of the educable Negro population of high school age" were "not in school * *." [75] This was hardly surprising since "there [were] twenty-eight counties in Mississippi which [did] not have any recognized high school facilities for Negroes." [76] As of that same period, the state board prescribed $28 per month for a six-month term ($170 per year) for Negro teachers. It was, of course, "obvious that the salary problem is one of our real problems * * * in Mississippi." [77] Even physical facilities as late as 1945 represented "one of the most pressing needs in Mississippi" to meet the simple but then unattained object that "schoolhouses need not be elaborate, but they should at least be sanitary, comfortable and adequate." [78] The report of 1955–57, noting considerable progress, but recognizing "that public schools for Negroes have been poor in the past" made specific recommendation for "getting all communities to meet the responsibility of truly equalizing facilities" for Negro and whites.[79] It recommended also increase in graduate training for Negro teachers, administrative supervision for Negro elementary schools since "many elementary teachers are not fully qualified," and local supervision of classroom teaching since "the fact that public schools for Negroes have been poor in the past * * * has a direct bearing on the quality of instruction being done * * *." [80]

All of these findings have been confirmed by various professional studies, including those for the University and the State Legislature.[81]

70. Twenty Years of Progress 1910–1930 and A Biennial Survey Scholastic Years 1929–30 and 1930–31 of Public Education in Mississippi 130 [hereinafter cited Twenty Years of Progress].

71. Twenty Years of Progress 107.

72. Twenty Years of Progress 90.

73. Biennial Report 1933–35, 41.

74. Ibid.

75. Biennial Report 1935–37, 13.

76. Ibid. Negroes "schooled" in that era are still a factor since approximately 8.6% (79,183) of the State's 1960 Negro population were born between 1923 and 1931. (Assuming entry to first grade at 6 years, and schooling terminating grade eight.) United States Bureau of the Census, United States Census of Population 1960, General Social and Economic Characteristics, Mississippi, Final Report PC(1)–26C, Table 37, at 26–112 (1961).

77. Biennial Report 1937–39, 16.

78. Biennial Report 1943–45, 21–22.

79. Biennial Report 1955–57, 40, 41.

80. Biennial Report 1957–59, 40, 41.

81. See A Report of the Committee of Investigation of the Teacher Training Facilities for Negroes in Mississippi, Bulletin No. 61 (1930) State of Mississippi Department of Education; Higher Education in Mississippi: A Survey Report to the Board of Trustees, Institutions of Higher Learning (1954) John E. Brewton, Director; Public Education in Mississippi: Report of Mississippi Legisla-

Pursuant to legislation in 1953, all counties were to make educational surveys of educational facilities and submit reorganization plan by July 1, 1957. Surveys were to be made by specified agencies of the state university system. The materials furnished by the Government contain summaries and extracts from 1955 to 1957 reports made in many counties.[82] As to Negro schools, they are nearly all the same: with per capita per pupil expenditures running frequently two to one in favor of whites, Negro school buildings are run-down, inadequate, unlighted, overcrowded, without desks, blackboards or needed facilities, staffed by overworked, underpaid, undertrained Negro teachers.[83]

### The 1890 Plan Has Worked

In the field of racial discrimination, figures do count. Figures tell the best, if not the whole, story. United States ex rel. Seals v. Wiman, 5 Cir., 1962, 304 F. 2d 53, at 66, 67.[84] The figures here are little less than devastating.[85] In many counties other than the six listed in the majority opinion (Part IV), the actual result shows that the percentage of registered Negro voters runs from a low of 0% to a high of 2.9.% This is in con-

tive Education Study Committee, December 1961; Public Education in Mississippi: Report of Advisory Study Groups, Institutions of Higher Learning, 1961.

82. The Reports extracted are by Dr. John E. Phay, Director Bureau of Educational Research, University of Mississippi or Dr. Ralph S. Owings, Head and Professor of Educational Administration, Mississippi Southern College.

As for another era (see note 76, supra), those "schooled" in the 1955–57 era are important. Those then attending (grades 1 through 12) span birth years of 1939–1951. Negroes born during that period comprise approximately 24.6% (226,500) of the 1960 Negro population. See United States Bureau of The Census, United States Census of Population 1960, General Social and Economic Characteristics, Mississippi, Final Report PC (1)–26C, Table 37, at 26–112.

83. The following comments concerning Negroes in various county reports are typical: "The program is very weak and inadequate * * *. These boys and girls are not getting a program of education that appears to be of too much consequence. * * *. The listing of the offerings would not reveal anything that would prove valuable." "The buildings for Negroes are most inadequate and in a deplorable condition." "There is a dearth of teaching materials and equipment in all the Negro schools. There is a shortage of chalk boards, bulletin boards, reading material, charts, maps, and library books." "The Negro buildings are most inadequate and in a deplorable condition * * *. It is quite evident from examination of the pictures of the schools that the Negro situation is pathetic." In a one-teacher school, "the windows are inadequate, * * * it has no lights and the furniture consists of chairs and benches. There is no water supply * * *. Teaching aids, such as chalk boards and bulletin boards are desired." Another one-teacher schoolroom "has a metal roof that leaks. The windows are inadequate and half the panes are missing * * *. There are no lights and the furniture is home-made benches. There is no water supply at all." In another, "the teaching aides are most inadequate. The entire facilities are not suitable for school." Of another county, "It may be said that throughout the entire county no high school for Negroes exists which presents a curriculum attractive enough to hold boys and girls in school. The needs of these youngsters are not being met." It "may be noted * * * that in the Negro elementary schools, the quality of education and the materials available for teaching seem to be far below that in the white schools. * * *." In " * * * both * * * the quality and quantity of housing, in the availability of instructional materials * * * the Negro elementary schools are below those of the white schools. * * *."

84. Brown v. Allen, 1953, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469; Smith v. Texas, 1940, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; Speller v. Allen, 1953, 344 U.S. 443, 477, 73 S.Ct. 397, 97 L.Ed. 469.

85. I treat this as in notes 36, 48, and 60. The material comes from the Government answers stating factual detail in support of the statistical allegations in the complaint.

trast to a low of 57% and a high of 100% for whites in the same counties.[86]

Of course there might be several explanations for these figures. One might be that this is what the Negroes want. Another might be that this is just accidental. A third might be that this proves the effectiveness of a carefully contrived plan to exclude the Negro. A choosing from those possible inferences is not a function of pleadings or a motion to dismiss. On a motion to dismiss, the Court cannot, for example, declare that this is all one of nature's accidents. And in the face of other evidence which the Government proposes to offer, it cannot be charged off at this early stage as voluntary conduct by many thousands of adult Mississippi Negroes. For in like response to interrogatories seeking factual basis for the allegations in the complaint that Negroes have regularly, consistently been denied the right to register or vote or both, the Government, citing chapter, verse, county, date, time, name, and circumstance, has identified thousands of Negroes who have sought but who have been denied these rights.[87] This leaves as plausible the inference asserted by the Government—that the 1890 plan, supplemented by inferior schools in a segregated society, operating in a closed white man's democratic primary with changes in 1954, 1960 and 1962, freezing in a large body of whites while freezing out thousands of Negroes—has achieved its purpose. Only a trial, at least in the present posture of this case, can resolve the choice.

That inference, once drawn, after a trial either as a matter of fact or as a matter of law, will go a long way—if not the whole way—toward establishing that the entire voter-registration-voting structure is invalid, not because it has been discriminatorily applied, but because it was meant to work that way and has.

86.

June 1962

| County | Whites | | | Negroes | | |
|---|---|---|---|---|---|---|
| | Number Over 21 | Registered | % | Number Over 21 | Registered | % |
| Panola | 7,639 | 5,309 | 69 | 7,250 | 2 | .028 |
| Tunica | 2,011 | 1,436 | 71 | 5,822 | 42 | .72 |
| Marshall | 4,342 | 4,162 | 96 | 7,168 | 57 | .8 |
| Yazoo | 7,598 | 7,130 | 93.0 | 8,719 | 256 | 2.9 |
| Copiah | 8,153 | 7,533 | 92.0 | 6,407 | 25 | .39 |
| Madison | 5,622 | 5,458 | 97 | 10,366 | 121 | 1.1 |
| Clarke | 6,072 | 5,000 | 83 | 2,998 | 1 | .03 |
| Tallahatchie | 5,099 | 4,330 | 85 | 6,483 | 5 | .07 |
| Holmes | 4,773 | 3,530 | 70 | 8,757 | 8 | .09 |
| Kemper | 3,113* | 3,224* | 100 | 3,221 | 30 | .9 |
| Forrest | 22,431 | 12,655 | 57 | 7,495 | 22 | .3 |
| Lamar | 6,489 | 5,593 | 91 | 1,071 | 0 | 0 |

* This is as reflected in the answers. Doubtless one or the other figure is in error.

87. These are found generally in the answer volumes. These answers were 19 (f), (g), relating to paragraph 69 of the complaint. These weigh approximately 35 pounds, and are over one foot thick. I treat these as in notes 36, 48, 60, and 85.

This illustrates also the significance of evidence of discrimination on the Government's theory. It is not to show discriminatory application, but to show the result of a discriminatory structure.

## Meeting the Exigencies From the Law's Reverses

The rapidity with which even the slightest breaches in this Maginot Line were closed demonstrates a continuing purpose, not only to institute but to maintain a structure of discrimination. Only brief mention may now be made of some of the more vivid of these.

### And For Or

The first is the amendment to § 244 to prescribe a read and understand test. Though Peay v. Cox, 5 Cir., 1951, 190 F.2d 123, opened up the door to Negroes who could read *or* understand, the effort in 1952 to amend the Constitution was unsuccessful. In 1954 the full impact was soon realized under the pressure of the 1954 Supreme Court school decision. With effective aid from White Citizens Councils, both the voter registration amendment and the school amendment giving the Legislature the discretion to maintain public schools were adopted.[88]

Was this action just a coincidence? Or was it an immediate and effective response against the possibility that the great number of under-educated adult Negroes, the product of segregated schools then acknowledged to be inferior, would now at least be eligible to orally state an understanding or interpretation? And if not now, would they not in the early future be eligible as more and more Negroes would receive an education of equal quality as a result of "integrated" attendance at formerly all white schools? At this stage of the proceedings, the minimum called for is a trial. For if those were the purposes,

then Gomillion v. Lightfoot, 1960, 364 U. S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110, would permit both judicial inquiry into, and judicial redress for, such racial discrimination.

### The 1962 Package

The complaint describes in detail the Government suit against Registrar Lynd, Forrest County, including the appeal, the injunction pending appeal by the Fifth Circuit resulting thereafter in contempt orders, hearings, judgments and affirmance.[89] Consequently, the Government is in no sense confined to the material set forth in answers to the interrogatories.[90] The Government may also legitimately point to all of the now publicly known developments in the Lynd cases to demonstrate that it can prove its theory. In a nutshell, the theory is that most, if not all, of the 1962 package of bills [91] was a direct, immediate effort to overcome or circumvent successive adverse decisions of the Fifth Circuit, particularly, in the Lynd cases.

The Lynd case essentially charged discriminatory application of laws otherwise assumed to be valid. One of the principal weapons for discriminatory administration was the registration application form.[92] Contrary to the bland assumption in the majority opinion that, "No tricky application form is alleged or exhibited," Majority Opinion Part XIV, at 956, the developments in the Lynd cases demonstrated that the form was loaded with ambiguities, pitfalls, and traps for the unwary, and as such, was a ready-made device for racial discrimination.[93]

---

88. This material is found in the Government's answers. I treat it as in notes 36, 48, 60, 85 and 87.

89. See notes 9 and 18.

90. These materials are found in the multi-volume answers. I treat these as in notes 36, 48, 60, 85, 87 and 88. Also, at least at this stage, it is proper to take judicial knowledge of the records and proceedings of all of the Lynd cases.

91. See note 27.

92. This form is promulgated by the State Election Board, Miss.Code of 1942, § 3209.6, as amended recently in 1962 to require a space on the form to reflect information as to good moral character.

93. For example, items "3. State your age and date of birth:", "8. For how long have you resided in Mississippi?" "10. Specify the date when such residence began," called for identical information for a native-born continuous resident, yet discrepancies resulted in rejection. Item

The greatest source of discrimination, of course, was in the requirement that the applicant copy a section of the Constitution selected by the registrar (Item 18) and then write his reasonable interpretation and meaning thereof, (Item 19) and also write a statement of his understanding of the duties and obligations of citizenship (Item 20).[94]

Those sections of the Mississippi Constitution given frequently to Negroes but never to whites were § 112,[95] § 124,[96] § 160,[97] § 224,[98] and § 273,[99] all exceedingly long, complex provisions having little relation to the usual notions of the nature of our constitutional government and its structure. In contrast, simple, direct and more fundamental ones were given frequently to whites, but never to Negroes, such as § 118,[100] § 139,[101] and § 226.[102]

The Lynd case centered about the use of the application form. In the injunction pending appeal (later affirmed), the

---

"12. Check which oath you desire to take: (1) General ———— (2) Ministers ———— (3) Ministers' Wife ———— (4) If under 21 years at present, but 21 years by date of general election ————." Item "21. Sign the oath or affirmation named in Question 12." was followed by "(a) GENERAL and/or SPECIAL OATH" consisting of an affidavit with a line for signature marked "Applicant's Signature As To Oath" and "(b) OATH OF MINISTER and/or MINISTER'S WIFE" with an affidavit and a line marked "Applicant's Signature As To Oath." Immediately below the line for minister's signature there was another line marked "The applicant will sign his name here." Though otherwise perfectly filled out, Negro applicants were frequently rejected because of failure to sign the bottom line which most (white and Negro) construed to be the place for a minister-applicant to sign. Both the (a) general and (b) minister's oath had blanks to fill out residence "in this State two years, and in ———— Election District of ———— County one year." Even though answer to Item "9. Where is your place of residence in the District" gave a correct address which would enable the registrar to know precisely from voting precinct records the proper voting District for the applicant and the answer to Item 10 "Specify the date when such residence began" would establish that it exceeded two years and one year respectively, the application was rejected if the wrong election district was named in the blanks of the oath.

94. "Item 20. Write in the space below a statement setting forth your understanding of the duties and obligations of citizenship under constitutional form of government."

95. § 112. "Taxation shall be uniform and equal throughout the state. Property shall be taxed in proportion to its value. The legislature may, however, impose a tax per capita upon such domestic animals as from their nature and habits are destructive of other property. Property shall be assessed for taxes under general laws, and uniform rules, according to its true value. But the legislature may provide for special mode of valuation and assessment for railroads, and railroad and other corporate property, or for particular species of property belonging to persons, corporations, or associations not situated wholly in one county. But all such property shall be assessed at its true value, and no county shall be denied the right to levy county and special taxes upon such assessment as in other cases of property situated and assessed in the county."

96. § 124. This section is a 161-word, detailed explanation of the Governor's pardoning power and the pardoning mechanism.

97. § 160. This section is a long description of the jurisdiction of the Chancery Court elaborating technical distinctions between law and equity in real estate proceedings.

98. § 224 covers the hiring of convicts for private or public work.

99. § 273. This section is a 155-word, detailed description of the constitutional amendatory mechanism.

100. § 118. "The governor shall receive for his services such compensation as may be fixed by law which shall neither be increased nor diminished during his term of office."

101. § 139. "The legislature may empower the governor to remove and appoint officers, in any county or counties of municipal corporations, under such regulations as may be prescribed by law."

102. § 226. This section contains a one-sentence restriction on hiring of convicts.

Fifth Circuit found a series of specific discriminations and enjoined the Registrar from committing specific acts. 301 F.2d 818, at 823. The registrar was ordered to give Negroes the benefit of the same type of assistance theretofore given to white persons; to cease rejecting applications of Negroes without giving the cause or reason for rejection; and to cease rejecting obviously qualified Negroes for inconsequential or no errors.

Typical of the immediate response was Miss.Laws 1962, Ch. 570. Prior to the amendment, this section required that an applicant fill out the application form without assistance or suggestion from any person. The amendment added that the requirements of the statute were mandatory; that no application shall be approved or the applicant registered unless all blanks on the application form are "properly and responsively" filled out by the applicant; and that both the oath as such and the application form must be signed separately by the applicant. And to inject a new standard which would defy a Federal Appellate Court determination that particular applicants were qualified as a matter of law,[103] Miss. Laws 1962, Ch. 575 was enacted to implement the 1960 Amendment to § 244 by inserting a good moral character requirement. Another bill required publication of the names of applicants and allowed members of the public thereafter to challenge such applicants. Miss.Laws 1962, Ch. 572.

---

103. This has been done at least twice by the Fifth Circuit. Alabama v. United States, 5 Cir., 1962, 304 F.2d 583, at 584, 594, aff'd mem., 1963, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112. And see paragraph 2a the unpublished contempt order in the Lynd case, certiorari denied, 1964, 375 U.S. 968, 84 S.Ct. 486, 11 L.Ed.2d 416; 5 Cir., 1963, 321 F.2d 26.

104. Whether it will be able to establish all or any portion of the supporting facts either as a matter of fact-finding or as a matter of law, either in advance of, or after, trial (see Carss v. Outboard Marine Corp., 5 Cir., 1958, 252 F.2d 690;

## V.

### No Legal Obstacle to Relief

When the true nature of the Government's theory is kept in mind, none of the legal arguments advanced by the majority serves as a stumbling block.

If from evidentiary materials, the Government establishes[104] that the disparity is the result of a structure instituted or thereafter maintained for the purpose of denying the Negroes' right to vote, then each and every statutory-constitutional element helpful to the operation of the illegal machine must fall.

Apparent validity on the *face* of such enactments will be of no significance. Gomillion v. Lightfoot, 1960, 364 U.S., 339, 81 S.Ct. 125, 5 L.Ed.2d 110; and see Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Lane v. Wilson, 1938, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281. Hence cases such as Williams v. Mississippi, 1898, 170 U. S. 213, 18 S.Ct. 583, 42 L.Ed. 1012, and Darby v. Daniel, S.D.Miss., 1958, 168 F. Supp. 170 which the majority (see Part XII) stresses as a holding "on the face" are of little consequence as precedents or for persuasiveness.

The extended preoccupation of the majority (see Part X) with the thesis that voter qualification is exclusively committed to the states is neither accurate nor significant. All bends to the Federal Constitution.[105]

Nor could the elusive, undefinable "good moral character" test (see Part

---

Camilla Cotton Oil Co. v. Spencer Kellogg and Sons, 5 Cir., 1958, 257 F.2d 162; Smoot v. State Farm Mutual Automobile Ins. Co., 5 Cir., 1962, 299 F.2d 525), I do not know. That question is not before me or the Court since the Government has not yet filed any motion for affirmative relief at this stage, either for summary judgment or otherwise. I intimate no judgment on these factual matters.

105. See Judge Wisdom's detailed analysis of this shibboleth in United States v. State of Louisiana, D.C.La. (3-Judge), 1963, 225 F.Supp. 353, 358.

**998**

XIII) be employed.as an intended or effective instrument of discrimination, no matter how well established it may be as a statutory requirement for professional or business permits. Standards of this kind, otherwise unobjectionable and often praiseworthy, must not be available to shield purposeful discrimination or conceal its exercise. The Fifth Circuit, for example, held a similar requirement for alumni recommendation unconstitutional since no Negro could hope to get such assistance from Mississippi white persons. Meredith v. Fair, 5 Cir., 1962, 298 F.2d 696, 701–702; and see also Ludley v. Board of Supervisors of Louisiana State University, E.D.La., 150 F.Supp. 900, aff'd, 5 Cir., 252 F.2d 372, cert. denied, 1958, 358 U.S. 819, 79 S.Ct. 31, 3 L.Ed.2d 61. And certainly a close look must be given to a test when the whole public—from the publication of the applicant's name—is invited to challenge the "good moral" character of a Negro. If First Amendment rights of freedom of association and expression are protected against such publicity (see note 28, supra), then surely Fifteenth Amendment rights are just as deserving.

Finally, nothing in Lassiter v. Northampton County Board of Elections, 1959, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072, affords any basis for supposing that either a literacy test or an understanding test is free from attack when purposefully chosen to *deny*, not grant, voter privileges.

Discrimination against Negroes, on the Government's theory, has not resulted from discriminatory administration of valid laws. It has happened because it was meant to happen. To eradicate this evil, the attack need not be made piece by piece. It may be made by a frontal assault on the whole structure. What the Government is saying is that Mississippi knows that this was the purpose, and now all it wants is for the Court to see what "[a]ll others can see and understand," [106]

since there "is no reason why [courts] should pretend to be more ignorant or unobserving than the rest of mankind." [107]

I therefore respectfully dissent.

---

106. Chief Justice Taft in Bailey v. Drexel Furniture Co., 1922, 259 U.S. 20, 37, 42 S.Ct. 449, 66 L.Ed. 817.

107. Affiliated Enterprises v. Waller, 1 Terry 28, 40 Del. 28, 5 A.2d 257, 261.